# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JESSICA WALTON,

      Plaintiff,

vs.                                                                           No. CIV 21-0466 JB/GJF

LEA COUNTY DETENTION CENTER;
RUBEN QUINTANA, in his official capacity;
JOHN DOE 1, as Lea Detention Warden (prior
to Ruben Quintana); KRISTIE S. PARISH, Lea
County Detention Center Employee in Records
Department; NEW MEXICO DEPARTMENT
OF CORRECTIONS; ADULT PROBATION
AND PAROLE, and DENICE GALLEGOS,
f.k.a. DENICE CERNA, in her official capacity,

      Defendants.

## **MEMORANDUM OPINION AND AMENDED ORDER[1]**

---

[1]This Memorandum Opinion and Amended Order addresses two orders that the Court has entered in this case.  On November 14, 2022, the Court entered an Order, filed November 14, 2022 (Doc. 80)("MSJ Order"), in which the Court disposed of: (i) Defendant John "Doe 3"'s Renewed Motion to Dismiss Plaintiff's Claims for Insufficient Service of Process and Lack of Personal Jurisdiction, filed March 28, 2022 (Doc. 40); (ii) Defendant "John Doe 3"'s Motion to Strike Plaintiff's Amended Complaint, filed May 6, 2022 (Doc. 49); (iii) Defendant "John Doe 3"'s Motion for Support Judgment and Memorandum in Support, filed June 27, 2022 (Doc. 55); (iv) Defendant Ruben Quintana's Motion for Summary Judgment Based Upon Qualified Immunity and Failure to State a Claim, filed March 22, 2022 (Doc. 39); (v) Defendant Kristie Parish's Motion for Summary Judgment Based Upon Qualified Immunity and Failure to State a Claim, filed July 1, 2022 (Doc. 57); and (vi) Lea County Detention Center's Motion for Summary Judgment, filed July 1, 2022 (Doc. 58).  See MSJ Order at 19-20.  On May 18, 2023, the Court entered an order granting Defendant Denice Cerna Gallegos's Motion for Summary Judgment and Memorandum in Support, filed December 28, 2022 (Doc. 84)("Cerna Gallegos MSJ").  See Order on Defendant Denice Cerna Gallego's [sic] Motion for Summary Judgment, filed May 18, 2023 (Doc. 86)("Cerna Gallegos Order").  In the MSJ Order and in the Cerna Gallegos Order, the Court stated that it would "issue . . . a Memorandum Opinion at a later date more fully detailing its rationale for this decision."  MSJ Order at 1 n.1.  See Cerna Gallegos Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

**THIS MATTER** comes before the Court on: (i)  Defendant Ruben Quintana's Motion for Summary Judgment Based Upon Qualified Immunity and Failure to State a Claim, filed March 22, 2022 (Doc. 39)("Quintana MSJ"); (ii) Defendant "John Doe 3"'s Motion for Summary Judgment and Memorandum in Support, filed June 27, 2022 (Doc. 55)("Doe 3 MSJ"); (iii) Defendant Kristie Parish's Motion For Summary Judgment Based Upon Qualified Immunity and Failure to State a Claim, filed July 1, 2022 (Doc. 57)("Parrish MSJ"); (iv) Lea County Detention Center's Motion for Summary Judgment, filed July 1, 2022 (Doc. 58)("Lea Detention MSJ"); and (v) Defendant Denice Cerna Gallegos's Motion for Summary Judgment and Memorandum in Support, filed December 28, 2022 (Doc. 84)("Cerna Gallegos MSJ").  The Court held a hearing on August 11, 2022.  See Clerk's Minutes, filed August 11, 2022 (Doc. 75).   The primary issues are: (i)  whether the Court possesses personal jurisdiction over Defendant Denice Cerna Gallegos;[2] (ii) whether the statute of limitations applicable to Walton's 42 U.S.C. § 1983 claims bars those claims; (iii) whether Doe 3 and Defendants Ruben Quintana, Kristie S. Parish, Lea County Detention Center ("Lea Detention"), and Cerna Gallegos are entitled to summary judgment on Walton's claim that their conduct violated the Ex Post Facto Clause of Article I, Section Nine of the Constitution of the United States of America; (iv) whether the Defendants are entitled to summary judgment on Walton's claims under the Fourth Amendment to the Constitution; (v) whether the Defendants are entitled to summary judgment on Walton's claims under the Due Process Clause of the Fourteenth Amendment to the Constitution; (vi) whether the

---

[2]The parties refer to Defendant Cerna Gallegos -- whose last name changed during the course of the events at issue -- variously as "Denice Cerna", "Denice Gallegos", and "Denice Cerna Gallegos."  The Court adopts the naming convention "Cerna Gallegos," because the Cerna Gallegos MSJ is the last filing that Cerna Gallegos made on her own behalf, and she refers to herself as "Denice Cerna Gallegos."  See Cerna Gallegos MSJ at 1.

Defendants are entitled to summary judgment on Walton's claims under the Eighth Amendment to the Constitution; (vii) whether absolute judicial immunity bars any § 1983 suit challenging the Defendants' preparation of an allegedly erroneous sentencing recommendation in a criminal case in which Walton was sentenced; and (viii) whether Lea Detention is entitled to summary judgment on Walton's claims for municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978)("Monell"), against Lea Detention.  The Court concludes as follows: (i) the Court possesses personal jurisdiction over Cerna Gallegos, because she waived her argument that the Court lacks jurisdiction over her; (ii) the statute of limitations does not bar Walton's § 1983 suit, because the Heck v. Humphry, 512 U.S. 477 (1994)("Heck"), delayed-accrual rule applies to her claim, satisfying the statute of limitations; (iii) the Court grants summary judgment for the Defendants on Walton's Ex Post Facto claim, because she identifies no penal law applied retroactively to her conduct; (iv) the Court grants summary judgment for the Defendants on Walton's Fourth Amendment claim, because her allegedly unlawful detention occurred after the institution of legal process against her, so her claim does not sound under the Fourth Amendment; (v) the Court grants summary judgment for the Defendants on Walton's Due Process claims, because she was not, as she alleges, over-detained, and because she does not demonstrate a mens rea beyond negligence; (vi) the Court grants summary judgment for the Defendants on Walton's Eighth Amendment claims, because Walton does not establish that the Defendants subjected her to cruel-and-unusual punishment; (vii) absolute judicial immunity would bar any claim Walton might assert against the sentence recommendation's preparation; and (viii) Lea Detention is entitled to summary judgment on Walton's Monell claims against it, because Walton does not establish that she cannot satisfy the elements for a Monell claim.  Accordingly, the Court grants

the Quintana MSJ, grants the Doe 3 MSJ, grants the Parish MSJ, grants the Lea Detention MSJ, and grants the Cerna Gallegos MSJ.[3]

## FACTUAL BACKGROUND FOR THE MOTION TO DISMISS

The Court here presents factual background for the MTD's disposition.  For this purpose, the Court draws its facts from the Plaintiff's First Amended Complaint for Violation of Civil Rights and False Imprisonment ¶ 5, at 2, filed April 22, 2022 (Doc. 43)("FAC"), because courts assessing motions to dismiss must take a complaint's facts as true, see See Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007)("[Federal courts] must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff.").  The MTD's facts and the summary judgment motions' facts are the same, except for the mens rea that Walton's FAC ascribes to the Defendants; the Court, in this fact section, assumes to be true the FAC's descriptions of the Defendants' mental states.

In 2013, Walton spent 101 days in jail at Lea Detention on forgery charges under a prosecution brought in the Magistrate Court, case number M-26-FR-2013-00141.  See FAC ¶ 16, at 3.  The Magistrate Court released Walton on bond after 101 days in custody, and bounded over Walton's case to the District Court, where it was assigned case number D-506-CR-2013-00366. See FAC ¶ 16, at 3-4.

Walton spent an additional 160 days in jail after the case was assigned a District Court number, before the District Court sentenced her, pursuant to a plea agreement, on May 27, 2016.

---

[3]Walton's FAC names as Defendants Adult Probation and Parole ("APP") and the New Mexico Corrections Department ("NMCD"), which have not yet moved to dismiss the claims against them or for summary judgment; nevertheless, because APP and NMCD have not been served or otherwise made appearances in the case, the Court will dismiss them from the case. Thereby disposing of all claims and parties in the case with prejudice, the Court will enter a separate Final Judgment closing the case.

<u>See</u> FAC ¶¶ 14, 16, at 3-4.  The District Court sentenced Walton to eighteen months of supervised probation, based on information in the sentencing recommendation.  <u>See</u> FAC ¶¶ 14-18, at 3-4.  Parish, the records custodian for Lea Detention, is responsible for keeping track of the amount of time detainees like Walton have served in Lea Detention's custody, and Parish was responsible for calculating the amount of time-served that detainees should be credited at sentencing.  <u>See</u> FAC ¶¶ 16-17, at 3-4.[4]  Parish calculated erroneously the amount of time Walton had spent in custody in the case: Parish did not credit Walton for the 101 days jail-time that Walton served while her forgery case was in the Magistrate Court, <u>see</u> FAC ¶ 16, at 3-4; Parish credited Walton only for the 160 days jail time Walton served ahead of her 2016 sentencing, once the case had been assigned a District Court case identifier, <u>see</u> FAC ¶¶ 16-17, at 3-4 .  Walton's probation officer at the time, Cerna Gallegos, created a sentencing recommendation that included a time-served credit amount, which Cerna Gallegos based on erroneous information that Parish supplied.  <u>See</u> FAC ¶ 17, at 4.  The district court credited erroneously Walton only 160 days time-served, and did not account for the 101 days jail time on the magistrate Court case.  <u>See</u> FAC ¶¶ 14-18, at 3-4.  Walton was placed on supervised probation.  <u>See</u> FAC ¶ 14, at 3.

In 2018, Walton's probation was revoked and she was incarcerated at Lea Detention to serve the remainder of her sentence.  <u>See</u> FAC ¶¶ 19-20, at 4.  The sentence was more than three

---

[4]The Court notes that the major difference between the facts section for the MTD and the facts section for the motions for summary judgment concerns this issue, namely, who was responsible for the erroneous time-served calculation that figured in the sentencing recommendation.  For the MTD's facts' purposes, the Court accepts as true Walton's assertion that Parish was culpable for the time-served calculation error.  In the summary judgment facts section, however, the Court determines that it is undisputed that neither Parish nor Cerna Gallegos is responsible for the time-served credit error, because Walton adduces no competent record evidence establishing either Defendant's responsibility for the error.  Nonetheless, for the MTD's purposes, the Court accepts as true the fact in the text.

months longer than it would have been had the time-served credit correctly reflected the 101 magistrate court jail days, and Walton earned an immediate release when her counsel identified to the District Court the erroneous time-served calculation.  See FAC ¶¶ 20-21, at 4.  In 2020, on Walton's motion, the District Court amended its 2016 sentence to correct the amount of time-served credit that it awarded Walton: the District Court credited Walton 265 days time-served, instead of the 160 days time-served that it had initially awarded Walton, and now reflected accurately the other 101 days jail time while the case was in Magistrate Court.  See FAC ¶ 23, at 4.[5]

### FACTUAL BACKGROUND FOR THE MOTIONS FOR SUMMARY JUDGMENT

The Court addresses now the facts pertinent to disposition of the various motions for summary judgment, which, as noted, are the same as those pertinent to the MTD's disposition, except for facts regarding responsibility for supplying Judge Sánchez the erroneous information. The Court draws its facts from the following sources grouped by motion and attendant filings: (i) the Quintana MSJ and related filings, namely Plaintiff's Response to Defendant Ruben Quintana's Motion for Summary Judgment Based Upon Qualified Immunity and Failure to State a Claim, filed April 22, 2022 (Doc. 45)("Walton's Quintana Response"), and Defendant Ruben Quintana, John Doe 1, and Jane Doe 2's Reply to Plaintiff's Response to the Motion for Summary Judgment Based Upon Qualified Immunity and Failure to State a Claim, filed May 6, 2022 (Doc. 50)("Quintana Reply"); (ii) the Doe 3 MSJ and related filings, namely, Plaintiff's Response

---

[5]Walton does not explain why the District Court credited her 265 days time-served credit in its Amended Judgment, or why she asserts that she spent 105 days in jail in excess of the correct duration, given that she identifies the 265-day figure as accounting for the 101 days Magistrate Court jail time, on top of the initial 160 days time-served that the District Court initially awarded her.

to Defendants [sic] John Doe 3 Motion for Summary Judgment, filed July 19, 2022 (Doc. 61)("Walton's Doe 3 Response"), and Defendant "John Doe 3"'s Reply in Support of Motion for Summary Judgment, filed July 27, 2022 (Doc. 66)("Doe 3 Reply"); (iii) the Parish MSJ and related filings, namely, Plaintiff's Response to Defendant Kristie Parish's Motion for Summary Judgment, filed July 20, 2022 (Doc. 62)("Parrish Response"), and Defendant Kristie S. Parish's Reply in Support of Motion for Summary Judgment, filed August 3, 2022 (Doc. 71)("Parrish Reply"); (iv) the Lea Detention MSJ and related filings, namely the Plaintiff's Response to Defendant Lea County Detention Center's Motion for Summary Judgment, filed July 20, 2022 (Doc. 63)("Lea Detention Response"), and Defendant Lea County Detention Center's Reply in Support of Motion for Summary Judgment, filed August 3, 2022 (Doc. 72)("Lea Detention Reply");  and (v) the Cerna Gallegos MSJ.  The Court states the undisputed material facts in the text.  See Fed. R. Civ. P. 56.  The Court specifically notes the facts that are disputed, or purportedly disputed, in the footnotes.

### 1.  Walton Spends 101 Days Incarcerated on Felony Charges in State Magistrate Court Before the Case is Bounded Over to State District Court.

On April 9, 2013, while Walton was jailed at Lea County Detention Center, on a set of State charges,[6] law enforcement officers executed an arrest warrant on her arising from a different set of State criminal charges, for forgery, in New Mexico Magistrate Court case number M-26-FR-2013-00141 (the "Magistrate Case" or "Case No. 00141").  See Walton's Quintana Response ¶ 4,

---

[6]No party has proffered facts for what charges Walton was in jail at the time law enforcement officers served her the arrest warrant on Case No. 00141 for the State forgery charges. Cf. Walton's Quintana Response ¶ 4, at 3 (not explaining why Walton was in jail on April 9, 2013); Walton's Doe 3 Response ¶ 4, at 3 (same); Walton's Parish Response ¶ 4, at 3 (same); Walton's Lea Detention Response ¶ 4, at 3 (same).

at 3 (asserting this fact); Walton's Doe 3 Response ¶ 4, at 3 (asserting this fact); Walton's Parish

Response ¶ 4, at 3 (asserting this fact); Lea Detention Response ¶ 4, at 3 (asserting this fact);

Quintana Reply ¶ 4, at 3 (admitting this fact); Parish Reply ¶ 4, at 2 (admitting this fact); Lea

Detention Reply ¶ 4, at 2 (admitting this fact).[7]   The bond as to Walton's arrest permitted Walton's

release if she could post a $2,500.00 bond.  See Walton's Quintana Response ¶¶ 4-5, at 2 (asserting

this fact)(citing Warrant for Arrest, State v. Walton, No. M-26-2013-00141 (N.M. Magis. Ct. April

9, 2013), filed as Exhibit 4 at Walton's Quintana Response at 26 ("Magistrate Arrest Warrant"))[8];

Walton's Doe 3 Response ¶ 5, at 3 (citing Release Order and Bond at 1, State v. Walton, No. M-

26-FR-2013-00141 (N.M. Magis. Ct. April 9, 2013), filed as Exhibit 4 at Walton's Doe 3 Response

at 15 ("April 9 Release Order and Bond")[9]); Walton's Parish Response ¶ 4-5, at 3 (citing April 9

Release Order and Bond); Walton's Lea Detention Response ¶ 4-5, at 3 (citing April 9 Release

Order and Bond); Quintana Reply ¶¶ 4-5, at 3 (admitting this fact); Doe 3 Reply ¶ 5, at 3 (admitting

this fact); Parish Reply ¶¶ 4-5, at 2 (admitting this fact); Lea Detention Reply ¶¶ 4-5, at 2

---

[7]Defendants Quintana, Parish and Lea Detention admit this fact, but assert that it is not relevant to disposition of the motions before the Court.  See Quintana Reply ¶ 4, at 3; Parish Reply ¶ 4, at 2; Lea Detention Reply ¶ 4, at 2.  An assertion of immateriality does not dispute a party's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d 920, 924 n.2 (D.N.M. 2014)(Browning, J.)("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Accordingly, the Court deems the fact in the text undisputed.

[8]The Warrant for Arrest is not included as a separate filing on PACER, but rather as a page toward the end of Walton's Quintana Response.

[9]The April 9, 2013, Release Order and Bond is not included as a separate filing on PACER, but rather as a page toward the end of Walton's Doe 3 Response.

(admitting this fact).[10]  Because Walton did not have the $2,500.00 to post bond, she remained in

jail for 101 days between April 9, 2013, when officers executed the warrant on her, and July 18,

2013, when Walton was released and the case was bounded over to the district court from the

magistrate court.  See Walton's Quintana Response ¶¶ 6-7, at 2 (asserting this fact)(citing April 9

Release Order and Bond; Release Order and Bond at 1, State v. Walton, No. M-26-FR-2013-00141

(N.M. Magis. Ct. July 18, 2013), filed as Exhibit 6 at Walton's Quintana Response at 28 ("July 18

Release Order and Bond")[11]); Walton's Doe 3 Response ¶¶ 6-7, at 3-4 (asserting this fact)(citing

Bind-Over Order, State v. Walton, No. M-26-FR-2013-00141 (N.M. Magis. Ct. July 24, 2013),

filed as Exhibit 5 at Walton's Doe 3 Response at 17 ("Bind-Over Order");[12] July 18 Release Order

and Bond)); Walton's Parish Response ¶ 6-7 (asserting this fact)(citing Bind-Over Order; July 18

Release Order and Bond); Walton's Lea Detention Response ¶¶ 6-7 (asserting this fact)(citing

Bind-Over Order; July 18 Release Order and Bond); Quintana Reply ¶¶ 6-7 (admitting this fact);

---

[10]Defendants Quintana, Parish, and Lea Detention admit the fact as undisputed, but assert that this fact is irrelevant to the disposition of the Motion.  See Quintana Reply ¶¶ 4-5, at 3 (containing identical language that the fact "lacks relevancy to the Motion at hand because neither Warden Quintana nor any other Lea detention employee received an Order Amending Ms. Walton's sentence as a result of this information"); Quintana Reply ¶¶ 4-5, at 3 (same proposition); Quintana Reply ¶¶ 4-5, at 3 (same proposition).  An assertion of immateriality or irrelevance does not dispute a party's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Accordingly, the Court deems the fact in the text undisputed.

[11]The July 18, 2013, Release Order and Bond is not included as a separate filing on PACER, but rather as a page toward the end of Walton's Quintana Response.

[12]The Bind-Over Order is not included as a separate filing on PACER, but rather as a page toward the end of Walton's Doe 3 Response

Doe 3 Reply ¶ 7, at 3 (admitting this fact); Parish Reply ¶¶ 6-7, at 2-3 (admitting this fact); Lea

Detention Reply ¶¶ 6-7, at 2 (admitting this fact).[13]

   An arraignment on the district court case as to the binding-over from magistrate court was

set for August 5, 2013, but Walton did not appear for the arraignment and a bench warrant was

issued for Walton's arrest.  See Walton's Quintana Response ¶ 9, at 3 (asserting this fact)(citing

Court Proceedings at 1, State v. Walton, D-506-CR-2013-00366 (N.M. Dist. Ct. August 5,

2013)("August 5 Court Proceedings"), filed as Exhibit 7 to Plaintiff's Response to Defendant

Ruben Quintana's Motion for Summary Judgment Based Upon Qualified Immunity and Failure to

State a Claim at 29, filed April 22, 2022 (Doc. 45));[14] Walton's Doe 3 Response ¶¶ 7-9, at 3-4

(asserting this fact)(citing August 5 Court Proceedings; Bench Warrant (dated August 15, 2013),

---

   [13]Defendants Quintana, Parish, and Lea Detention admit this fact but dispute its relevance
and materiality.  See Quintana Reply ¶¶ 6-7, at 3 (containing identical language that the fact "lacks
relevancy to the Motion at hand because neither Warden Quintana nor any other Lea Detention
employee received an Order Amending Ms. Walton's sentence as a result of this information");
Parish Reply ¶¶ 6-7, at 2-3 (same proposition); Lea Detention Reply ¶¶ 6-7, at 2 (same).  An
assertion of immateriality or irrelevance does not dispute a party's asserted fact.  If necessary, the
Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual
Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting
to an asserted fact as immaterial in response to an asserted fact effectively deems the fact
undisputed.").  Doe 3 disputes Walton's Doe 3 Response ¶ 6 proffered fact, i.e., that Walton "was
not able to post bond and remained incarcerated until July 18, 2013."  Walton's Doe 3 Response
¶ 6, at 3.  See Doe 3 Reply ¶ 6, at 3 ("Plaintiff's sixth alleged material fact is not supported by any
evidence whatsoever and this Defendant lacks sufficient knowledge and information to
independently determine the veracity of the allegation, and therefore, disputes both it and its
alleged materiality.").  To the extent that no other party disputes this fact, only its materiality, the
Court will, for purposes of this Memorandum Opinion, deem the fact undisputed and provides it
at least for background.

   [14]Walton adduces this document as an exhibit in several of her filings, including it as a page
within the overall motion filing.  The Court introduces a full citation here for the document, which
serves as a short-cite for the Court's subsequent citations thereto. \

Walton's Doe 3 Response ¶ 9, at 21); Walton's Parish Response ¶¶ 8-9, at 3 (asserting this fact)(citing August 5 Court Proceedings; Bench Warrant at 1, State v. Walton, D-506-CR-2013-00366 (N.M. Dist. Ct. Dec. 14 2015), filed as Exhibit 8 to Walton's Parish Response at 21 ("Dec. 14 Bench Warrant")[15]); Walton's Lea Detention Response ¶¶ 8-9, at 3 (asserting this fact)(citing August 5 Court Proceedings; Dec. 14 Bench Warrant); Quintana Reply ¶ 9, at 4 (admitting this fact); Doe 3 ¶¶ 7-9, at 3 (admitting this fact); Parish Reply ¶¶ 8-9, at 3 (admitting this fact); Lea Detention Reply ¶¶ 8-9, at 3 (admitting this fact).[16]

Two years later, on December 11, 2015, Walton was arrested on the failure-to-appear bench warrant.  See Walton's Quintana Response ¶ 2(b), at 2 (asserting this fact); Walton's Doe 3 Response ¶ 2(b), at 3 (asserting this fact); Walton's Parish Response ¶ 2(b), at 3 (asserting this fact); Walton's Lea Detention Response ¶ 2(b), at 3 (asserting this fact); Doe 3 Reply ¶ 2, at 2 (admitting this fact); Parish Reply ¶ 2, at 2 (admitting this fact); Lea Detention Reply ¶ 2, at 2 (admitting this fact).  See also Dec. 14 Bench Warrant (stating that Walton was arrested on December 11, 2015).[17]

---

[15]The Dec. 14 Bench Warrant is not included as a separate filing on PACER, but rather as a page toward the end of Walton's Parish Response.

[16] Quintana, Parish and Lea Detention admit this fact but dispute its relevance and materiality.  See Quintana Reply ¶ 9, at 4 ("[T]he cited attachment and the information contained within the Additional Undisputed Fact lacks relevancy to the Motion at hand because neither Warden Quintana nor any other Lea Detention employee received an Order Amending Ms. Walton's sentence as a result of this information."); Parish Reply ¶¶ 8-9, at 3 (same proposition); Lea Detention Reply ¶ 8-9, at 3 (same proposition).  An assertion of immateriality or irrelevance does not dispute a party's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Accordingly, the Court deems the fact in the text undisputed.

At this time, the case was bounded formally over to the district court from the magistrate court when Walton was arraigned in the district court on January 11, 2016, and the case was assigned a district court case number, D-506-CR-2013-00366 (the "District Court Case" or "Case No. 00366"). Walton's Quintana Response ¶¶ 8-9, at 2-3 (asserting this fact)(citing August 5 Court Proceedings); Court Proceedings at 1, State v. Walton, No. D-506-CR-2013-00366 (N.M. Dist. Ct. January 11, 2016), filed as Exhibit 8 at Walton's Quintana Response at 31 ("January 11 Proceedings")); Quintana Reply ¶¶ 8-9, at 3-4 (admitting this fact); Walton's Doe 3 Response ¶¶ 7-9, at 3-4 (asserting this fact)(citing Bind-Over Order); Doe 3 Reply ¶¶ 7-9, at 3 (admitting this fact); Walton's Parish Response ¶¶ 7-9, at 3 (asserting this fact)(citing Bind-Over Order); Parish Reply ¶¶ 7-9, at 2-3 (admitting this fact); Walton's Lea Detention Response ¶¶ 7-9, at 3 (asserting this fact)(citing Bind-Over Order); Lea Detention Reply ¶¶ 7-9, at 2-3 (admitting this fact).[18]  A

---

[17]The Quintana Reply does not address explicitly the proposition in that a "Bench Warrant [was] served on Ms. Walton on December 11, 2015." Walton's Quintana Response ¶ 2(b), at 2. The Quintana Reply instead disputes other parts of the assertion in Walton's Quintana Response ¶ 2, at 1-2. See Quintana Reply ¶ 2 ("Pursuant to the April 9, 2010, Order . . . Plaintiff Walton received 'a total confinement credit of two-hundred and seventy-two (272) days as set forth in the Confinement Credit Attachment.' As such, Warden Quintana disputes Plaintiff's statement 'at the time of the guilty plea, Ms. Walton was given credit for 160 days of pre-sentence confinement.'"). The Court deems undisputed, however, that Walton was arrested on the bench warrant on December 11, 2015, because the parties have introduced evidence that unambiguously states that this arrest occurred.

[18] Quintana, Parish, and Lea Detention admit this fact, but dispute its relevance and materiality. See Quintana Reply ¶¶ 8-9, at 3-4 ("[T]he cited attachment and the information contained within the Additional Undisputed Fact lacks relevancy to the Motion at hand because neither Warden Quintana nor any other Lea Detention employee received an Order Amending Ms. Walton's sentence as a result of this information."); Parish Reply ¶¶ 7-9, at 2-3 (same proposition); Lea Detention Reply ¶¶ 7-9, at 2-3 (same proposition).  An assertion of immateriality or irrelevance does not dispute a party's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section. See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed."). Accordingly, the Court deems the fact in the text undisputed.

hearing on the failure-to-appear warrant occurred on February 24, 2016.  See Walton's Quintana Response ¶ 2(c), at 2 (asserting this fact);[19] Walton's Doe 3 Response ¶ 2(c), at 3 (asserting this fact); Doe 3 Reply ¶ 3, 2 (admitting this fact); Walton's Parish Response ¶ 2(c), at 3 (asserting this fact); Parish Reply ¶ 2 (admitting this fact); Walton's Lea Detention Response ¶ 2(c) (asserting this fact); Lea Detention Reply ¶ 2 (admitting this fact).  Upon the case's being bound over to district court, Walton served 160 days in jail between her arrest on December 11, 2015, and May 24, 2016, at which time she was released, ahead of sentencing in the underlying forgery case, Case No. 00366.  See Walton's Quintana Response ¶ 2(a)-(d), at 1-2 (asserting this fact)(citing Order Revoking Probation and Commitment to the Lea County Detention Center at 1, filed March 22, 2022 (Doc. 39-2)("Revocation Order"));[20] Walton's Doe 3 Response ¶ 2(a)-(d), at 3 (asserting this fact)(citing Confinement Credit Attachment);[21] Doe 3 Reply ¶ 2, at 2 (admitting this fact);

---

[19]The Quintana Reply does not address this factual proposition, but disputes only the facts that a different subparagraph of Walton's Quintana Response ¶ 2 offers.  See Quintana Reply ¶ 2, at 2 ("Warden Quintana disputes Plaintiff's statement 'at the time of the guilty plea, Ms. Walton was given credit for 160 days of pre-sentence confinement.'" (quoting Walton's Quintana Response ¶ 2)).  Accordingly, the Court deems undisputed that a hearing on the failure-to-appear occurred on February 24, 2016.  See D.N.M. LCvR 56.1(b) ("The response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. . . . All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[20]The Quintana Reply does not address this factual proposition, instead disputing only the facts that a different subparagraph of Walton's Quintana Response ¶ 2 offers.  See Quintana Reply ¶ 2, at 2 ("Warden Quintana disputes Plaintiff's statement 'at the time of the guilty plea, Ms. Walton was given credit for 160 days of pre-sentence confinement.'" (quoting Walton's Quintana Response ¶ 2).  Accordingly, the Court deems undisputed that a hearing on the failure-to-appear occurred on February 24, 2016.

[21]The Confinement Credit Attachment appears at page four of the Order Revoking Probation and Commitment to the Lea County Detention Center, filed March 22, 2022 (Doc. 39-2)("Revocation Order"), but the parties often cite to it as its own document, so the Court will refer to it as the Confinement Credit Attachment.

Walton's Parish Response ¶ 2(a)-(d), at 2-3 (asserting this fact)(citing Confinement Credit Attachment); Parish Reply ¶ 2, at 2 (admitting this fact);  Walton's Lea Detention Response ¶ 2(a)-(d), at 3 (asserting this fact)(citing Confinement Credit Attachment); Lea Detention Reply ¶ 2, at 2 (admitting this fact).

2.    **The State District Court Sentences Walton in 2016 but Does Not Credit Her for the 101 Days' Walton was Incarcerated while Her Case Was in Magistrate Court.**

On May 27, 2016, the Honorable Mark Terrence Sánchez, District Judge for the Fifth Judicial District Court, State of New Mexico, sentenced Walton in Case No. 00366.  See Quintana MSJ ¶ 1, at 3 (asserting this fact)(citing Judgment & Sentence, filed March 22, 2022 (Doc. 39-1)("Judgment")); Walton's Quintana Response ¶ 1, at 1 (asserting this fact)(citing Judgment);  Doe 3 MSJ ¶ 1, at 2 (asserting this fact); Walton's Doe 3 Response at 4 (admitting this fact); Parish MSJ ¶ 1, at 3 (asserting this fact)(citing Judgment); Walton's Parish Response ¶ 1, at 4 (admitting this fact); Cerna Gallegos MSJ ¶¶ 1-2, at 2 (asserting this fact)(citing FAC ¶ 14, at 3; Judgment). Judge Sánchez sentenced Walton to eighteen months incarceration, suspended in favor of probation, and credited Walton with 160 days time-served.  See Quintana MSJ ¶ 1, at 3 (asserting this fact)(citing Judgment);  Walton's Quintana Response ¶¶ 1-2, at 1-2 (citing Judgment; Revocation Order);[22]  Doe 3 MSJ ¶¶ 1-2, at 2 (asserting this fact)(citing Complaint ¶ 12, at 3;

---

[22]Although the Quintana MSJ asserts this factual proposition, the Quintana Reply purports to dispute the same fact.  The Quintana Reply, replying to Walton's Quintana Response's exposition of the time-served calculation in the 2016 Judgment, asserts the following:

Pursuant to the April 9, 2010, Order . . . Plaintiff Walton received "a total confinement credit of two-hundred and seventy-two (272) days as set forth in the Confinement Credit Attachment." As such, Warden Quintana disputes Plaintiff's statement "at the time of the guilty plea, Ms. Walton was given credit for 160 days of pre-sentence confinement."

Judgment); Walton's Doe 3 Response at 4 (admitting this fact); Parish MSJ ¶ 1, at 3 (asserting this fact)(citing Judgment); Walton's Parish Response at 4 (admitting this fact); Lea Detention MSJ ¶ 1, at 3 (asserting this fact)(citing Judgment); Walton's Lea Detention Response at 4 (admitting this fact); Cerna Gallegos MSJ ¶ 2, AT 2 asserting this fact).  The 160-day time-served credit in Judge Sánchez' sentence does not reflect the 101 days' incarceration in 2013 before the case's bounding over to district court, and instead reflects only the 160 days between December 11, 2015, and May 24, 2016.  See Walton's Quintana Response ¶¶ 1-2, 10, at 1-3 (asserting this fact)(citing Judgment; Revocation Order; Amended Judgment and Order Partially Suspending Sentence, State v. Walton, No. D-506-CR-2013-00366 (N.M. Dist. Ct January 21, 2020), filed July 27, 2022 (Doc. 55-6)("Amended Judgment")).[23]    A  probation  officer's  sentencing  recommendation

---

Quintana Reply ¶ 2, at 2 (quoting Walton's Quintana Response ¶ 2, at 2).  The Court deems undisputed that Walton's 2016 sentence credited her 160 days of time-served credit.  The Quintana MSJ asserts that the 2016 Judgment credited Walton 160 days' time-served credit.  See Quintana MSJ ¶ 1, at 3.  The Quintana Reply, however, misreads the time stamp on the Revocation Order. The Court understands that document to be time-stamped "2018 APR-9", not "2010 APR-9," although the "8" in "2018" looks somewhat like a "0".  Accordingly, there is no "April 9, 2010" order, as the Quintana Reply maintains.  See Quintana Reply ¶ 2, at 2.  Indeed, the present case did not arise until 2013, when the underlying offense occurred, see Judgment at 1 (stating that Walton's "Date of Offense" is "March 01, 2013"); there is no genuine factual dispute that Walton pled guilty to the underlying forgery and was sentenced in 2016, a fact to which the Judgment, which Quintana supplies in his MSJ, attests.  See Quintana MSJ ¶ 1, at 1.  That 2016 Judgment provides that Walton will receive 160 days of time-served credit.  See Judgment at 1 ("The defendant is sentenced to: . . . Confinement: Serve at New Mexico Department of Corrections for 18 Month(s); all suspended. followed [sic] by 1 Year(s) parole; . . . Supervised probation for 18 Month(s) with the Adult Probation & Parole; Probation totaling 1 Year(s) 23 Day(s) with 160 Day(s) of Credit for time served.").  Accordingly, the Court deems it undisputed that Walton's 2016 sentence for the underlying forgery offense credited her 160 days of time-served credit.

[23]The Quintana Reply purports to dispute this fact, see Quintana Reply ¶ 2, at 2 ("Warden Quintana disputes Plaintiff's statement 'at the time of the guilty plea, Ms. Walton was given credit for 160 days of pre-sentence confinement.'" (quoting Walton's Quintana Response ¶ 2)), but, for the reasons discussed above, see n.22 supra, the Court deems this fact undisputed.

informed Walton's sentence and incorporated the 160 day time-served credit figure, a figure which, mistakenly but not knowingly or maliciously, failed to take into account the 101 days Walton was incarcerated under the Magistrate Court case.[24]

After Judge Sánchez sentenced Walton to eighteen-months imprisonment, suspended in favor of probation, Walton was placed on probation.  See Walton's Quintana Response ¶ 2, at 1-2 (asserting this fact)(citing Judgment & Sentence; Revocation Order); Quintana Reply ¶ 2, at 5

---

[24]The Court deems undisputed the above-the-line factual proposition.  Although Walton disputes that whoever prepared the sentencing recommendation knew or intended that it included an erroneous time-served credit, the Court concludes that it is undisputed that the incorrect figure was only a mistake, because Walton offers no competent evidence about a knowing or malicious mens rea. Doe 3/Cerna Gallegos asserts that she incorporated into the sentencing recommendation time-served figures that Parish calculated erroneously and supplied to her.  See Doe 3 MSJ ¶¶ 3-6, at 3 ("According to Plaintiff, 'Jane Doe 2' miscalculated the amount of presentence credit to which Plaintiff was entitled . . . 'John Doe 3' is alleged to have incorporated Jane Doe 2's erroneous calculation into a sentencing recommendation. . . . Plaintiff does not allege and there is any evidence to suggest that 'John Doe 3' knew that Jane Doe 2's presentence credit calculations were erroneous.").  Parish asserts that she had no knowledge of what time-served credit Walton was owed, and she does not assert she had any role in the report's preparation.  See Parish MSJ ¶¶ 4-5, at 4 ("After receiving the District Court's Order Revoking Probation and the Confinement Credit Attachment, Lea County Detention Center ('LCDC') created a Time Served Worksheet . . . Neither LCDC nor any LCDC employee were provided additional documents relating to Plaintiff's sentence.").  Walton disputes these claims only with her own speculative testimony.  See Walton's Doe 3 Response at 4 ("Plaintiff does not know who did which calculation. . . . Plaintiff asserts that she does not know the relationship between Jane Doe 3 and Jane Doe 4 and how they work together."); Oral Deposition of Jessica Walton Williams at 44:2-45:16, at 7-8, filed June 27, 2022 (Doc. 55-2)("Walton Depo.")("Q. [A]s far as you know, at that time, Ms. Cerna simply accepted and relied upon the information Ms. Parish had given her and assumed that it was correct. Right? . . . A. Right."); Affidavit of Jessica Walton ¶¶ 2-4, at 1, at Walton's Doe 3 Response at 26 ("Walton Aff.")("I am unaware of who actually calculated the incorrect presentence confinement. . . . I have no personal knowledge of how the presentence confinement time was calculated."); Walton's Parish Response at 4 ("Defendant Parish who was the keeper of all records of all inmates, Ms. Walton included. There was no document the Ms. Walton was in possession of concerning her confinement that Ms. Parish did not have or create for the Court to incorporate into their order.").  The Court deems undisputed that the 160-day time-served figure was neither knowingly nor maliciously provided.  Walton offers no evidence besides her own speculative testimony that the person who supplied that figure knew it was incorrect.  The Court, therefore, deems undisputed that whoever supplied the figure did not know it was incorrect and did not include it maliciously for that reason.

(admitting this fact); Walton's Doe 3 Response ¶ 5, at 5 (asserting this fact); Doe 3 Reply ¶ 5, at 4 (admitting this fact);  Walton's Parish Response ¶ 5, at 5 (asserting this fact); Parish Reply ¶ 5, at 4 (admitting this fact); Walton's Lea Detention Response ¶ 5, at 5 (asserting this fact); Lea Detention Reply ¶ 5, at 4 (admitting this fact); Cerna Gallegos MSJ ¶ 6, at 3 (asserting this fact).[25]

3.    **Walton Violates Her Probation, the State Revokes Her Probation, and She is Incarcerated**.

Walton successfully complied with her probation terms for 237 days, but after Walton violated multiple terms of probation, the State of New Mexico filed a petition to revoke Walton's probation on January 18, 2017.  See Walton's Quintana Response ¶ 3, at 2 (asserting this fact)(citing Revocation Order); Quintana Reply ¶ 3, at 2 (admitting this fact); Doe 3 MSJ ¶ 7, at 3 (asserting this fact)(citing Petition to Revoke Probation, filed June 27, 2022 (Doc. 55-3)("Petition to Revoke"); Walton's Doe 3 Response ¶ 3, at 5 (admitting this fact); Walton's Parish Response ¶ 3, at 2 (asserting this fact)(citing Revocation Order); Parish Reply ¶ 3, at 2 (admitting this fact); Walton's Lea Detention Response ¶ 3, at 2 (asserting this fact)(citing Revocation Order); Lea Detention Reply ¶ 3, at 2 (admitting this fact).  A bench warrant for Walton's arrest was issued, and Walton was arrested on February 6, 2018, and spent thirty-five days in jail, until March 12, 2018, when Walton plead guilty to violating her probation.  See Walton's Quintana Response ¶ 3, at 2 (citing Confinement Credit Attachment); Quintana Reply ¶ 3, at 2 (admitting this fact); Doe 3

---

[25] The Quintana Reply, Parish Reply, and Lea Detention Reply do not address this factual proposition, instead disputing only the facts that a different subparagraph of Walton's Quintana Response ¶ 2 offers.  See Quintana Reply ¶ 2, at 2 ("Warden Quintana disputes Plaintiff's statement 'at the time of the guilty plea, Ms. Walton was given credit for 160 days of pre-sentence confinement.'" (quoting Walton's Quintana Response ¶ 2)); Parish Reply ¶ 2, at 2 (same assertion); Lea Detention Reply ¶ 3, at 2 (same).  Accordingly, the Court deems undisputed that, after sentencing, Walton was placed on probation.

MSJ ¶ 8, at 3 (asserting this fact)(citing Bench Warrant, filed July 27, 2022 (Doc. 55-4)("Bench Warrant")); Walton's Doe 3 Response ¶ 3, at 2 (admitting this fact);  Walton's Parish Response ¶ 3, at 2 (citing Confinement Credit Attachment); Parish Reply ¶ 3, at 2 (admitting this fact); Walton's Lea Detention Response ¶ 3, at 2 (citing Confinement Credit Attachment); Lea Detention Reply ¶ 3, at 2 (admitting this fact); Cerna Gallegos MSJ (asserting this fact).

After Walton admitted on March 12, 2018, to violating her probation conditions, Judge Sánchez on April 9, 2018, revoked Walton's probation and declared she should be incarcerated for what remained of her eighteen-month sentence, less time-served credit.  See Quintana MSJ ¶ 2-3, at 3-4 (asserting this fact)(citing Revocation Order); Walton's Quintana Response ¶ 3, at 2 (admitting this fact); Doe 3 MSJ ¶ 9, at 3 (asserting this fact)(citing Revocation Order);  Walton's Doe 3 Response ¶ 9, at 4 (admitting this fact); Parish MSJ ¶ 2-3, at 3-4 (asserting this fact)(citing Revocation Order); Walton's Parish Response ¶ 3, at 2 (admitting this fact); Lea Detention MSJ ¶ 2-3, at 3-4 (asserting this fact)(citing Revocation Order); Walton's Lea Detention Response ¶ 3, at 2 (admitting this fact); Cerna Gallegos MSJ ¶ 4, at 3 (asserting this fact).  Walton received a total of 272 days of time-served credit toward her eighteen-month incarceration period.  See Quintana MSJ ¶ 2-3, at 3-4 (asserting this fact); Walton's Quintana Response ¶ 3, at 2 (asserting this fact); Doe 3 MSJ ¶ 9, at 4 (asserting this fact)(citing Revocation Order); Walton's Doe 3 Response ¶ 3, at 5 (admitting this fact); Parish MSJ ¶ 2-3, at 3-4 (asserting this fact); Walton's Parish Response ¶ 3, at 2 (asserting this fact); Lea Detention MSJ ¶ 2-3, at 3-4 (asserting this fact); Walton's Lea Detention Response ¶ 3, at 2 (asserting this fact); Cerna Gallegos MSJ ¶ 6, at 3 (asserting this fact).  The 272 days of total confinement credit represented 237 days of probation credit based on the number of days she successfully completed probation between May 27, 2016, and January 18, 2017, and the thirty-five days she was incarcerated between her February 6, 2018,

arrest and her plea to the probation violation on March 12, 2018, less absconder time. <u>See</u> Walton's Quintana Response ¶ 3(a)-(b), at 2 (asserting this fact)(citing Confinement Credit Attachment); Quintana Reply ¶ 3, at 2 (admitting this fact); Doe 3 MSJ ¶ 9 (asserting this fact)(citing Revocation Order); Walton's Doe 3 Response ¶ 9, at 5 (admitting this fact);  Walton's Parish Response ¶ 3(a)-(b), at 2 (asserting this fact)(citing Confinement Credit Attachment; Parish Reply ¶ 3, at 2 (admitting this fact); Walton's Lea Detention Response ¶ 3(a)-(b), at 2 (asserting this fact)(citing Confinement Credit Attachment); Lea Detention Reply ¶ 3, at 2 (admitting this fact); Cerna Gallegos MSJ ¶ 3, at 4 (asserting this fact).  The time-served credit calculation applicable at Walton's probation revocation reflects the earlier 160-day time-served credit calculation, and, therefore, does not reflect the 101 days she spent in incarceration before the case was bounded over from magistrate court.  <u>See</u> Walton's Quintana Response ¶ 3(a)-(b), at 2 (asserting this fact)(citing Confinement Credit Attachment); <u>id.</u> ¶ 10, at 3 (citing Amended Judgment); Quintana Reply ¶ 3, at 2 (admitting this fact); Walton's Doe 3 Response ¶ 3(a)-(b), at 2 (citing Confinement Credit Attachment); Walton's Parish Response ¶ 3(a)-(b), at 2 (asserting this fact)(citing Confinement Credit Attachment); <u>id.</u> ¶ 10, at 3 (citing Amended Judgment);  Parish Reply ¶ 3, at 2 (admitting this fact); Walton's Lea Detention Response ¶ 3(a)-(b), at 2 (asserting this fact)(citing Confinement Credit Attachment); <u>id.</u> ¶ 10, at 3 (citing Amended Judgment);  Lea Detention Reply ¶ 3, at 2 (admitting this fact); Cerna Gallegos MSJ ¶ 5, at 4 (asserting this fact).  Walton was then incarcerated at Lea Detention to serve out her sentence, and, based on Judge Sánchez' order, Parrish, Quintana and Lea Detention calculated Walton's release date as December 12, 2018, and created timesheets to that effect.  <u>See</u> Quintana MSJ ¶ 4, at 4 (citing Timesheet, filed March 22, 2022 (Doc. 39-7)("Timesheet")); Walton's Quintana Response at 4 (admitting this fact); Doe 3 MSJ ¶ 9, at 3 (asserting this fact)(citing Revocation Order); Walton's Doe 3 Response at 4

(admitting this fact); Parish MSJ ¶ 4, at 4 (asserting this fact)(citing Timesheet); Walton's Parish

Response at 4 (admitting this fact); Lea Detention MSJ ¶ 4, at 4-5 (asserting this fact)(citing

Timesheet); Walton's Lea Detention Response at 4 (admitting this fact); Cerna Gallegos MSJ ¶ 9,

at 3 (asserting this fact)(citing Revocation Order).

4.     **Walton Moves the State Court to Correct Her Sentence, the State Court Orders Walton's Release, and Walton Later Succeeds in Having Her Sentenced Reduced by Getting 101 Days Credited as Part of Time-Served Credit.**

On June 5, 2018, Walton filed with Judge Sánchez a Motion to Declare Correct Sentence

Expiration Date, in which she explains:

> Defendant was originally sentenced on this case for Forgery, a fourth degree Felony, said sentence occurring May 27, 2016.  Defendant was awarded one hundred sixty (160) days credit time served, leaving one year and twenty-three (23) days to serve on Adult Supervised Probation. . . . Given this set of circumstances, Defendant's original expiration date was June 19, 2017, (1 years, 23 days(( probation time)), added to sentencing date(5/27/16)[)] . . .
>
> Defendant was fully Revoked and Committed to the Lea County Detention Center for the remainder of her sentence, Order file April 9, 2018 . . . This Order also reflects absconder time was added from January 18, 2017 through February 6, 2018. . . . [T]he amount of time from 1/18/17 to 2/6/18 is three hundred eight four (384) days. . . . 384 days added to the original expiration should be the Defendant's new expiration date.  The calendar calculator shows 384 added to Defendant's original expiration date of 6/19/17 is July 8, 2018. . . **The jail's expiration date is 12/12/18.**

Quintana MSJ ¶ 6, at 4 (asserting this fact)(citing Motion to Declare Correct Sentence Expiration

Date (dated June 5, 2018), filed March 22, 2022 (Doc. 39-4)("Motion to Correct"))(emphasis in

original); Parish MSJ ¶ 6, at 4 (asserting this fact)(citing Motion to Correct); Walton's Parish

Response at 4 (admitting this fact); Lea Detention MSJ ¶ 6, at 4 (asserting this fact)(citing Motion

to Correct); Walton's Lea Detention Response at 4 (admitting this fact).[26]  On July 13, 2018, Judge

---

[26]Walton's Quintana Response to the Quintana MSJ does not address the Quintana MSJ's assertion of the above fact.  See Walton's Quintana Response ¶¶ 1-10, at 1-4.  The Court deems

Sánchez issued an order that Walton should be released from Lea Detention's custody.  See Quintana MSJ ¶ 7, at 4 (asserting this fac)(citing Order for Release (dated July 13, 2018), filed March 22, 2022 (Doc. 39-5)("Release Order"));[27] Doe 3 MSJ ¶ 10, at 3 (asserting this fact)(citing Complaint ¶ 18, at 4); Walton's Doe 3 Response at 4 (admitting this fact); Parish MSJ ¶ 7, at 5 (asserting this fact)(citing Release Order); Walton's Parish Response at 4 (admitting this fact); Lea Detention MSJ ¶ 7, at 4 (asserting this fact)(citing Release Order); Walton's Lea Detention Response at 4 (admitting this fact); Cerna Gallegos MSJ ¶ 10, at 3 (asserting this fact)(citing FAC ¶ 20, at 4).  The Release Order states: "[W]ith the chance for all parties to be heard on the matter, and having given full consideration to the matter at hand, and with Defendant's Motion being well taken, it is now the Order of this Court that Defendant shall be released July 10, 2018."  Release Order at 1.[28]  The Release Order provides that Walton "shall be released July 10, 2018," although

---

undisputed that she moved the district court to correct her sentence, see D.N.M. LCvR 56.1(b) ("The response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. . . . All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Walton's Parish Response and Walton's Lea Detention Response do not dispute, however, the Parish MSJ's and the Lea Detention MSJ's assertions of these same facts, as stated above.  Although the parties do not quote in their assertions of undisputed facts the Motion to Correct's content, the Court quotes it, because it is helpful background information, and because no party disputes the adduced record evidence's authenticity.

[27]Walton's Quintana Response to the Quintana MSJ does not specifically dispute the Quintana MSJ's assertion of the above fact.  See Walton's Quintana Response ¶¶ 1-10, at 1-4.  The Court deems undisputed that she moved the district court to correct her sentence.  See D.N.M. LCvR 56.1(b) ("The response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. . . . All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[28]Although the parties do not quote in their assertions of undisputed facts the Motion to Correct's content, the Court quotes it, because it is helpful background information, and because no party disputes the adduced record evidence's authenticity.

that date already had passed when Judge Sánchez filed the Release Order on July 13, 2018. Quintana MSJ ¶ 4, at 4 (asserting this fact)(citing Release Order);[29] Doe 3 MSJ ¶ 10, at 3 (asserting this fact)(citing Complaint ¶ 18, at 4); Walton's Doe 3 Response at 4 (admitting this fact); Parish MSJ ¶ 7, at 5 (asserting this fact)(citing Release Order); Walton's Parish Response at 4 (admitting this fact); Lea Detention MSJ ¶ 7, at 4 (asserting this fact)(citing Release Order); Walton's Lea Detention Response at 4 (admitting this fact); Cerna Gallegos MSJ ¶ 10, at 3 (asserting this fact)(citing FAC ¶ 20, at 4).  Lea Detention received Judge Sánchez' Release Order the same day Judge Sánchez issued it on July 13, 2018, and Lea Detention released Walton from its custody that same day.  See Quintana MSJ ¶ 8, at 5 (citing Complaint ¶ 18, at 4; Affidavit of Kristie S. Parish ¶ 15, at 3 (dated March 21, 2022), filed March 22, 2022 (Doc. 39-6)("Parish Aff."));[30] Doe 3 MSJ ¶ 10, at 3 (asserting this fact)(citing Complaint ¶ 20, at 5); Walton's Doe 3 Response at 4 (admitting this fact); Parish MSJ ¶ 8, at 5 (asserting this fact)(citing Complaint ¶ 18, at 4; Parish Aff. ¶ 15, at 3); Walton's Parish Response at 4 (admitting this fact); Lea Detention MSJ ¶ 8, at 4 (asserting this fact)(citing Complaint ¶ 18, at 4; Parish Aff. ¶ 15, at 3); Walton's Lea Detention Response at 4 (admitting this fact); Cerna Gallegos MSJ ¶ 10, at 3 (asserting this fact)(citing FAC ¶ 20, at 3).

---

[29]Walton's Quintana Response does not address this asserted fact, see Walton's Quintana Response ¶¶ 1-10, at 1-4, so the Court concludes that Walton's Quintana Response does not dispute it, see D.N.M. LCvR 56.1(b) ("The response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. . . . All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[30]Walton's Quintana Response does not address this asserted fact, see Walton's Quintana Response ¶¶ 1-10, at 1-4, so the Court concludes that Walton's Quintana Response does not dispute it, see D.N.M. LCvR 56.1(b) ("The response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. . . . All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Several months after authorities released Walton from Lea Detention, her counsel moved Judge Sánchez to amend Walton's original sentence.  See Walton's Quintana Response ¶ 10, at 3 (asserting this fact)(citing Amended Judgment); Quintana Reply ¶ 10, at 4 (admitting this fact); Doe 3 MSJ ¶ 11, at 3-4 (asserting this fact)(citing Amended Judgment); Walton's Doe 3 Response ¶ 10, at 3 (admitting this fact); Walton's Parish Response ¶ 10, at 4 (asserting this fact)(citing Amended Judgment); Parish Reply ¶ 10, at 3 (admitting this fact); Walton's Lea Detention Response ¶ 10, at 4 (asserting this fact)(citing Amended Judgment); Lea Detention Reply ¶ 10, at 3 (admitting this fact); Cerna Gallegos MSJ ¶ 11, at 4 (asserting this fact)(citing Amended Judgment).[31]   Judge Sánchez granted the motion, crediting her after the fact for the 101 days she spent incarcerated on the magistrate court case.  See Walton's Quintana Response ¶ 10, at 3 (citing Amended Judgment); Quintana Reply ¶ 10, at 4 (admitting this fact); Doe 3 MSJ ¶ 11, at 3-4 (asserting this fact)(citing Amended Judgment); Walton's Doe 3 Response ¶ 10, at 4 (admitting this fact); Walton's Parish Response ¶ 10, at 4 (asserting this fact)(citing Amended Judgment); Parish Reply ¶ 10, at 3 (admitting this fact); Walton's Lea Detention Response ¶ 10, at 4 (asserting this fact)(citing Amended Judgment); Lea Detention Reply ¶ 10, at 3 (admitting this fact); Cerna Gallegos MSJ ¶ 11, at 4 (asserting this fact)(citing FAC ¶ 20, at 3).[32]

---

[31]The Quintana Reply, the Parish Reply and the Lea Detention Reply state that this fact is undisputed, but argues that it "lacks relevancy to the Motion at hand."  Quintana Reply ¶ 10, at 4. See Parish Reply ¶ 10, at 3 (same assertion); Lea Detention Reply ¶ 10, at 3 (same assertion).  An assertion of immateriality or irrelevancy does not dispute a party's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Accordingly, the Court deems the fact undisputed.

[32]The Quintana Reply, the Parish Reply and the Lea Detention Reply state that this fact is undisputed, but argues that it "lacks relevancy to the Motion at hand."  Quintana Reply ¶ 10, at 4. See Parish Reply ¶ 10, at 3 (same assertion); Lea Detention Reply ¶ 10, at 3 (same assertion).  An

Judge Sánchez granted Walton's motion on January 21, 2020, and issued the Amended Judgment.  See Walton's Quintana Response ¶ 10, at 3 (citing Amended Judgment); Quintana Reply ¶ 10, at 4 (admitting this fact); Doe 3 MSJ ¶ 11, at 3-4 (asserting this fact)(citing Amended Judgment); Walton's Doe 3 Response ¶ 10, at 4 (admitting this fact);   Walton's Parish Response ¶ 10, at 4 (asserting this fact)(citing Amended Judgment); Parish Reply ¶ 10, at 3 (admitting this fact); Walton's Lea Detention Response ¶ 10, at 4 (asserting this fact)(citing Amended Judgment); Lea Detention Reply ¶ 10, at 3 (admitting this fact); Cerna Gallegos MSJ ¶ 11, at 4 (asserting this fact)(citing FAC ¶ 20, at 3).[33]   The Amended Judgment amended the 2016 sentence to award Walton 265 days time-served credit, which reflects an additional 105 days in time-served credit beyond the 160 days Judge Sánchez had awarded Walton in the 2016 sentencing order.  See Walton's Quintana Response ¶ 10, at 3 (asserting this fact)(citing Amended Judgment); Quintana Reply ¶ 10, at 4 (admitting this fact); Doe 3 MSJ ¶ 11, at 3-4 (asserting this fact)(citing Amended Judgment); Walton's Doe 3 Response ¶ 10, at 4 (admitting this fact); Walton's Parish Response ¶ 10, at 4 (asserting this fact)(citing Amended Judgment); Parish Reply ¶ 10, at 3 (admitting this fact); Walton's Lea Detention Response ¶ 10, at 4 (asserting this fact)(citing Amended Judgment);

---

assertion of immateriality or irrelevancy does not dispute a party's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Accordingly, the Court deems the fact in the text undisputed.

[33]The Quintana Reply, the Parish Reply and the Lea Detention Reply state that this fact is undisputed, but argues that it "lacks relevancy to the Motion at hand."  Quintana Reply ¶ 10, at 4. See Parish Reply ¶ 10, at 3 (same assertion); Lea Detention Reply ¶ 10, at 3 (same assertion).  An assertion of immateriality or irrelevancy does not dispute a party's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2  ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Accordingly, the Court deems the fact in the text undisputed.

Lea Detention Reply ¶ 10, at 3 (admitting this fact); Cerna Gallegos MSJ ¶ 11, at 4 (asserting this fact)(citing Amended Judgment).[34]

## **PROCEDURAL BACKGROUND**

On May 18, 2021, Walton filed in federal court the present lawsuit under 42 U.S.C. § 1983 for alleged violations of her Constitutional rights. See Plaintiff's Complaint for Violation of Civil Rights and False Imprisonment, filed May 18, 2021 (Doc. 1)("Complaint"). The Complaint names as Defendants Lea Detention, Quintana, and four John Doe's. See Complaint ¶¶ 1-6 at 1-2. Defendants Doe 3 and Doe 4 filed a motion to dismiss on the basis of lack of personal jurisdiction, arguing the Court lacked personal jurisdiction over them, because Walton inadequately had served them with the Complaint. See Defendants "John Doe 3" and "John Doe 4's" Motion to Dismiss Plaintiff's Claims for Insufficient Service of Process and Lack of Personal Jurisdiction, filed August 4, 2021 (Doc. 12)("MTD"). According to Doe 3 and Doe 4, Walton had served them inadequately, because Walton left a copy of the Complaint and summons with an employee at these Defendants' place of work, the Lea County Probation and Parole. See MTD ¶¶ 1-8, at 1-3. According to Doe 3 and Doe 4, this service is inadequate to confer the Court's personal jurisdiction

---

[34]The parties do not explain why Judge Sanchez added 105 days instead of only 101 days, based on the 101 days that Walton spent in custody on the magistrate court case. Nonetheless, the parties do not dispute that the 105 additional days in time-served credit is intended to compensate Walton for the 101 days spent incarcerated while her case was in magistrate court. Moreover, the Quintana Reply, the Parish Reply and the Lea Detention Reply state that this fact is undisputed, but argue that it "lacks relevancy to the Motion at hand." Quintana Reply ¶ 10, at 4. See Parish Reply ¶ 10, at 4 (same proposition); Lea Detention Reply ¶ 10, at 4 (same). An assertion of immateriality or irrelevancy does not dispute a party's asserted fact. If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section. See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed."). Accordingly, the Court deems the fact in the text undisputed.

over them.  See MTD ¶¶ 1-8, at 1-3.  Indeed, the summons returned executed as to Doe 3 and Doe 4 indicates that, on July 14, 2021, a process server served both summonses on an individual named "Ericka Chavira, who is designated by law to accept service of process on behalf of . . . Lea County Probation and Parole."  Summons in a Civil Action, filed July 16, 2021 (Doc. 10)("Doe 3 Summons")(describing summons served on Doe 3).  See Summons in a Civil Action, filed July 16, 2021 (Doc. 11)(using same language to describe summons served on Doe 4).  Walton's Complaint, notably, does not name Lea County Probation and Parole as a Defendant.  See Complaint ¶¶ 1-6, at 1-2.

The Court held a hearing on the MTD on February 25, 2022.  See Clerk's Minutes, filed February 25, 2022 (Doc. 37).  At the hearing, the Court indicated that it grants the MTD as to John Doe 4, because the parties agreed that John Doe 4 was not a proper defendant.  See Transcript of Hearing at 2:24-4:13, taken February 25, 2022 (Court, Evans, Bettis, DeFillippo)("February 25 Tr.").[35]  The Court indicated that Walton could move to amend her Complaint to name Cerna Gallegos as a Defendant, because Walton determined that Doe 3 is Cerna Gallegos.  See February 25 Tr. at 4:14-5:9 (Evans, Court); Response to Defendants's [sic] Motion to Dismiss Plaintiff's Claims for Insufficient Service of Process and Lack of Personal Jurisdiciton [sic] ¶ 2, at 1, filed November 16, 2021 (Doc. 23).  After the hearing, the Court issued an order.  See Order on Defendants "John Doe 3" and "John Doe 4's" Motion to Dismiss Plaintiff's Claims for Insufficient Service of Process and Lack of Personal Jurisdiciton [sic], filed March 10, 2022 (Doc. 38)("MTD Order").  The MTD Order dismisses with prejudice John Doe 4 as a Defendant in the proceedings

---

[35]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

and permits Walton ten days from the MTD Order's issuance in which to move to amend her complaint.  See MTD Order at 1.

Walton did not move to amend her Complaint within ten days, and instead the case's next filing was Quintana's MSJ on March 22, 2022.  See Quintana MSJ at 1.  Doe 3 also filed her renewed motion to dismiss based on the lack of sufficient service.  See Defendant "John Doe 3"'s Renewed Motion to Dismiss Plaintiff's Claims for Insufficient Service of Process and Lack of Personal Jurisdiciton [sic], filed March 28, 2022 (Doc. 40)("Renewed MTD").  Walton then filed an Amended Complaint, instead of filing a motion to amend her Complaint as the MTD Order had specified.  See MTD Order at 1; Plaintiff's First Amended Complaint for Violation of Civil Rights and False Imprisonment, filed April 19, 2022 (Doc. 42)("Misspelled FAC").  The Amended Complaint names Cerna Gallegos as a defendant and also names Parish, but misspells Parish's name as "Christy Parrish."  Misspelled FAC ¶ 5, at 2.  Walton filed another amended complaint, the operative complaint, which corrects, accurately, the spelling of Parish's name, to read "Kristie S. Parish."  FAC at 1.  Doe 3 filed a motion to strike the Correct FAC on the basis of Walton's failure to move to amend her complaint and having amended her complaint without the Court's leave.  See Defendant "John Doe 3"'s Motion to Strike Plaintiff's Amended Complaint, filed May 6, 2022 (Doc. 49)("MTS").  Summons were issued for Cerna Gallegos and for Parish.  See Text-Only Entry, April 20, 2022 (Cerna Gallegos summons); Text-Only Entry, April 22, 2022 (Parish summons).  The case's docket contains no indication that either the Cerna Gallegos summons or the Parish summons ever was returned executed.

Doe 3 filed her Doe 3 MSJ, Parish filed her Parish MSJ and Lea Detention filed its Lea Detention MSJ.  See Doe 3 MSJ at 1; Parish MSJ at 1; Lea Detention MSJ at 1.  The Court held a hearing on the MSJs, on the Renewed MTD, and on the MTS on August 11, 2022.  See Clerk's

Minutes at 1, filed August 11, 2022 (Doc. 75).  At the hearing the Court stated that it would deny the MTS, because the Defendants agreed with the Court they would not have opposed Walton's motion to amend her Complaint, had she taken correctly that procedural step.  See Transcript of Hearing at 37:16-38:7, taken February 25, 2022 (Court)("August 11 Tr.").  The Court indicated also that it would grant the Renewed MTD, because Walton had not served properly Cerna Gallegos.  See August 11 Tr. at 37:16-38:7 (Court).  As to the MSJs, the Court indicated that it would take under the advisement each of the MSJs.  See August 11 Tr. at 52:23-53:14 (Court). The Court included in this ruling that it would consider Doe 3's MSJ although the Court and Doe 3 acknowledged that Doe 3 had not waived her claims about lack of jurisdiction, and Doe 3 indicated that her attorney could not accept service on her behalf.  See August 11 Tr. at 39:2-4 (Evans).  The Court noted that Lea Detention's argument against its Monell v. Department of Social Services, 436 U.S. 658 (1978)("Monell"), liability cannot rest wholly on the proposition that Lea Detention is not liable if no individual employee Defendant is liable, see August 11 Tr. at 21:10-26:19 (Court, DeFillippo, Evans); recent Tenth Circuit caselaw, the Court noted, permits a municipality sometimes to face Monell liability even if no individual employee commits a Constitutional violation, see August 11 Tr. at 21:10-26:19 (Court, DeFillippo, Evans).

After the August 11 hearing, Walton filed a motion for leave to amend her complaint, which the Court had ordered her to do, and the Court then issued an order granting the motion.  See Order Granting Plaintiffs [sic] Motion for Leave of the Court to Amend Plaintiff's Complaint for Violation of Civil rights and False Imprisonment, filed September 1, 2022 (Doc. 77).   On November 14, 2022, the Court entered an Order effecting the conclusions it reached at the August 11, 2022, hearing and that also granted the MSJs.  See Order at 19-20, filed November 14, 2022 (Doc. 80)("MSJ Order").  The Order grants the Quintana MSJ, grants the Doe 3 MSJ, grants the

Parish MSJ, and grants the Lea Detention MSJ.  <u>See</u> MSJ Order at 19-20.  The Order also grants the Renewed MTD, but it denies the MTS.  <u>See</u> MSJ Order at 19-20.

    After the MSJ Order, the Court held a last hearing on December 1, 2022.  <u>See</u> Clerk's Minutes, filed December 1, 2022 (Doc. 85).  At the December 1, 2022, hearing, the parties indicated that Walton had never served Cerna Gallegos properly, and Cerna Gallegos again insisted that her attorney could not accept service on her behalf.  <u>See</u> Transcript of Hearing at 2:23-3:3, 11:14-12:3, taken December 1, 2022 (Evans)("December 1 Tr."); <u>id.</u> at 11:14-12:3 (Court).  The Court noted that its MSJ Order, effectively would dismiss Cerna Gallegos from the case, because the parties agree that Cerna Gallegos is Defendant Doe 3, and the November 14 Order grants Doe 3's MSJ on the basis of qualified immunity.  <u>See</u> December 1 Tr. at 12:7-19 (Court).  The Court indicated that, to tee up the case for appeal, Walton should serve Cerna Gallegos sufficiently.  <u>See</u> December 1 Tr. at 12:7-19 (Court).  After this hearing, Walton still did not serve Cerna Gallegos properly.  Neither of the next filings in the case after the December 1 hearing -- an attorney's entry of appearance on behalf of Cerna Gallegos and the Cerna Gallegos MSJ -- mention, however, the lack of service or assert lack of personal jurisdiction.  <u>See</u> Entry of Appearance at 1, filed December 8, 2022 (Doc. 83)("COMES NOW Atwood, Malone, Turner & Sabin, P.A., by Bryan Evans and K. Renee Gantert and hereby enters its appearance on behalf of Defendant Denice Gallegos, fka Denice Cerna."); Cerna Gallegos MSJ ¶¶ 14-15, at 4 (including no argument about lack of service or lack of personal jurisdiction).  The Cerna Gallegos MSJ offers otherwise essentially the same arguments that the Doe 3 MSJ offers.  <u>See</u> Cerna Gallegos MSJ at 1.  The Court then issued an order granting the Cerna Gallegos MSJ.  <u>See</u> Order on Defendant Denice Cerna Gallego's Motion for Summary Judgment at 1, filed May 18, 2023 (Doc. 86).

## LAW REGARDING MONELL CLAIMS

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

42 U.S.C. § 1983.  The Supreme Court has recognized that "municipalities and other bodies of local government are 'persons' within the meaning of this statute."  St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988).  The Supreme Court has articulated "when a decision on a single occasion may be enough to establish an unconstitutional municipal policy."  St. Louis v. Praprotnik, 485 U.S. at 123 (citation omitted).

> First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered."  [Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986)].  Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability.  [Pembaur v. City of Cincinnati, 475 U.S. at 483] (plurality opinion).  Third, whether a particular official has "final policymaking authority" is a question of state law.  [Pembaur v. City of Cincinnati, 475 U.S. at 483] (plurality opinion).  Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business.  [Pembaur v. City of Cincinnati, 475 U.S. at 482-83] (plurality opinion).

St. Louis v. Praprotnik, 485 U.S. at 123.  The Tenth Circuit has explained that there are two elements that a plaintiff must show when "suing a county under section 1983 for the actions of one of its officers": (i) "a municipal employee committed a constitutional violation"; and (ii) "a municipal policy or custom was the moving force behind the constitutional deprivation."  Myers v. Okla. Cty. Bd. of Cty. Comm'rs, 151 F.3d 1313, 1318 (10th Cir. 1998)(citing Monell, 436 U.S. at 694)).  Although the general rule is that an individual officer must be Constitutionally liable,

- 30 -

there are circumstances under which <u>Monell</u> liability may exist in the absence of individual officer liability.  <u>See</u> <u>Quintana v. Santa Fe Cnty. Bd. of Comm'rs</u>, 973 F.3d 1022, 1033 (10th Cir. 2020)("[M]unicipal liability under <u>Monell</u> may exist without individual liability.").  This situation occurs when a plaintiff's rights are violated, because of the actions of multiple municipal employees, none of whom individually are liable; alternatively, if no individual employee is liable, and a plaintiff does not experience a violation, then no <u>Monell</u> liability obtains:

> The general rule in [<u>Trigalet v. City of Tulsa, Oklahoma</u>, 239 F.3d 1150 (10th Cir. 2001)("<u>Trigalet</u>")] is that there must be a constitutional violation, not just an unconstitutional policy, for a municipality to be held liable. In most cases, this makes the question of whether a municipality is liable dependent on whether a specific municipal officer violated an individual's constitutional rights. But [<u>Garcia v. Salt Lake Cnty.</u>, 768 F.2d 303 (10th Cir. 1985)("<u>Garcia</u>")] remains as a limited exception where the alleged violation occurred as a result of multiple officials' actions or inactions.

<u>Crowson v. Washington Cnty. Utah</u>, 983 F.3d 1166 (10th Cir. 2020).  Even under the <u>Garcia</u> model of <u>Monell</u> liability, however, a plaintiff must establish that a municipality's policy caused the plaintiff's Constitutional injury and that the municipality's actions or inactions demonstrate deliberate indifference.  <u>See</u> <u>Quintana v. Santa Fe Cnty. Bd. of Commissioners</u>, 973 F.3d at 1034 ("[The] complaint must . . . allege facts that, under <u>Garcia</u> and <u>Monell</u>, plausibly state a cause of action against Santa Fe County. To state a claim against the County, the plaintiffs must allege facts showing: (1) an official policy or custom, (2) causation, and (3) deliberate indifference.").

## LAW REGARDING PROCEDURAL DUE PROCESS CLAIMS

The Tenth Circuit prescribes a two-step inquiry for determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"  <u>Camuglia v. City of Albuquerque</u>, 448 F.3d 1214, 1219

(10th Cir. 2006)(quoting <u>Clark v. City of Draper</u>, 168 F.3d 1185, 1189 (10th Cir. 1999)).  "[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake."  <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. 564, 570-71 (1972).  "'Liberty' and 'property' are broad and majestic terms.  They are among the '[g]reat [constitutional] concepts . . . purposely left to gather meaning from experience."  <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 571 (quoting <u>Nat'l Mutual Ins. Co. v. Tidewater Transfer Co.</u>, 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)).  The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money.  By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process."  <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 571-72. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men.  In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

<u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 572.  "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired

in specific benefits." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 576.  These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 [(1970)].  See Flemming v. Nestor, 363 U.S. 603, 611 [(1960)].  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 [(1952)], have interests in continued employment that are safeguarded by due process.

<u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." <u>Teigen v. Renfrow</u>, 511 F.3d 1072, 1079 (10th Cir. 2007).  See <u>Paul v. Davis</u>, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").  "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 577.  See <u>Farthing v. City of Shawnee</u>, 39 F.3d 1131, 1135 (10th Cir.

1994)("Rather, property interests, which are the subject of the present litigation, 'are created and

their dimensions are defined by existing rules or understandings that stem from an independent

source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what

process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey

v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation

of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the

nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is

flexible and calls for such procedural protections as the particular situation demands." Mathews

v. Eldridge, 424 U.S. 319, 334 (1976). The Supreme Court has explained that

> the root requirement of the Due Process Clause [is] that an individual be given an
> opportunity for a hearing before he is deprived of any significant property interest.
> This principle requires some kind of a hearing prior to the discharge of an employee
> who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have
> pointed out that [t]he formality and procedural requisites for the hearing can vary,
> depending upon the importance of the interests involved and the nature of the
> subsequent proceedings. In general, something less than a full evidentiary hearing
> is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted). The Second Circuit

has stated:

> The Supreme Court . . . explained that procedural due process is a flexible standard
> that can vary in different circumstances depending on "'the private interest that will
> be affected by the official action'" as compared to "the Government's asserted
> interest, 'including the function involved' and the burdens the Government would
> face in providing greater process." *Hamdi v. Rumsfeld*, 542 U.S. 507,
> [529] (2004)(quoting *Mathews v. Eldridge*, 424 U.S. at 335). A court must carefully
> balance these competing concerns, analyzing "'the risk of an erroneous deprivation'
> of the private interest if the process were reduced and the 'probable value, if any,

of additional or substitute safeguards.'" *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. at 335).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose. See Mathews v. Eldridge, 424 U.S. at 335. For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate." Clark v. City of Draper, 168 F.3d at 1189. See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has considered procedural due process violations on multiple occasions. See, e.g., A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692, 2015 WL 13668431, at *37-43 (D.N.M. December 7, 2015)(Browning, J.)("Youngers"). For example, in Youngers, the Court concluded that the New Mexico Department of Health denied a woman with developmental disabilities due process when it deprived her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it afforded her no process whatsoever for the deprivation. See Youngers, 2015 WL 13668431, at *37-43. The Court also has concluded that a tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing after the firing, and the employee's due process claim was in reaction to the city's appeal of the hearing board's decision. See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a

win."). <u>See</u> <u>also</u> <u>Duprey v. Twelfth Judicial Dist. Court</u>, 760 F. Supp. 2d 1189, 1215 (D.N.M. 2009)(Browning, J.)(denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers"); <u>Camuglia v. City of Albuquerque</u>, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.)("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner."), <u>aff'd</u>, 448 F.3d 1214, 1220-21 (10th Cir. 2006). The Court has concluded that a student's complaints against a university's allegedly inadequate procedures for addressing sexual misconduct states a valid due process claim, but that a university's procedures may, upon a full factual record, satisfy due process dictates. <u>See</u> <u>Lee v. Univ. of New Mexico</u>, 449 F. Supp. 3d 1071, 1122 (D.N.M. 2020)("Lee has a protected property interest in his continued enrollment at UNM. Further, Lee's allegations plausibly support a conclusion that the procedures used in UNM's sexual misconduct investigation do not comport with Due Process."); <u>Lee v. Univ. of New Mexico</u>, 500 F. Supp. 3d 1181, 1235 (D.N.M. 2020)("[U]nder the three Mathews v. Eldridge factors, none of Lee's alleged procedural deficiencies substantially prejudice him [on summary judgment], and the Defendants have satisfied their obligations under the Due Process Clause to afford Lee notice and an opportunity to be heard.").

### LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

There exist two types of substantive due process claims:

In *Halley v. Huckaby*, 902 F.3d 1136 (10th Cir. 2018), we recently recounted that the Supreme Court recognizes two types of substantive due process claims: (1) claims that the government has infringed a "fundamental" right, *see*, *e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 721-22 . . . (1997)(assessing asserted right to assisted suicide); and (2) claims that government action deprived a person

> of life, liberty, or property in a manner so arbitrary it shocks the judicial conscience,
> *see*, *e.g.*, *City of Sacramento v. Lewis*, 523 U.S. 833, 846 . . . (1998)(examining a
> high-speed police chase).  *Halley*, 902 F.3d at 1153.  "[W]e apply the fundamental-
> rights approach when the plaintiff challenges legislative action, and the shocks-the-
> conscience approach when the plaintiff seeks relief for tortious executive action."
> *Id.*

Doe v. Woodard, 912 F.3d 1278, 1300 (10th Cir. 2019).  "[N]othing in the language of the Due

Process Clause itself requires the State to protect the life, liberty and property of its citizens against

invasion by private actors."  DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 195

(1989).  The Due Process Clause is not a guarantee of a minimal level of safety and security.  See

DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.

### 1. **Exceptions to the General Rule**.

There are, however, two exceptions to this general rule that States need not protect against

deprivation of liberty or property interests by private actors.  The first exception -- the special-

relationship doctrine -- arises when the state has a custodial relationship with the victim, which

triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of

Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991,

994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a

State may also be liable for an individual's safety "only when 'a state actor affirmatively acts to

create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v.

Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d at 923).  "If either the

special- relationship or danger-creation exception applies, the conduct of the state actor must go

beyond negligence to the point of 'shocking the conscience.'"  Glover v. Gartman, 899 F. Supp.

2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455

F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of

suits.")).

2.        **Special-Relationship Exception.**

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the Due Process Clause is the special-relationship doctrine. Under this exception, a plaintiff must show that he or she was involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine.  See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)." Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

3.        **Danger-Creation Exception.**

Second, the Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d at 573. The danger-creation exception applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." Currier v. Doran, 242 F.3d at 923.  See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm.").  Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573.  A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'" Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)).  To state a prima facie case, a plaintiff must show that his or her danger-creation claim for due process violations meets a six-part test: (i) the State and

individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) the defendant must have acted recklessly in conscious disregard of that risk; and (vi) such conduct, when viewed in total, shocks the conscience.  See Peña v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  A defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk." Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1496 (10th Cir. 1992).  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences." Medina v. City & Cnty. of Denver, 960 F.2d at 1496 (citations omitted).

### 4.   Government Conduct That Shocks the Conscience.

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.  See Cty. of Sacramento v. Lewis, 523 U.S. at 849)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").  "[A] plaintiff must do more than show that the government actor intentionally or

recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d at 1222 (internal quotation marks omitted)(quoting Moore v. Guthrie, 438 F.3d at 1040). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d at 574)(internal quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Peña v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)(unpublished))).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three

inmates.  See 265 F.3d at 1132.  The district court concluded that the plaintiff failed to state a

§ 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the

defendants' actions were "not of such a magnitude that the Court is able to conclude they shock

the conscience."  265 F.3d at 1134.  The Tenth Circuit agreed with the district court's conclusion,

stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks is

not enough to satisfy the danger-creation theory's conscience shocking standard."  265 F.3d

at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M.

2010)(Browning, J.), the plaintiffs alleged that the defendants -- a school district, superintendent,

principal, and vice principal of a middle school -- violated the plaintiffs' substantive due process

rights when they did not take sufficient action to prevent a student at the school from "racking"[36]

the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court concluded that the defendants' conduct

did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were
> aware of three instances of an unknown eighth-grade student racking various sixth-
> grade students within the span of a month, and failed to implement policies to
> improve hallway monitoring and stop this conduct from occurring in time to
> prevent [the plaintiffs' son] from falling victim to the same fate.  Further, the
> Defendants indicated to the sixth graders that it had policies in place to punish
> individuals that assaulted other students but did not, in fact, have such policies.
>
> While such behavior may be worthy of remedy under tort law, and perhaps
> worthy of punishment in the form of punitive damages, the Court's conscience is
> not shocked . . . .
>
> Any number of actions by the Defendants might have remedied the
> problem, but the Court's conscience is not shocked by the Defendants' failure to

---

[36]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as
being "kicked and/or punched in the testicles."  716 F. Supp. 2d at 1059 n.2 (citations
omitted)(internal quotation marks omitted).

consider or implement such a policy.  Even if the Defendants knew that students
frequently -- more than three times per month -- attacked other students in the halls
and declined to implement safety measures to minimize that conduct, the Court is
not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING THE EIGHTH AMENDMENT

When a prisoner is incarcerated after being indicted, the Eighth Amendment protects him

from "a prison official's 'deliberate indifference' to a substantial risk of serious harm."  Farmer v.

Brennan, 511 U.S. 825, 828 (1994).  An incarcerated person bringing an Eighth Amendment claim

to challenge prison conditions must satisfy a two-pronged test with objective and subjective

components.  See Farmer v. Brennan, 511 U.S. at 834.  First, the plaintiff must demonstrate that

the official caused an injury that, objectively, is "sufficiently serious," Farmer v. Brennan, 511

U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)), because it deprives the plaintiff

of "the minimal civilized measure of life's necessities," Farmer v. Brennan, 511 U.S. at 834

(quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).   To establish the first prong of the test,

"the prisoner must show that the risk of which he complains is not one that today's society chooses

to tolerate."  Helling v. McKinney, 509 U.S. 25, 36 (1993).  Those conditions that "pose an

unreasonable risk of serious damage to a [person's] future health" may violate the Eighth

Amendment even if the damage has not yet occurred and may not affect every incarcerated person

exposed to the conditions.  Farmer v. Brennen, 511 U.S. at 836.

Second, the official, subjectively, must have a "sufficiently culpable state of mind."

Farmer v. Brennan, 511 U.S. at 834 (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991)).  This

second prong represents the functional application of the deliberate indifference standard.  See

Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006).  In other words, the plaintiff must

prove that the defendant knew of the risk posed by the challenged condition and disregarded that knowledge by failing to take reasonable measures to abate the risk. See Martinez v. Beggs, 563 F.3d 1082, 1088-89 (10th Cir. 2009). That a risk is obvious is circumstantial evidence that permits the conclusion that a prison official knew of the risk, even absent direct evidence about what the official knew. See Farmer v. Brennan, 511 U.S. at 842-43.

Prison officials must take reasonable measures to protect prisoners from assault by other incarcerated people. See Farmer v. Brennan, 511 U.S. at 843. In the United States Court of Appeals for the Tenth Circuit, "it is clearly established . . . that labelling a prisoner a snitch constitutes deliberate indifference." Benefield v. McDowall, 241 F.3d 1267, 1271 (10th Cir. 2001). When a plaintiff alleges violations of both their Eighth and Fourteenth Amendment rights, the Tenth Circuit has noted that, "where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of substantive due process." Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th Cir. 1996).

## LAW REGARDING JUDICIAL AND PROSECUTORIAL IMMUNITY

Absolute judicial immunity bars civil rights and state law claims against judicial officers acting as judges. See Stump v. Sparkman, 435 U.S. at 355-56; Christensen v. Ward, 916 F.2d at 1473-76; Hunnicutt v. Sewell, 219 P.3d at 534-45. The doctrine of judicial immunity is applicable in actions with 42 U.S.C. § 1983 claims and state law claims. See Van Sickle v. Holloway, 791 F.2d 1431, 1434-35 (10th Cir. 1986); Collins ex rel. Collins v. Tabet, 806 P.2d 40, 45 (1991). Absolute immunity bars all suits for money damages for acts made in the exercise of judicial discretion. See Guttman v. Khalsa, 446 F.3d 1027, 1033 (10th Cir. 2006).

The Supreme Court of the United States of America has recognized absolute immunity for

officials whose special functions or Constitutional status requires complete protection from suit.

See Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  The purpose of absolute judicial immunity is:

> to benefit the public, "whose interest is that the judges should be at liberty to exercise their functions with independence and without fear of consequences."  The Supreme Court has recognized that "the loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus." Therefore, absolute immunity is necessary so that judges can perform their functions without harassment or intimidation.

Van Sickle v. Holloway, 791 F.2d at 1434-35.

Like judges, prosecutors are entitled to immunity in the performance of their prosecutorial functions.  See Miller v. Spiers, 434 F. Supp. 2d 1064, 1066 (2006)(Browning, J.); Johnson v. Lally, 887 P.2d 1262, 1263 (N.M. Ct. App. 1994).  The common law has long recognized that prosecutors must be given immunity from civil liability's chilling effects.  See Burns v. Reed, 500 U.S. 478, 485 (1991); Griffith v. Slinkard, 44 N.E. 1001, 1002 (Ind. 1896); Collins ex rel. Collins v. Tabet, 806 P.2d at 45.  Prosecutors are absolutely immune from damages for their advocacy and activities "intimately associated with the judicial phase of the criminal process."  Imbler v. Pachtman, 424 U.S. 409, 430 (1976).

## ANALYSIS

The Court possesses personal jurisdiction over Cerna Gallegos, because she voluntarily waived her lack of service of process and lack of personal jurisdiction defenses.  Quintana, Parish, and Cerna Gallegos are entitled to summary judgment on the basis of qualified immunity on Walton's claims that they violated her Constitutional rights, and Lea Detention is entitled to summary judgment on Walton's Monell claims.  Under the summary judgment standard unique to qualified immunity motions, Walton must establish a violation of her Constitutional rights, and

Supreme Court or Tenth Circuit precedent giving the Defendants clear notice that they violated her rights.  See Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016)(placing burden on plaintiff to "show that (1) the officers' alleged conduct violated a constitutional right, and (2) [that right] was clearly established at the time of the violation, such that 'every reasonable official would have understood,' that such conduct constituted a violation of that right." (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)).  Walton cannot succeed on either prong against the individual Defendants.

None of the Constitutional theories that Walton proffers -- that the Defendants are liable under the Fourth Amendment, the Ex Post Facto Clause, the Due Process Clause, and the Eighth Amendment -- can succeed, for several independent reasons.  Of primary importance to the Court's holdings is that Walton fails to establish that any more than a negligent mistake caused her detention at Lea Detention in excess of the time she should have spent had her sentence calculated correctly the time-served credits she was owed.  That she cannot establish a mens rea on the Defendants' part beyond negligence is fatal to some Constitutional claims, specifically her due process claims and her Eighth Amendment claims.  Also fatal to her claims is that, because the Court determines that her suit challenges essentially the sentence imposed on her and the erroneous information on which it was based, judicial absolute immunity applies to foreclose those claims against the individual Defendants.

The Court's analysis proceeds in the following way.  First, the Court determines that it has personal jurisdiction over Cerna Gallegos.  Second, the Court determines that no statute of limitations bars Walton's lawsuit.  Third, the Court determines that the Defendants are entitled to summary judgment on Walton's Ex Post Facto claim.  Fourth, the Court determines that the Defendants are entitled to summary judgment on Walton's Fourth Amendment claim.  Fifth, the Court determines that the Defendants are entitled to summary judgment on Walton's Due Process

claims.  Sixth, the Court determines that the Defendants are entitled to summary judgment on Walton's Eighth Amendment claims.  Seventh, the Court determines that absolute judicial immunity would bar any claims alleging Constitutional harms arising out of Walton's erroneously informed sentence.  Eighth, the Court determines that Lea Detention is entitled to summary judgment on Walton's Monell claims.  Accordingly, the Court grants the various motions for summary judgment.[37]

---

[37] Although the parties do not argue that Heck bars Walton's lawsuit, the cases upon which they rely turn in part on that doctrine and suggest that doctrine's applicability here.  See Quintana MSJ at 9 (citing Farrell v. Colorado, No. 14-CV-01882, 2015 WL 13730678, at *4 (D. Colo. November 24, 2015)(Shaffer, M.J.), report and recommendation adopted sub nom. Farrell v. Colorado, No. CIV 14-01882, 2016 WL 1253617 (D. Colo. March 31, 2016)(Krieger, J.), which relies on Heck).  Heck does not bar Walton's claim, but a brief detour into Heck makes apparent that the heart of Walton's claim is her allegedly erroneous sentence; Walton's claim comes within Heck's purview, but Heck does not bar the claim, because Walton succeeded previously in having her sentence declared invalid.  The Heck bar prevents a § 1983 suit if the suit turns on the sentence or incarceration's validity, and the claimant has not secured favorable termination of the issue either on direct appeal or through habeas corpus relief:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence . . . .

Heck, 512 U.S. at 486-87.

Heck can apply to § 1983 claims like Walton's which assert that the claimant, incarcerated pursuant to a criminal sentence, was incarcerated longer than she should have been: such claims turn, of necessity, on the sentence's validity.  See Hurd v. District of Columbia, No. CIV 15-666, 2023 WL 8697829, at *6 (D.D.C. Dec. 15, 2023)(Bates, J.)("Hurd's time-served credit theory of over-incarceration 'necessarily impl[ies]' the invalidity of his confinement. Hurd expressly argues that the District unlawfully imprisoned him for roughly 10 months longer than it should have." (quoting party's briefing)); Farrell v. Colorado, 2015 WL 13730678, at *4 ("Heck . . . applies to

## I.   **THE COURT HAS PERSONAL JURISDICTION OVER CERNA GALLEGOS.**

The Court concludes that it has personal jurisdiction over Cerna Gallegos, because she waived her argument that the Court lacks jurisdiction over her.  Without service or waiver thereof, the Court lacks jurisdiction over a defendant, and the burden is Walton's to demonstrate proper service.  See Compania de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V., 970 F.3d 1269, 1292 (10th Cir. 2020)("'Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied.' . . . Service of process notifies a defendant of the commencement of an action against him and 'marks the court's assertion of jurisdiction over the lawsuit.'" (quoting Omni Capital Int'l, Ltd. v.

---

challenges to the duration of confinement . . . .").  The Heck bar can apply even to a released State inmate, if the inmate has never succeeded either on direct appeal or on collateral relief in declaring the inmate's sentence or incarceration unlawful.  See Hurd v. District of Columbia, 2023 WL 8697829, at *6 ("[T]he favorable-termination requirement should still apply 'in those cases . . . involving former state prisoners who, because they are no longer in custody, cannot bring postconviction challenges,' because 'the principle barring collateral attacks . . . is not rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated.'" (quoting Heck, at 490 n.10)).  If, however, a claimant's failure to secure favorable termination is not through any fault of her own, e.g., because her sentence was too short to pursue through to completion a habeas petition, then the Heck bar does not apply.  See Cohen v. Longshore, 621 F.3d 1311, 1316-17 (10th Cir. 2010)("If a petitioner is unable to obtain habeas relief -- at least where this inability is not due to the petitioner's own lack of diligence -- it would be unjust to place his claim for relief beyond the scope of § 1983." (citing Spencer v. Kemna, 523 U.S. 1, 21 (1998)(Souter, J., concurring)).

Heck, although implicated in Walton's situation, does not foreclose her lawsuit, because she has succeeded in having her sentence declared wrongful.  Walton succeeded first on immediate appeal in convincing Judge Sanchez to release her immediately on July 13, 2018; Walton then succeeded on direct appeal to State court to declare unlawful that part of her sentence she should not have served because she should have been credited 101 days for the magistrate court case jail time.  See Release Order at 1; Amended Judgment at 1-3.  The way is thus cleared for Walton's 1983 suit, and the Heck bar presents no barrier.

That Heck could have barred Walton's suit under slightly different facts, however, makes apparent the extent to which Walton's claim attacks her sentence itself.  As the Court discusses later, the 2016 sentence, and the facts upon which it relies, is the heart of any Constitutional claim that Walton offers, particularly under due process.  Actions that post-date the sentence's imposition, the Court concludes, are of little Constitutional moment.

Rudolf Wolff & Co., 484 U.S. 97, 104 (1987), then Okla. Radio Assocs. v. FDIC, 969 F.2d 940, 943 (10th Cir. 1992))); Salazar v. City of Albuquerque, 278 F.R.D. 623, 626 (D.N.M. 2011)(Browning, J.)("The burden of establishing validity of service is on the plaintiff.").   The Court can possess personal jurisdiction over a defendant based on any of a set of enumerated bases in the Federal Rules of Civil Procedure, as well as based on State law.   See Fed. R. Civ. P. (4)(e)(1) (permitting service on an individual by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made"); id. 4(e)(2)(A)-(C) (permitting service of summons and complaint on an individual by "delivering . . . to the individual personally[,] leaving a copy of each at the individual's dwelling . . . with someone of suitable age and discretion . . . [,] or delivering a copy of each to an agent authorized . . . to receive service of process").   Plaintiffs can serve New Mexico government officers by delivering process to the officer personally and to the Attorney General; there is no allowance in actions against individual officers for leaving a copy of process with a representative of the officer's office.   See N.M.R.A. § 1-004(H)(1)(c) ("Service may be made . . . in any action in which an officer, official, or employee of the state . . . is named a party defendant, by delivering a copy of the process to the officer, official or employee and to the attorney general.").   A defendant can waive, however, lack of proper service, and waive an argument that the court lacks personal jurisdiction over him or her.   See Mohon v. Agentra LLC, 400 F. Supp. 3d 1189, 1210 n.3 (D.N.M. 2019)(Browning, J.)("Personal jurisdiction can be waived." (citing Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703 (1982))). Specifically, a defendant can waive such defenses to a complaint as lack of personal jurisdiction, lack of proper service of process, and lack of proper process, by declining to raise them in a responsive pleading or by making an appearance.   See Fed. R. Civ. P. 12(h) ("A party waives any

defense listed in Rule 12(b)(2)-(5) by . . . . omitting it from a motion . . . [under] Rule 12(g)(2)[,] or . . . [by] failing to either . . . make it by motion under this rule. . . or [] include it in a responsive pleading or in an amendment allowed . . . as a matter of course."); Fed. R. Civ. P. 12(b)(2), (5) (enumerating as defenses "(2) lack of personal jurisdiction" and "(5) insufficient service of process").

Despite the Court's allowances, Walton never successfully served Cerna Gallegos, but Cerna Gallegos waived her argument that the Court lacks personal jurisdiction over her. The Court's concludes that Cerna Gallegos waived her service and jurisdiction arguments, so that she could obtain from the Court a dispositive ruling in her favor, a ruling which the Court indicated it would give Cerna Gallegos if the Court possessed personal jurisdiction over her. Initially Walton served a representative at Cerna Gallegos' place of work, which all parties and the Court determined was inadequate. See Doe 3 Summons at 1 (stating that the process server served Doe 3's process on an individual named "Ericka Chavira, who is designated by law to accept service of process on behalf of . . . Lea County Probation and Parole"); February 25 Tr. at 2:1-5:9 (Court, Evans).

Although Walton was given an opportunity to correct this problem by serving Cerna Gallegos using an accepted means of service, Walton never took this action. Cerna Gallegos continued until the last moment to contest service and personal jurisdiction, and to assert that her attorney could not accept service on her behalf, first under the pseudonym Doe 3 against the original Complaint and then under her own name as Cerna Gallegos against the FAC after it named her as a defendant. See MTD at 3 ("More than ten days have now passed since the entry of the Court's Order on "John Doe 3" 's previous motion to dismiss . . . Despite ample time [and] opportunity . . . , Defendant "John Doe 3" remains unnamed [and] unserved. . . . Personal

jurisdiction over "John Doe 3" remains lacking."); Doe 3 MSJ at 1 n.1 ("Defendant takes the position that Plaintiff's First Amended Complaint is not properly before this Court and is not the operative pleading. . . . Even if the Amended Complaint is deemed the operative pleading, . . . Ms. Cerna has never been properly served."); August 11 Tr. at 12-15 (Evans)("[Doe 3's attorneys] did not have authority to accept service for [Doe 3]. The bottom line is she hasn't been served, and I don't think this Court has jurisdiction over her at this point."); December 11 Tr. at 2:23-3:3 (Evans)("John Doe 3 has never been served in this case at all, and so I'm not entering an appearance for her or anybody else but that person has never been served so to my understanding there is no currently pending case against my client, because she's never been served."); id. at 10:15-19 (Court, Evans)("'[W]hat were your plans in Evans? Were you going to accept [service] on behalf of Ms. Gallegos?' 'I don't have authority to do that, Your Honor.'").  At the same time, however, Cerna Gallegos, both under the Doe 3 moniker and under her own name, argued that she should win on the merits of her summary judgment motions.  See Doe 3 MSJ at 1 n.1 ("Even if the Amended Complaint is deemed the operative pleading, it should be noted that Ms. Cerna has never been properly served. Moreover, all of the arguments set forth below would still apply with equal force."); August 11 Tr. at 39:2 (Evans)("Without waiving any claims concerning service of process or jurisdiction over John Doe 3, we did move for summary judgment.").

Ultimately, however, Cerna Gallegos determined she would waive the service and jurisdiction arguments, because it was in her interests to do so.  The Court indicated in its final hearing with the parties that, if Walton served properly Cerna Gallegos, so that the Court possessed personal jurisdiction over Cerna Gallegos, then the Court would grant summary judgment in her favor on the basis of qualified immunity, because the Court's MSJ Order already had granted

summary judgment in Doe 3's favor, which all the parties understood to be Cerna Gallegos; indeed,

the Court gave the parties marching orders to that effect, to get the case squared away:

> I think I've already found in that order that Ms. Gallegos is entitled to qualified immunity. So I'm wondering if we need to go through any more motions here. If you want to appeal it, . . . I think that I've already decided that she's entitled to qualified immunity.
>
> . . .
>
> [W]e knew that Doe 3 is Gallegos and I've already found that Gallegos is entitled to qualified immunity[;] it seems to me we just need to get it in the right posture.
>
> . . .
>
> I think [Walton is] going to have to serve [Cerna Gallegos], [so] why don't you serve her and tell me when you've served her then we can do something at this end. With that we can either enter an [order] saying our qualified immunity analysis applies to her, we dismiss her or . . . maybe a form of motion or something . . . [M]aybe Mr. Evans could run past you a form of order that you could approve as to form which adopts the analysis in there, and then dismisses [Cerna Gallegos] and then I could enter final judgment so it would be ready for you to take an appeal of.
>
> [Walton] is going to get Ms. [Cerna Gallegos] served and Mr. Evans you're going to give me a motion and a form of order . . . to dismiss Gallegos and/or Serna for qualified immunity for the reasons stated on pages 16 through I think in my order.
>
> [Evans]:      Very well, Your Honor, yes, sir.

December 1 Tr. at 9:4-9 (Court); id. at 10:12-15 (Court); id. 12:8-13:5 (Court, Evans).

Following this last allowance that Walton properly serve Cerna Gallegos -- because Cerna

Gallegos insisted again that her attorney could not accept service on her behalf -- Walton again

failed to serve Cerna Gallegos properly. The case's docket contains no indication that the summons

issued to Cerna Gallegos ever was returned executed. Cf. Docket Entry, filed April 20, 2022 (text

only entry)("Summons Issued on Amended Complaint as to Denice Cerna, Christy Parrish"). The

next two docket entries following the December 1, 2022, hearing is a December 8, 2022, notice

that an attorney entered an appearance on Cerna Gallegos' behalf and then the December 28, 2022, filing of the Cerna Gallegos MSJ, neither of which contains an assertion about failure-to-serve or lack of personal jurisdiction.   See Entry of Appearance at 1, filed December 8, 2022 (Doc. 83)("COMES NOW Atwood, Malone, Turner & Sabin, P.A., by Bryan Evans and K. Renee Gantert and hereby enters its appearance on behalf of Defendant Denice Gallegos, fka Denice Cerna."); Cerna Gallegos MSJ ¶¶ 14-15, at 4 (including no argument about lack of service or lack of personal jurisdiction).   Given this case's circumstances -- Walton's repeated failure to effect proper service, her inability to follow the Court's directives, and Cerna Gallegos' knowledge that the Court intends to grant summary judgment in her favor as soon as the Court possessed personal jurisdiction over her -- the Court construes as waiving her lack of proper service and lack of jurisdiction claims those actions that Cerna Gallegos took following the December 1, 2022, namely the lawyer's entry of an appearance on her behalf and her decision in the Cerna Gallegos MSJ not to raise lack of personal jurisdiction.   Because the failure to raise in a motion or responsive pleading such defenses as lack of proper service and lack of personal jurisdiction effects waiver, the Court construes as effecting such waiver Cerna Gallegos' actions.   See Fed. R. Civ. P. 12(h); Mohon v. Agentra LLC, 400 F. Supp. 3d at 1210 n.3 ("Personal jurisdiction can be waived." (citing Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. at 703)).   Cerna Gallegos can waive personal jurisdiction, and she has waived her service and personal jurisdiction issues. Moreover, as the Court later concludes, she is entitled to summary judgment in her favor on the basis of qualified immunity.

## II.   THE STATUTE OF LIMITATIONS DOES NOT BAR WALTON'S SECTION 1983 SUIT.

Walton's § 1983 suit is not time-barred based on the statute of limitations applicable in this case, because Walton initiated her suit within the three years from the date she was released from Lea Detention's custody.  Cerna Gallegos' arguments to the contrary do not persuade the Court. See Doe 3 MSJ at 7-8.  Section 1983 lacks its own statute of limitations, so the Supreme Court of the United States has instructed that a State's generic personal injury tort cause of action's statute of limitations provides the applicable time-frame.  See Varnell v. Dora Consol. Sch. Dist., 756 F.3d 1208, 1212 (10th Cir. 2014)("The text of § 1983 does not contain a statute of limitations. . . . [I]f 'state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions.'" (quoting Owens v. Okure, 488 U.S. 235, 250 (1989)).  New Mexico's statute of limitations for generic personal injury torts is three years and applies to Walton's claim.  See Varnell v. Dora Consol. Sch. Dist., 756 F.3d at 1212 ("[F]or § 1983 claims arising in New Mexico the limitations period is three years, as provided in New Mexico's statute of limitations for personal-injury claims." (citing Wilson v. Garcia, 471 U.S. 261, 280 (1985); N.M.S.A. § 37-1-8 ("Actions must be brought . . . for an injury to the person or reputation of any person, within three years.")).

The next analytical step is determining when Walton's action accrued; the claims here accrued on July 13, 2018, when Walton secured her release, having convinced Judge Sánchez that her 2016 sentence was in part unlawful for having insufficiently credited Walton time-served.  To determine when a § 1983 action accrues, to which a State's generic personal injury statute of limitations applies, the general rule is the action accrues when the plaintiff becomes aware of the underlying facts that she alleges make out liability.  See Mata v. Anderson, 685 F. Supp. 2d 1223, 1262 (D.N.M. 2010)(Browning, J.)("A § 1983 action accrues when facts that would support the cause of action are or should be apparent.  . . . '[C]laims accrue and [t]he statute of limitations

begins to run when the plaintiff . . . has reason to know of the existence and cause of the injury which is the basis of his action.'" (quoting Alexander v. Oklahoma, 382 F.3d 1206, 1215 (10th Cir. 2004)).  Within that general framework, federal courts look for guidance to State law tort analogues and their accrual doctrines.  See Manuel v. City of Joliet, 580 U.S. 357, 370 (2017)("In defining the contours and prerequisites of a § 1983 claim, including its rule of accrual, courts are to look first to the common law of torts."); id. at 371 ("Manuel analogizes his claim to the common-law tort of malicious prosecution. . . . According to the City, [however,] the most analogous tort to Manuel's constitutional claim is not malicious prosecution but false arrest, which accrues when legal process commences.").  Although State law governs the applicable Statute of Limitations, and although federal courts look to State tort law analogues to guide the accrual analysis, § 1983 accrual remains a matter of federal law.  See Gibson v. Superintendent of N.J. Dep't of L. & Pub. Safety-Div. of State Police, 411 F.3d 427, 435 (3d Cir. 2005)("Although state law governs the limitations period, it is federal law that governs the accrual of § 1983 claims.").[38]  A special accrual rule, however, applies to § 1983 claims to which Heck applies: Heck delays accrual for actions that come within its purview -- namely, § 1983 actions that necessarily imply a criminal conviction

---

[38]Because accrual rules are federal in character, the Court does not need to undertake an Erie analysis to predict how New Mexico courts would determine the accruing of such an over-detention claim as Walton's.  The Court does not identify a New Mexico tort case addressing such specific factual settings as Walton's -- prolonged incarceration because of errors in sentencing law application -- but the Court need not, in the absence of such a rule, predict under Erie what the Supreme Court of New Mexico would do with the issue.  This conclusion is because the Court need only look to State law analogues for guidance on the action's accrual, see Manuel v. City of Joliet, 580 U.S. at 370 ("In defining the contours and prerequisites of a § 1983 claim, including its rule of accrual, courts are to look first to the common law of torts."), but accrual is not per se a matter of State law, see Gibson v. Superintendent of N.J. Dep't of L. & Pub. Safety-Div. of State Police, 411 F.3d at 435 ("Although state law governs the limitations period, it is federal law that governs the accrual of § 1983 claims.").  Accordingly, the Court can look for guidance to New Mexico tort law, without the need to undergo a full-on Erie prediction.

or sentence's invalidity -- until the <u>Heck</u> plaintiff succeeds on direct or collateral review in having

declared unlawful the conviction or sentenced implicated in her claims:

> [F]or § 1983 claims necessarily challenging the validity of a conviction or sentence, <u>Heck</u> delays the rise of the cause of action until the conviction or sentence has been invalidated. Because the cause of action does not accrue until such time, the applicable statute of limitations does not begin to run until [then].

<u>Beck v. City of Muskogee Police Dep't</u>, 195 F.3d 553, 557 (10th Cir. 1999).  <u>Heck</u> thus pegs

accrual to the moment of success on direct or collateral review.  Here, Walton's claim accrued and

the statute of limitations started running when she succeeded effectively in having her sentence

declared illegal on July 13, 2018, the day that Judge Sánchez ordered her released from Lea

Detention's custody.  The unique <u>Heck</u> delayed-accrual rule compels that outcome.  <u>See Beck v.</u>

<u>City of Muskogee Police Dep't</u>, 195 F.3d at 557.

      Other doctrines, which are not decisive, suggest different accrual outcomes.  The general

rule -- § 1983 claims accrue when a plaintiff becomes aware of the facts that allegedly make out

the Constitutional liability -- would peg accrual to 2016, when Walton first knew or should have

known that her sentence was based on incorrect information.  <u>Cf. Mata v. Anderson</u>, 685 F. Supp.

2d at 1262 ("A § 1983 action accrues when facts that would support the cause of action are or

should be apparent.  . . . '[C]laims accrue and [t]he statute of limitations begins to run when the

plaintiff . . . has reason to know of the existence and cause of the injury which is the basis of his

action.'" (quoting <u>Alexander v. Oklahoma</u>, 382 F.3d at 1215)).  Insofar as, in the Court's view, the

sentence's misinformed character represents the heart of Walton's claim and her best available

theory of Constitutional injury, then 2016 was when she became aware of that violation.  <u>See</u>

Section V.B.3 <u>infra</u>, at 56-59 (discussing the misinformed sentencing as a procedural due process

violation).  Cerna Gallegos argues for this result.  <u>See</u> Doe 3 MSJ at 8 ("Plaintiff has not alleged

on which date 'John Doe 3' allegedly incorporated the erroneous pre-sentence confinement calculation into the sentencing recommendation, but it is obvious the alleged action had to have occurred *before* Plaintiff's sentencing on May 26, 2016." (emphasis in Doe 3 MSJ)).  The general accrual rule, therefore, would say that the clock started ticking then.

The rule that federal courts look to State law tort analogues for accrual guidance suggests yet another route, pegging accrual to a moment even earlier than 2016.  Cf. Manuel v. City of Joliet, 580 U.S. at 370 ("In defining the contours and prerequisites of a § 1983 claim, including its rule of accrual, courts are to look first to the common law of torts."); Manuel v. City of Joliet 580 U.S. at 371 ("Manuel analogizes his claim to the common-law tort of malicious prosecution. . . . According to the City, [however,] the most analogous tort to Manuel's constitutional claim is not malicious prosecution but false arrest, which accrues when legal process commences.").  One tort analogue is wrongful detention, and, indeed, Walton in part characterizes her claim as one for wrongful detention.  See FAC at 5-6.  False imprisonment accrues either when executive officers release a victim from custody or legal process commences to justify the detention, at which point the suit becomes one for malicious prosecution.  See McDonough v. Smith, 139 S. Ct. 2149, 2156 (2019)("[T]he common-law tort of malicious prosecution . . . accrues only once the underlying criminal proceedings have resolved in the plaintiff's favor."); Mondragon v. Thompson, 519 F.3d 1078, 1082-83 (10th Cir. 2008)("The false imprisonment ends for these purposes either when the victim is released or when the victim's imprisonment becomes 'pursuant to [legal] process -- when, for example, he is bound over by a magistrate or arraigned on charges.'" (quoting Wallace v. Kato, 549 U.S. 384, 390 (2007))(alterations in Mondragon v. Thompson, not in Wallace v. Kato)); Mondragon v. Thompson, 519 F.3d at 1083 ("After the institution of legal process, any remaining constitutional claim is analogous to a malicious prosecution claim.").  Walton's claims, however,

do not sound in the ordinary Fourth Amendment doctrines concerning police officers' seizure of a person without justification. Keeping strictly to the wrongful detention's accrual rule would mean that Walton's alleged wrongful detention occurred when legal process was begun against her, i.e., before even 2016 when she was sentenced to probation. Except in the sense discussed below that the Supreme Court has likened Heck suits to malicious prosecution torts, Walton's claims are not characterized in any obvious way as malicious prosecution, because she does not suggest a wrongful basis for the criminal proceedings against her. Cf. M.G. v. Young, 826 F.3d 1259, 1262 (10th Cir. 2016)("A Section 1983 malicious prosecution claim includes five elements: (1) the defendant caused the plaintiff's . . . prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the . . . prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." (quoting Wilkins v. DeReyes, 528 F.3d 790, 799 (10th Cir. 2008)). The Court has not identified a New Mexico tort that targets such alleged wrongful detentions as Walton's. Ultimately, therefore, the Court determines that New Mexico's tort analogues are not of much guidance.

The Heck delayed-accrual rule is the governing one, because Walton's claims attack essentially her criminal sentence; the clock started ticking, therefore, when she succeeded in declaring unlawful her sentence. Although the Court agrees with Cerna Gallegos that, insofar as the misinformed 2016 sentencing represents the alleged Constitutional injury's core, the generic § 1983 accrual doctrine would peg accrual to that time, cf. Mata v. Anderson, 685 F. Supp. 2d at 1262 ("A § 1983 action accrues when facts that would support the cause of action are or should be apparent. . . . '[C]laims accrue and [t]he statute of limitations begins to run when the plaintiff . . . has reason to know of the existence and cause of the injury which is the basis of his action.'" (quoting Alexander v. Oklahoma, 382 F.3d at 1215)), nevertheless, because Walton's claim comes

under <u>Heck</u>, then <u>Heck</u>'s specific delayed-accrual rule governs.  As the Court discusses, <u>see</u> n.37 <u>supra</u>, at 30-31, Walton attacks essentially the 2016 sentence imposed on her: although she characterizes her claim as an over-detention case, she alleges she was over-detained because her sentence credited her insufficiently time-served credit.  Such a claim comes under <u>Heck</u>'s auspices, because Walton, to pursue a § 1983 claim, first had to succeed in invalidating the sentence on either direct appeal or collateral attack.  <u>See</u> <u>Hurd v. District of Columbia</u>, 2023 WL 8697829, at *6 ("Hurd's time-served credit theory of over-incarceration 'necessarily impl[ies]' the invalidity of his confinement. Hurd expressly argues that the District unlawfully imprisoned him for roughly 10 months longer than it should have." (quoting party's briefing)); <u>Farrell v. Colorado</u>, 2015 WL 13730678, at *4 ("<u>Heck</u> . . . applies to challenges to the duration of confinement.'").  Walton successfully cleared the <u>Heck</u> threshold, because she succeeded in having her sentence declared illegal, first by obtaining successfully her immediate release in July 13, 2018, and then, later in 2020, she succeeded in convincing Judge Sánchez to amend her sentence.

Walton's § 1983 cause of action, therefore, began accruing once she succeeded in having her sentence declared unlawful; <u>Heck</u> provides for delaying accrual of a § 1983 cause of action that for a claim under its purview, namely, a claim that presupposes the invalidity of a criminal conviction or sentence.  <u>See</u> <u>Beck v. City of Muskogee Police Dep't</u>, 195 F.3d at 557 ("[F]or § 1983 claims necessarily challenging the validity of a conviction or sentence, <u>Heck</u> delays the rise of the cause of action until the conviction or sentence has been invalidated. Because the cause of action does not accrue until such time, the applicable statute of limitations does not begin to run until [then].").  Walton's claim is, at heart, such a <u>Heck</u> claim, so it benefits from the delayed-accrual rule.  Accordingly, the three-year New Mexico personal injury statute of limitations did

not begin to run until Walton's § 1983 claim accrued at the time she succeeded in having her sentence declared illegal.

The question remains, however, which of two points in time -- Walton's July 13, 2018, release or her 2020 Amended Judgment -- represents the point for purposes of the Heck delayed-accrual rule.  On either view, the three-year statute of limitations does not bar Walton's suit, because either temporal window permits her to file, as she did, her lawsuit on May 18, 2021.  See Complaint ¶ 1, at 1.  Nonetheless, between the two points in time, the Court concludes that the earlier one represents the point of accrual.  Although the Amended Judgment represents the more fulsome declaration that Walton's sentence was illegal, the more fulsome declaration need not be § 1983's accrual start line: a plaintiff clears Heck's bar once some direct or collateral review has called into question the conviction or sentence's legality.  Cf. Heck, 512 U.S. at 486-87 ("[A] § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."). Heck thus permits implicitly a plaintiff's suit to proceed on something less than a full-throated reversal.  Here, the July 13, 2018, Release Order suffices for that purpose: that Judge Sánchez then ordered Walton's immediate release casts doubt on the validity of the sentence's length.  Although the Release Order does not explain in detail why Judge Sánchez orders Walton's release, neither does the Amended Judgment explain in detail why Judge Sánchez amends Walton's sentence. Heck does not mandate that plaintiffs, along with successfully securing their sentence or conviction's invalidation, also obtain a reasoned explanation for that success.  Heck draws upon the tort of malicious prosecution for its conclusion that a convicted § 1983 litigant must secure her conviction or sentence's invalidation, see Heck 512 U.S. at 486 n.4 (placing "reliance on malicious

prosecution's favorable termination requirement as illustrative of the common-law principle barring tort plaintiffs from mounting collateral attacks on their outstanding criminal convictions"); the tort of malicious prosecution's favorable termination requirement, as the Supreme Court recently explains, can be satisfied without a formal explanation of the basis of a litigant's success, cf. Thompson v. Clark, 596 U.S. 36, 49 (2022)("[W]e hold that a Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence. A plaintiff need only show that the criminal prosecution ended without a conviction."). See Geness v. Cox, 902 F.3d 344, 356 (3d Cir. 2018)(criticizing the district court for "refus[ing] to look beyond the four corners of the [dismissal] order"). The Court similarly concludes that the Release Order's command that Walton be released, a command which undercuts the validity of the sentence that Judge Sánchez previously had imposed, suffices in the same way for purposes of Heck's favorable termination requirement. Because the July 13, 2018, Release Order itself calls into question Walton's sentence length's validity, that point in time represents the pertinent accrual moment under Heck's delayed accrual rule. Accordingly, New Mexico's three-year statute of limitations does not foreclose Walton's claim, because she filed it on May 18, 2021.

## III. WALTON'S EX POST FACTO CLAIMS DO NOT SURVIVE SUMMARY JUDGMENT.

The Defendants are entitled to summary judgment on Walton's claims for violations of the Ex Post Facto clause, because Walton's Ex Post Facto claim fails to state a claim for relief. The Ex Post Facto clause targets legislation that inflicts backwards-looking punishment. See Young v. McKune, 280 F. Supp. 2d 1250, 1255 (D. Kan. 2003)(Murguia, J.)("To fall within the ex post facto prohibition . . . [a] law [first] must be retrospective[;] . . . second, it must disadvantage the offender

affected by it."), aff'd, 85 F. App'x 723 (10th Cir. 2004).  Walton identifies no law that came into existence after the conduct for which she faced criminal penalties and that was applied retroactively to that conduct.  Moreover, the Ex Post Facto clause is a bulwark against legislative actions and executive agency rulemaking but not executive officers' individual actions.  See Weaver v. Graham, 450 U.S. 24, 30 (1981)("[A]n individual's right . . . [to] fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated."); Young v. McKune, 280 F. Supp. 2d at 1255 ("[T]he law must be retrospective."); Smith v. Scott, 223 F.3d 1191, 1193-94 (10th Cir. 2000)("[A]n agency regulation which is legislative in nature is encompassed by this prohibition because a legislative body 'cannot escape the Constitutional constraints on its power by delegating its lawmaking function to an agency.'" (quoting United States v. Bell, 991 F.2d 1445, 1450 (8th Cir. 1993)).  The implicit logic of Walton's FAC is that the Ex Post Facto clause targets any temporal-related wrongs visited on her, i.e., that the Defendants caused her to spend too much time in jail.  Because Walton identifies no penal law applied retroactively to conduct she committed, there is no Ex Post Facto violation.

Walton does not cite a case which holds an Ex Post Facto violation occurs on such facts as hers, nor does the Court in its independent research find such a case.  The Court's independent research identifies no caselaw holding that an Ex Post Facto Clause violation exists under these circumstances.  Accordingly, even if there were a violation, Walton cannot show that the law was clearly established that an Ex Post Facto violation occurs under these circumstances at the time she suffered her alleged violation, so the individual Defendants would be entitled to qualified immunity, see Perea v. Baca, 817 F.3d at 1202 (placing burden on plaintiff to "show that (1) the

officers' alleged conduct violated a constitutional right, and (2) [that right] was clearly established at the time of the violation"), while Lea Detention is entitled to summary judgment.

## IV.   WALTON'S FOURTH AMENDMENT CLAIMS DO NOT SURVIVE SUMMARY JUDGMENT.

The Defendants are entitled to summary judgment on Walton's Fourth Amendment claims, because no Fourth Amendment claim lies on such facts as these.  Any claim that a person's detention is unconstitutional ceases to sound under the Fourth Amendment once judicial process has begun: after the commencement of legal process, claims alleging a person's detention is unlawful come under the Due Process Clause or else the Cruel and Unusual Punishments Clause. See Manuel v. City of Joliet, 580 U.S. at 369 n.8 ("[O]nce a trial has occurred, the Fourth Amendment drops out: A person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment."); Heter v. City of Hutchinson, 851 F. App'x 874, 876 (10th Cir. 2021)("After the initiation of legal process, the source of an alleged constitutional violation stemming from a plaintiff's continued detention shifts from the Fourth to the Fourteenth Amendment.").

The period of Walton's incarceration that she says is unlawful occurred after she was already sentenced: she says, in essence, that her sentence was too long, because it did not credit her for 101 days in jail she had spent already.  Because the period of allegedly unlawful detention occurred pursuant to judicial process, her claims do not sound under the Fourth Amendment but instead under the Due Process Clause or under the Eighth Amendment.  Cf. Sloan v. Pugh, No. CIV 05-00527, 2005 WL 2464678, at *1 (D. Colo. October 4, 2005)(Blackburn, J.)("[A] prisoner has a constitutional right, founded on either the Fifth or Eighth Amendment, or both, not to be imprisoned past the date his sentence expires."); Sloan v. Pugh, 2005 WL 2464678, at *1 n.2

("[P]laintiff seeks damages for the miscalculation of his sentence . . . Plaintiff cites to no case, and I have found none, holding that the Fourth Amendment creates a constitutional right under circumstances similar to those implicated in this case.").  Accordingly, Walton's FAC fails to state a claim under the Fourth Amendment, and the Defendants are entitled to summary judgment thereon.

Moreover, Walton does not cite any law that clearly establishes that the Defendants violated a Fourth Amendment right under these circumstances.  The Court, in its own research, cannot find any caselaw to support her position.  Accordingly, even if Walton could establish a Fourth Amendment Constitutional violation, she has not established that the law was clearly established at the time of her alleged Constitutional violation, so the individual Defendants are entitled to qualified immunity.

## V.   WALTON'S DUE PROCESS CLAIMS DO NOT SURVIVE SUMMARY JUDGMENT.

Walton cannot survive summary judgment on her claims that the Defendants violated her rights to due process under a theory either of substantive due process or of procedural due process. The parties invoke different due process doctrines, but no doctrine ultimately establishes a due process violation that overcomes the individual Defendants' qualified immunity.  Although the Court determines that Walton experienced a procedural due process injury, insofar as her sentence was based on erroneous information, the Court concludes for several independent reasons that the individual Defendants are not liable for that injury; and, as the Court later discusses, Lea Detention cannot face municipal liability for that injury, see Section VIII infra, at 92-95.

The Court first discusses and rejects any substantive due process Walton might assert. Within this discussion, the Court contends with a claim central to Walton's theory of the case: that

the Defendants over-detained her, holding her beyond their lawful authority to incarcerate her.  The Court addresses the Tenth Circuit's Moya v. Garcia, 895 F.3d 1229 (10th Cir. 2018)("Moya"), case, which suggests that over-detention can be a substantive due process claim, see Moya, 895 F.3d at 1232 n.1 ("The complaint contains claims based on both substantive and procedural due process. Based on our disposition, we need not distinguish between the claims involving procedural and substantive due process.").  See also Moya, 895 F.3d at 1245 n.4 (McHugh, J., concurring in the result and dissenting in part)("Our sister circuits are divided as to whether overdetention claims sound in procedural or substantive due process. . . . Although I would hold that Plaintiffs have pleaded a plausible procedural due process claim, I decline to opine on whether a substantive due process claim might also be viable." (citing Jauch v. Choctaw Cnty., 874 F.3d 425, 430 (5th Cir. 2017))).  Moya and related over-detention cases are inapposite, however, because the Court concludes that Walton was not over-detained: in the over-detention cases, a detainee is held either in the absence of or in excess of judicial authorization for the complained-of period of detention, see, e.g., Moya, 895 F.3d at 1231 ("This appeal involves claims of overdetention. . . . Both [plaintiffs] were arrested based on outstanding warrants and detained in a county jail for 30 days or more prior to their arraignments. These arraignment delays violated New Mexico law, which requires arraignment of a defendant within 15 days of arrest."); here, by contrast, Walton was detained pursuant to a judicially imposed sentence.  That sentence happened to be erroneous, because of the time-served information on which it was based.  That the sentence was legally erroneous does not mean, however, that Walton was over-detained.  Moya and its kind, to the extent they state a substantive due process claim, are inapposite.  The Court concludes that Walton establishes no other substantive due process claim that can overcome summary judgment.

Walton also does not establish a procedural due process violation that overcomes summary judgment. First, to the extent that <u>Moya</u>'s over-detention doctrine states a procedural due process violation, such a claim fails Walton for the same reason a substantive due process over-detention claim fails her: Walton was not over-detained. Second, under entitlement doctrines, although Walton has a liberty interest in her time-served credits that triggers due process protections, she was afforded the process for deprivation to which due process entitles her; no Constitutional violation occurs on this theory. Third, the Court concludes that Walton experienced a due process injury insofar as her sentence was based on inaccurate information, but Walton does not establish with adequate record evidence any Defendant's responsibility for the misinformation; Walton also does not establish that the Defendants possessed any mens rea beyond negligence. Moreover, as the Court discusses later, <u>see</u> Section VI <u>infra</u>, judicial absolute immunity would immunize any attack on the sentencing recommendation's preparation, because the Defendants in such a capacity were acting as auxiliaries of the sentencing court. Accordingly, Walton cannot establish any individual Defendant's § 1983 liability for the procedural due process violation her misinformed sentence worked. In sum, the Defendants are entitled to summary judgment on a theory either of substantive or procedural due process violations.

### A.   WALTON'S SUBSTANTIVE DUE PROCESS CLAIMS DO NOT SURVIVE SUMMARY JUDGMENT.

Walton cannot overcome summary judgment on a theory of substantive due process violations. Substantive due process protects persons' essential rights from unjustified government interference, in an analysis that looks to the rationale for the government interference and not the processes used to protect the right: if government infringes on a right without adequate justification, then a Constitutional violation occurs regardless how much process the person

receives.  See Brammer-Hoelter v. Twin Peaks Charter Acad., 81 F. Supp. 2d 1090, 1100 (D. Colo. 2000)(Kane, J.)("[S]ubstantive due process . . . guarantees that the state will not deprive a person of those rights for an arbitrary reason regardless of how fair the procedures are that are used in making the decision." (citing Archuleta v. Colorado Dep't of Insts., Div. of Youth Servs., 936 F.2d 483, 490 (10th Cir. 1991))).  Substantive due process can be established by showing that a fundamental right is violated or the existence of government conduct that shocks the judicial conscious.  See Seegmiller v. LaVerkin City, 528 F.3d 762, 767 (10th Cir. 2008)("The Supreme Court has described two strands of the substantive due process doctrine. One strand protects an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience.").[39]

_____

[39]There is some doctrinal tension over which analysis applies when the allegedly unconstitutional actor is the legislature versus the executive.  The Tenth Circuit at one time held that both the fundamental-rights test and the shocks-the-conscious test apply regardless of the defendant's identity.  See Seegmiller v. LaVerkin City, 528 F.3d at 768 ("Nowhere . . . [has] the [Supreme] Court establish[ed] an inflexible dichotomy. . . . [T]he distinction between legislative and executive action is ancillary to the real issue in substantive due process cases: whether the plaintiff suffered from governmental action that either (1) infringes upon a fundamental right, or (2) shocks the conscience." (discussing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998))).  The Tenth Circuit, however, has indicated its retreat from that position.  Although no published Tenth Circuit opinion overrules Seegmiller's language, the Tenth Circuit has in multiple unpublished opinions indicated that Seegmiller's gloss on County of Sacramento v. Lewis and like cases is dicta and that the fundamental-rights test applies only to legislative actors, while the shocks-the-conscious test applies only to executive actors:

Seegmiller does suggest both the shocks-the-conscience and fundamental-rights tests apply in analyzing alleged violations of substantive due process. 528 F.3d at 768-69.  In Browder v. City of Albuquerque, 787 F.3d 1076, 1079 n.1 (10th Cir. 2015), however, this court concluded the relevant language from Seegmiller was dicta and Supreme Court precedent mandates that, in cases of alleged government-official misconduct, the shocks-the-conscience test is the only applicable test. Id.; see also Dawson v. Bd. of Cnty. Comm'rs of Jefferson Cnty., 732 F. App'x 624, 633–36 (10th Cir. 2018)(Tymkovich, C.J., concurring)(unpublished disposition cited exclusively for its persuasive value).  Because this case involves allegedly arbitrary conduct by a state official or entity, the question whether the Amended Complaint

Walton's claim that she was over-detained illegally may sound in substantive due process, because the Tenth Circuit has not ruled out definitively over-detention as a matter of substantive due process.  See Moya, 895 F.3d at 1232 n.1 ("The complaint contains claims based on both substantive and procedural due process. Based on our disposition, we need not distinguish between the claims involving procedural and substantive due process."); Moya, 895 F.3d at 1245 n.4 (McHugh, J., concurring in the result and dissenting in part)("Our sister circuits are divided as to whether overdetention claims sound in procedural or substantive due process.").[40]  Walton cannot

---

states a constitutional violation must be judged exclusively by reference to the shocks-the-conscience test.

Wright v. City of Ponca City, No. 22-6137, 2023 WL 5765848, at *4 (10th Cir. September 7, 2023). See Moya, 895 F.3d at 1243-45 (McHugh, J., concurring in the result and dissenting in part)(discussing this "crosswinds in our case law"); Dawson v. Bd. of Cnty. Commissioners of Jefferson Cnty., 732 F. App'x 624, 634-35 (10th Cir. 2018)(Tymkovich, C.J., concurring)("Our Circuit has settled on the following solution: if the case involves a *legislative act*, only the 'rights' strand applies. . . . On the other hand, when the case involves *executive action* by a government official or entity, we apply the 'shocks the conscience' test." (emphasis in original)).   The Honorable Timothy M. Tymkovich, United States Circuit Judge for the United States Court of Appeals for the Tenth Circuit, for example, has offered a thoughtful three-part schema for substantive due process doctrine:

> "Looking to the history of Due Process Clause jurisprudence, as well as to the Supreme Court's stated policy concerns in this area, we propose dividing substantive due process into (1) cases challenging legislative action, (2) cases challenging executive action, and (3) cases challenging judicial action (though those distinctions themselves will require line drawing)."

ETP Rio Rancho Park, LLC v. Grisham, 522 F. Supp. 3d 966, 1029 (D.N.M. 2021)(Browning, J.)(quoting Timothy M. Tymkovich, Joshua Dos Santos & Joshua J. Craddock, A Workable Substantive Due Process, 95 Notre Dame L. Rev. 1961, 1964 (2020)).

[40]In the Court's view, a case of actual over-detention -- which Walton's is not -- is best analyzed as a matter of procedural due process.  The two-part framework for procedural due process maps cleanly onto cases of over-detention: (i) there is an obvious liberty interest in physical freedom from prolonged detention, a liberty interest arising from the Due Process Clause itself, see Jauch v. Choctaw Cnty., 874 F.3d 425, 430 (5th Cir. 2017)("The Constitution itself protects physical liberty."); and (ii) a stringent demand for adequate process can protect that

interest, although the Court agrees with the Fifth Circuit's view that, rather than the ordinary Matthews v. Eldridge test, the more applicable test is Medina v. California, because the latter test assesses the procedures available to protect persons' liberty interests who already are subject to the carceral system.  See Jauch v. Choctaw Cnty., 874 F.3d at 431-32 (discussing Medina v. California's applicability to over-detention); Kincaid v. Gov't of D.C., 854 F.3d 721, 726 (D.C. Cir. 2017)("A rule of criminal procedure usually does not violate the Due Process Clause unless it (i) 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or (ii) 'transgresses any recognized principle of 'fundamental fairness' in operation.'" (quoting Medina v. California, 505 U.S. at 446, 448)).  Although the Medina v. California test is more deferential to State criminal procedure rules, still it can protect against over-detention.  See Jauch v. Choctaw Cnty., 874 F.3d at 432 ("Even under the deferential *Medina* test, the indefinite-detention procedure violated Jauch's right to procedural due process.").

Although the Honorable Judge Carolyn B. McHugh, United States Circuit Judge for the United States Court of Appeals for the Tenth Circuit, analyzed over-detention under the Matthews v. Eldridge framework instead of under the Medina v. California framework, the Court agrees with her view that over-detention is cognizable under procedural due process.  See Moya, 895 F.3d at 1245 n.4 (McHugh, J., concurring in the result and dissenting in part)("I would hold that Plaintiffs have pleaded a plausible procedural due process claim, [so] I decline to opine on whether a substantive due process claim might also be viable.").  The Tenth Circuit en banc majority does not disagree that a procedural due process claim would be available along the theoretical lines that Judge McHugh articulates; the majority instead declined to decide that issue, because, in its view, Judge McHugh's theory was not the one that the litigants advanced.  See Moya, 895 F.3d at 1238 ("[T]he plaintiffs have consistently framed their argument based on the arraignment delays.  The dissent's theory is not the theory presented by the plaintiffs."); id. at 1238 n.11 ("[W]e need not decide whether Mr. Moya and Mr. Petry would have stated a valid claim if they had alleged a broader right to freedom from pretrial detention (unrelated to Rule 5-303(A)'s fifteen-day requirement). We are deciding only the validity of the theory advanced by Mr. Moya and Mr. Petry.").

The Supreme Court has cautioned against too expansive a use of substantive due process to address rights deprivations; where, for example, an alleged legal wrong could sound under a Constitutional doctrine other than substantive due process, the Supreme Court requires that the claim be analyzed exclusively under that non-substantive-due-process framework:

> Because we have "always been reluctant to expand the concept of substantive due process," *Collins v. Harker Heights,* [503 U.S. 115, 125 (1992)], . . . we held in *Graham v. Connor,* 490 U.S. 386 . . . (1989), that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 273 . . . (1994) (plurality opinion of REHNQUIST, C.J.)(quoting *Graham v. Connor, supra,* at 395 . . .) (internal quotation marks omitted)

succeed on such a claim, even if it is available in the Tenth Circuit, however, because she was not

over-detained.  Walton, the Court concludes, also has no other viable substantive due process

claim, so the Defendants are entitled to qualified immunity on a substantive due process theory.

### 1.   Walton's Over-Detention Claim, Characterized as a Substantive Due Process Claim, Fails, Because Walton Was Not Over-Detained.

To the extent that Walton asserts her case is an over-detention one cognizable under

substantive due process, she cannot succeed, because she was not over-detained.[41]  Some federal

courts have described over-detention as raising a substantive due process issue, although the matter

also has been described as one of procedural due process or as Eighth Amendment cruel-and-

unusual punishment.  See Moya, 895 F.3d at 1232 n.1; Moya, 895 F.3d at 1245 n.4 (McHugh, J.,

concurring in the result and dissenting in part).  See also Sloan v. Pugh, 2005 WL 2464678, at *1-

2  ("[A] prisoner has a constitutional right, founded on either the Fifth or Eighth Amendment,[] or

both, not to be imprisoned past the date his sentence expires.").  The Court first addresses Walton's

over-detention claim as a matter of substantive due process.  The Court draws, however, on cases

from other Constitutional frameworks and its conclusions in this section apply to other

---

Cnty. of Sacramento v. Lewis, 523 U.S. at 842.  See Shrum v. City of Coweta, 449 F.3d 1132, 1145 (10th Cir. 2006)("Where a plaintiff has recourse to an 'explicit textual source of constitutional protection,' a more general claim of substantive due process is not available." (quoting Graham v. Connor, 490 U.S. at 395)).  The Court's view then is that the issue of over-detention, cognizable under procedural due process, ought to be left under that doctrine and not analyzed under substantive due process.

[41]The Court, in its MSJ Order, held that the over-detention caselaw of Moya applies to Walton's situation and that Walton unconstitutionally was over-detained, but that the Defendants were entitled to qualified immunity because the right against over-detention was not clearly established.  See MSJ Order at 10-13; id. at 13 ("Even though Walton's overdetention violated her Fourteenth Amendment due process rights, her Fourteenth Amendment right against overdetention is not 'clearly established.'" (quoting Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009))).  On further consideration, however, the Court concludes that Walton was not over-detained, so Moya and its doctrines are inapposite to Walton's situation.

Constitutional frameworks, because the Court concludes, as a threshold matter, that Walton was not over-detained.

Walton's situation is not characterizable as one of over-detention, because she was not incarcerated past the expiration of the valid sentence imposed on her. See Dodds v. Richardson, 614 F.3d 1185, 1192 (10th Cir. 2010)("Plaintiff's claim falls into a category of claims which unfortunately have become so common that they have acquired their own term of art: 'overdetention,' i.e., when 'the plaintiff has been imprisoned by the defendant for longer than legally authorized, whether because the plaintiff's incarcerative sentence has expired or otherwise.'" (quoting Holder v. Town of Newton, 638 F. Supp. 2d 150, 153 (D.N.H. 2009)(Laplante, J.)). Moya and cases like it stand for the proposition that a Constitutional violation lies on a jailor's detention of a plaintiff without authorization. One set of facts common to these cases involves executive officers detaining a person too long before they are brought before a judge. See Moya, 895 F.3d at 1231 ("This appeal involves claims of overdetention by [plaintiffs who] were arrested based on outstanding warrants and detained in a county jail for 30 days or more prior to their arraignments. These arraignment delays violated New Mexico law, which requires arraignment of a defendant within 15 days of arrest."). Another common setting involves prisoners held past their prison sentence's expiration, e.g., because prison officials ignore the calculated release date, refuse to correct a miscalculated release date, or resist a court order for release. See Davis v. Hall, 375 F.3d 703, 714 (8th Cir. 2004)("[T]he defendants deprived [Davis] of a protected liberty interest by continuing to confine him after he completed his sentence and was ordered immediately released."); Calhoun v. N.Y. State Div. of Parole Officers, 999 F.2d 647, 653 (2d Cir. 1993)("[D]efendants had no constitutional authority to hold [Calhoun] in prison for the five extra days beyond his original maximum expiration date."); Mitchell v. N.M. Dep't of Corr., 1993 WL

191810, at *3 (10th Cir. June 1, 1993)("[T]here exists a genuine issue of material fact concerning whether defendants have incarcerated Mr. Mitchell beyond his release date.  Imprisonment beyond one's term can constitute cruel and unusual punishment for purposes of the Eighth Amendment."); Sample v. Diecks, 885 F.2d 1099, 1110 (3d Cir. 1989)("[N]ot every official who is aware of a problem exhibits indifference by failing to resolve it. . . . [I]f a prison official knows that . . . a sentence calculation problem will not likely be resolved unless he or she addresses it . . . , it is far more likely that the requisite attitude will be present."); Haygood v. Younger, 769 F.2d 1350, 1354 (9th Cir. 1985)("Detention beyond the termination of a sentence could constitute cruel and unusual punishment if it is the result of 'deliberate indifference' to the prisoner's liberty interest[;] . . . otherwise, such detention can be held to be unconstitutional only if it violates due process." (quoting Estelle v. Gamble, 429 U.S. 97, 104-06 (1976))); Douthit v. Jones, 619 F.2d 527, 535 (5th Cir. 1980)("'While not a surety for the legal correctness of a prisoner's commitment, . . . [prison officials'] functions include not only the duty to protect a prisoner, but also the duty to effect his timely release.'" (quoting Whirl v. Kern, 407 F.2d 781, 792 (5th Cir. 1968))); Sloan v. Pugh, 2005 WL 2464678, at *1-2  ("[A] prisoner has a constitutional right, founded on either the Fifth or Eighth Amendment,[] or both, not to be imprisoned past the date his sentence expires."); Farrell v. Colorado, 2015 WL 13730678, at *4 ("All of [the plaintiff's] claims are founded upon his allegation that his sentence discharge date . . . was improperly extended by either six or seven days because he did not receive all of his earned time credit after a disciplinary conviction was expunged.").

Walton was imprisoned pursuant to a valid court order that committed her on April 9, 2018, to Lea Detention's custody for eighteen months less 272 days of confinement credit.  See Revocation Order at 1-2; Confinement Credit Attachment at 1.  Walton does not assert that the

Defendants incorrectly calculated her release date as December 12, 2018, based on the Revocation Order.  See Release Date Calendar at 1.  According to New Mexico State law, the Defendants had no power to release Walton without a court order; indeed, it would subject them to criminal penalties to release her without a court order.  See N.M.S.A. § 33-3-3 ("The jail . . . in each county shall be used . . . for the imprisonment of every person who in conformity with sentence, upon conviction of an offense, may have been sentenced. . . ."); N.M.S.A. § 33-3-12(A) ("Every public officer who has power to order the imprisonment of any person for violation of law shall . . . transmit . . . a true copy of the order so that the person imprisoned may be considered under his custody until expiration of the commitment."); N.M.S.A. § 33-3-12(B) ("Any jailer who deliberately and knowingly releases a prisoner without an order of release as provided in this section, except upon expiration of the prisoner's term of commitment, is guilty of a misdemeanor and shall be removed from office.").   The Defendants were not over-detaining Walton when, on July 13, 2018, Walton secured her release from Judge Sánchez, and, on that same date, the Defendants released Walton.  See Release Order at 1.

Walton's suit is, at heart, against the Revocation Order and the 2016 sentence on which it was based for insufficiently crediting her time-served.  Her case only appears to be an over-detention case, because of the mere fortuity that her sentence was short enough that she would have been released earlier, had Judge Sánchez credited correctly her time-served; if Walton's sentence was longer, and she were still incarcerated, then any suit about insufficient time-credit clearly would be a legal attack that calls into question the sentence's validity.  Cf. Heck, 512 U.S. at 490 n.10 ("[T]he principle barring collateral attacks . . . is not rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated.").   Walton's charge against her incarceration is equivalent to arguing she was incarcerated too long, because the sentencing court

applied erroneously a sentencing enhancement or declined erroneously to apply a downward departure -- each legally incorrect determination increasing her incarceration beyond what a legally correct sentence would have imposed.  Just as here, the time in jail in excess of what a legally correct sentence would have imposed is not characterizable as a period of over-detention, and she cannot lay blame on her jailors for doing what a judge's order told them to do.  Cf. Douthit v. Jones, 619 F.2d at 535 (stating that prison officials are "'not [] suret[ies] for the legal correctness of a prisoner's commitment'" (quoting Whirl v. Kern, 407 F.2d at 792)).  Although some language describing over-detention suggests that the doctrine has a capacious reach, cf. Dodds v. Richardson, 614 F.3d at 1192 (describing over-detention as occurring when "'the plaintiff has been imprisoned by the defendant for longer than legally authorized, whether because the plaintiff's incarcerative sentence has expired or otherwise'" (quoting Holder v. Town of Newton, 638 F. Supp. 2d at 153)(emphasis the Court's)), it would stretch too far the doctrine to describe as a case of over-detention case any situation where a person sits longer in jail than she would have had the sentencing court applied correctly the applicable sentencing framework.  Such a rule would Constitutionalize any error -- no matter how technical or esoteric -- in a criminal sentencing framework's application, frameworks which can be quite byzantine; many defendants whose sentence is affected by error could identify some window of time attributable to such error, even if the person's jailors had no reason to know the sentence was erroneous.  To treat as not "'legally authorized,'" Dodds v. Richardson, 614 F.3d at 1192 (quoting Holder v. Town of Newton, 638 F. Supp. 2d at 153), any period of incarceration beyond the period that a perfectly correct criminal sentence would impose would be to deem not an over-detention only the actions of the platonic jailor enforcing the platonic criminal sentence.  Because criminal sentences may be affected by error, and addressed through normal channels of direct and collateral appeal, not all such errors

need make for "over-detention," as here.  Walton was not over-detained, so the <u>Moya</u>-line of cases is not a viable basis for Constitutional liability.[42]

There being no Constitutional violation, neither is there clearly established law to that effect, so the individual Defendants are entitled to summary judgment on Walton's substantive due process over-detention claims against them.  <u>See</u> <u>Perea v. Baca</u>, 817 F.3d at 1202 (placing burden on plaintiff to "show that (1) the officers' alleged conduct violated a constitutional right, and (2) [that right] was clearly established at the time of the violation, such that 'every reasonable official would have understood,' that such conduct constituted a violation of that right." (quoting <u>Mullenix v. Luna</u>, 577 U.S. at 11)).  Walton does not cite any controlling Supreme Court or Tenth Circuit case that clearly holds that an over-detention substantive due process exists on these facts.

---

[42]Even if this was an over-detention case, <u>Moya</u> would prevent Walton's recovery, because the Defendants, who could not release Walton, did not cause her over-detention.  <u>Cf.</u> N.M.S.A. § 33-3-12(B) ("Any jailer who deliberately and knowingly releases a prisoner without an order of release as provided in this section, except upon expiration of the prisoner's term of commitment, is guilty of a misdemeanor and shall be removed from office.").  Even if the Court were to characterize as a period of over-detention that period of time Walton would not have spent in jail had her sentence correctly credited her time-served, the Court still would not deem the Defendants responsible for that period of over-detention.  <u>See</u> <u>Moya</u>, 895 F.3d at 1236 ("Mr. Moya and Mr. Petry did not sue the court; they sued the sheriff and wardens, officials that could not have caused the arraignment delays because of their inability to schedule the arraignments."); <u>Torrez v. El Paso Cnty. Sheriff's Dep't</u>, No. CIV 20-2478, 2021 WL 4245377, at *5 (D. Colo. September 16, 2021)(Mix, M.J.)("<u>Moya</u>'s general holding is . . . that without adequate allegations that the defendant caused the overdetention, no claim is stated.").  If anyone is responsible for that hypothetical over-detention, it is the sentencing court, which created the over-detention by ordering that Walton be incarcerated for an erroneous amount of time.  Walton, however, did not sue the sentencing court, nor could she.  <u>See</u> <u>Moss v. Kopp</u>, 559 F.3d 1155, 1163 (10th Cir. 2009)("'[J]udges acting in their judicial capacity are absolutely immune from liability under section 1983 . . . .'" (quoting <u>Turney v. O'Toole</u>, 898 F.2d 1470, 1472 (10th Cir. 1990))).  As the Court discusses later, any actions that the Defendants took to aid the sentencing court in sentencing Walton also are immunized.  <u>See</u> Section VII <u>infra</u>, at 90-92.

The Court's independent research has not uncovered any case that holds such a violation exists. Thus, even if there is a Constitutional violation, the law was not clearly established at the time of the alleged violation, and the individual Defendants are entitled to qualified immunity on these claims.

### 2.    No Other Substantive Due Process Is Available to Walton.

Beyond the specific substantive due process theory that the over-detention cases can represent, Walton cannot advance another substantive due process liability theory on the basis that otherwise the Defendants' conduct violates a fundamental right or that it shocks the judicial conscious. As noted above, a substantive due process claim requires either: (i) legislative action that violates a fundamental right, where a right is fundamental if it is deeply rooted in the Nation's historical traditions; or (ii) executive action that shocks the judicial conscious. See Wright v. City of Ponca City, 2023 WL 5765848, at *4 ("Supreme Court precedent mandates that, in cases of alleged government-official misconduct, the shocks-the-conscience test is the only applicable test."); Seegmiller v. LaVerkin City, 528 F.3d at 767 ("The Supreme Court has described two strands of the substantive due process doctrine. One strand protects an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience."). Setting aside the over-detention theory -- because Walton was not over-detained -- the Defendants' executive officer conduct does not shock the judicial conscious. The Defendants' conduct in declining to release Walton before the expiration of the sentence that the Revocation Order imposed is not shocking; when Walton raised the time-served credit issue to her jailers, they told her to seek out counsel:

> Request:      was wondering why my time dec 2015 till may 25th 2016 wasn't counted towards my sentence that im in here on i did 5 1/2 months befor sentencing on may 27th 2016 it was counted towards my probation and it should

be counted towards my confinement time on this sentencing plz look in to this matter and tell me what I need to do to get this time counted and my time fixed my release date should be way before dec .12 th . . . . [sic]

           Response:     You need to contact your attorney.  There is nothing we can do about it.

Inmate Request Form at 1.  The Defendants' behavior is not conscious-shocking: the Defendants could do no other than what they did; they had no authority to release Walton without a court order, see N.M.S.A. § 33-3-3; N.M.S.A. § 33-3-12(A)-(B), and directing Walton to her attorney, a person who could seek relief on Walton's behalf, is an appropriate response to Walton's situation.

The standard for a substantive due process violation is conduct that either violates a fundamental right or that shocks the judicial conscious, an extremely high standard.  Certainly, being incarcerated for 101 days she should not have served is unfortunate and wrong, but it does not violate a fundamental right nor shock the judicial conscious.  Defendants often are serving time in custody when their sentences are reversed or they are determined not guilty; errors are a casualty of human reason and incomplete judgment.  101 days spent in prison because of a flawed sentence, however, does not violate a fundamental right or shock the judicial conscious.  Substantive due process is not a useful vehicle for such a case as Walton's.  Walton has due process rights not to be sentenced based on inaccurate information -- i.e., a due process right that the 101 days served on the magistrate court case be considered at her 2016 sentencing; this predicament raises a procedural due process question instead of a substantive due process question, and will be considered in that part of the analysis, see Section V.B.3 infra, at 61-62.  Accordingly, Walton does not establish that a substantive due process violation occurred.

Given that there is no Constitutional violation, it is not possible to find any clearly established precedent holding that a substantive due process violation occurred under these

circumstances.  Walton does not cite any Supreme Court or Tenth Circuit caselaw that holds a substantive due process violation occurs under these circumstances, and the Court, in its independent research, does not find a case that holds a substantive due process violation occurs on these facts.  Accordingly, the individual Defendants are entitled to qualified immunity based on any substantive due process violation that Walton asserts.

### B.   WALTON'S PROCEDURAL DUE PROCESS CLAIMS DO NOT SURVIVE SUMMARY JUDGMENT.

The Defendants are entitled to summary judgment on Walton's due process claims under a procedural due process framework.  Procedural due process ensures that deprivations of life, liberty, and property interests occur according to fair processes.  See Archuleta v. Colo. Dep't of Insts., Div. of Youth Servs., 936 F.2d 483, 490 (10th Cir. 1991)("[P]rocedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision. . . .").  Three procedural due process theories are implicated in Walton's case, but none of them ultimately can overcome summary judgment.  First, to the extent that over-detention raises a procedural due process claim, this theory fails, because, for the same reasons discussed above, Walton was not over-detained.  Second, under a deprivation-of-entitlements theory, Walton has a liberty interest that triggers due process protections in receiving time-served credit; because, however, she received the process to which a deprivation of that interest entitles her, her procedural due process rights were not violated.  Third, the Court determines that, although Walton experienced a due process injury, because Judge Sánchez sentenced her based on inaccurate information, nevertheless Walton cannot establish that any individual Defendant violated her due process rights, because she does not establish with adequate record evidence that any individual Defendant bears responsibility for causing the sentence to be based on erroneous

information; moreover, even if she could establish any Defendant's causal responsibility, she does not establish that any individual Defendant possessed a mens rea beyond negligence; finally, as the Court explains later, see Section VII infra, absolute judicial immunity bars suits that relate to the preparation of a sentencing recommendation, given that such a task is closely linked to an essential judicial function.

### 1.  Walton's Over-Detention Claims, Characterized as Procedural Due Process Claims, Cannot Succeed, Because She Was Not Over-Detained.

For the same reasons that, as the Court discusses above, Walton does not state a substantive due process over-detention claim, Walton also does not state a procedural due process over-detention claim.  As noted, under current Tenth Circuit law, which has not ruled definitively on this issue, over-detention may be either a matter of procedural or of substantive due process, as well as a matter of Eighth Amendment cruel-and-unusual punishment.  See Moya, 895 F.3d at 1232 n.1 ("The complaint contains claims based on both substantive and procedural due process. Based on our disposition, we need not distinguish between the claims involving procedural and substantive due process."); Moya, 895 F.3d at 1245 n.4 (McHugh, J., concurring in the result and dissenting in part)("Our sister circuits are divided as to whether overdetention claims sound in procedural or substantive due process."); Sloan v. Pugh, 2005 WL 2464678, at *1-2 ("[A] prisoner has a constitutional right, founded on either the Fifth or Eighth Amendment,[] or both, not to be imprisoned past the date his sentence expires."); in the Court's view, procedural due process is the best framework for an over-detention claim, see n.40 supra, at 57.  Regardless how over-detention should be characterized as a Constitutional problem, however, Walton cannot succeed, because she was not over-detained.  See Section V.A.1 supra, at 47-54.  Accordingly, even if over-detention states a procedural due process violation, she cannot establish such a violation because she was

not over-detained.  As the court notes, and will further explain, only that Walton's sentence was based on inaccurate information because of a calculation error harmed her establishes a due process injury.

> **2.**     **Although Walton's Interest in Time-Served Credits Constitutes a Liberty Interest that Triggers Due Process Protections, She Received Adequate Process.**

Walton has a liberty interest entitlement in time-served credit that triggers due process protections, but she received adequate process, so she cannot demonstrate a violation of due process.  Under the Matthews v. Eldridge framework, upon which rely the cases that the parties invoke, a person must point to an interest that due process protects and must have received an appropriate level of process, with what counts as adequate determined based on a balancing test. See Merrifield v. Bd. of Cty. Comm'rs, 654 F.3d 1073, 1078 (10th Cir. 2011)("To assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process."); Jauch v. Choctaw Cnty., 874 F.3d 425, 431 (5th Cir. 2017)("Ordinarily, '[t]he starting point for any inquiry into how much 'process' is 'due' must be the Supreme Court's opinion in Mathews v. Eldridge,' and we would consider the private interest at stake, the risk of erroneous deprivations under existing procedures . . . , and the government's interest." (quoting Buttrey v. United States, 690 F.2d 1170, 1177 (5th Cir. 1982)).  Here, Walton identifies in her expectation of receiving time-served credit a liberty interest that due process protects, but, because she received adequate process, she was not denied due process.

> **a.**     **Walton Possesses a Liberty Interest in Time-Served Credits, Which Triggers Due Process Procedures.**

Because New Mexico law mandates that sentencing courts provide time-served credit, Walton possessed a liberty interest in those credits which triggers due process protections. Due process can protect interests that arise from State law as well as from the Due Process clause itself. See Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)("Protected liberty interests may arise from two sources -- the Due Process Clause itself and the laws of the States."). State law can create a protected liberty interest, as long as an entitlement is at issue; entitlements are interests that are mandated when certain predicate conditions exist. See Elliot v. Martinez, 675 F.3d 1241, 1244 (10th Cir. 2012)("[A] state-created interest is not protected by the procedural component of the Due Process Clause unless the interest is an entitlement -- that is, unless the asserted right to property or liberty is *mandated* by state law when specified substantive predicates exist.")(emphasis in Elliot v. Martinez). Precise identification of the interest at issue -- and distinguishing that interest from the process that protects it -- is important analytically. See Elliott v. Martinez, 675 F.3d at 1245 (warning litigants against creating "confusion between what is a liberty interest and what procedures the government must follow before it can restrict or deny that interest" such that litigants "'collapse the distinction between the interest protected and the process that protects it.'" (quoting Town of Castle Rock v. Gonzales, 545 U.S. 748, 772 (2005)(Souter, J., concurring))). Where State law mandates a certain benefit be received and limits discretion in the deprivation thereof, then a person's legitimate, justified expectations make for a protected interest. See Vitek v. Jones, 445 U.S. 480, 489 (1980)(explaining no protected interest exists when deprivation is "discretionary with the prison authorities, and  . . . the prisoner [does not] possess any right or justifiable expectation that he would not be [deprived] except . . . upon the occurrence of [] specified events" (describing Meachum v. Fano, 427 U.S. 215, 226-27 (1976))).

Walton has a protected liberty interest in time-served credits, because New Mexico law requires that the sentencing court award them to her.  Like good-time credits accrued in prison, time-served credits are protected liberty interests that trigger due process protections.  See Routt v. Howry, 835 F. App'x 379, 382 (10th Cir. 2020)("[A] prisoner has a due-process liberty interest in credit for jail time served (or, analogously, in good-time credits) and a right under the Eighth Amendment's prohibition on cruel and unusual punishment to be released when his sentence ends.").  Although criminal sentencing is generally a matter of judicial discretion, see State v. Lack, 1982-NMCA-111, ¶¶ 21-27, 98 N.M. 500, 508-09, 650 P.2d 22, 30-31 ("By its nature, sentencing involves the proper application of sound judicial discretion in determining a proper sentence in each case. The sentencing judge must make an independent decision regarding an appropriate sentence and is not bound by presentence recommendations."), awarding time-served credit is not discretionary: State law places in trial judges' hands the responsibility of determining the correct amount of time-served credit and affords them no discretion to decline to award it,  see N.M.S.A. § 31-20-12 ("A person held in official confinement on suspicion or charges of the commission of a felony shall, upon conviction of that or a lesser included offense, be given credit for the period spent in presentence confinement against any sentence finally imposed for that offense."); Stewart v. State, 1991-NMSC-095, ¶¶ 5, 112 N.M. 653, 654, 818 P.2d 854, 855 ("[U]nder . . . Section 31-20-12 it is for the trial court to determine at the time of sentencing . . .  the specific presentence confinement to be credited against any sentence finally imposed for offenses on which an accused has been held.").  Walton thus had in these credits a justifiable expectation that constitutes a liberty interest which due process will protect.

> **b.**   **Walton Received the Process She Was Owed as to the Deprivation of the Time-Served Credit.**

Because the time-served credits are liberty interests, they trigger the requirement that some procedure be available to challenge the deprivation of such interests; here, Walton received process in the form of a sentencing hearing before a State judge, at which counsel represented her.  Walton asserts no reason to believe this hearing deviated in any way from the norm or failed to provide her adequate opportunity to be heard.   Such process satisfies both the ordinary <u>Matthews v. Eldridge</u> standard, <u>see</u> <u>Jauch v. Choctaw Cnty.</u>, 874 F.3d at 431 ("[Under <u>Matthews v. Eldridge</u>,] we . . . consider the private interest at stake, the risk of erroneous deprivations under existing procedures . . . , and the government's interest."), and the more State-deferential <u>Medina v. California</u> standard, which the United States Court of Appeals for the Fifth Circuit explains:

> The Supreme Court . . . [has held] "that 'the [Mathews v. Eldridge] balancing test does not provide the appropriate framework for assessing the validity of state procedural rules which . . . are part of the criminal process,' reasoning that because the 'Bill of Rights speaks in explicit terms to many aspects of criminal procedure,' the Due Process Clause 'has limited operation' in the field." *Kaley v. United States*, [571 U.S. 320, 334] (2014) (quoting *Medina v. California*, 505 U.S. 437, 443 . . . (1992)) (alterations in original). . . .
>
> As used in *Medina*, the phrase "part of the criminal process" has been described as "rules concern[ing], for example, the allocation of burdens of proof and the type of evidence qualifying as admissible." *Nelson v. Colorado*, . . . 137 S.Ct. 1249, 1255 . . . (2017). . . . *Medina* was premised on the "considerable expertise" of the states "in matters of criminal procedure and the criminal process" and represents "substantial deference to legislative judgments in this area," 505 U.S. at 445–46 . . . .
>
> The *Medina* test represents the "narrower inquiry" and is "far less intrusive than that approved in *Mathews.*" 505 U.S. at 445-46 . . . . "A rule of criminal procedure usually does not violate the Due Process Clause unless it (i) 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or (ii) 'transgresses any recognized principle of 'fundamental fairness' in operation.' " *Kincaid v. Gov't of D.C.*, 854 F.3d 721, 726 (D.C. Cir. 2017) (quoting *Medina*, 505 U.S. at 446, 448, . . .) . . . .

<u>Jauch v. Choctaw Cnty.</u>, 874 F.3d at 431-32.

That this process deprived Walton erroneously of the full time-served credits which were due her, nevertheless, does not mean the process was Constitutionally deficient. Even if the outcome was incorrect, the Constitution does not require that the outcome be correct for the process itself to be Constitutionally sufficient: due process requires only procedures that minimize sufficiently the risks of erroneous outcomes; it does not demand processes that never produce errors. Cf. Caldwell v. Univ. of New Mexico Bd. of Regents, 679 F. Supp. 3d 1087, 1126 (D.N.M. 2023)(Browning, J.)(explaining that among Matthews v. Eldridge's considerations is "the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable"). Persons have no right to a particular sentence so long as it falls within the relevant parameters, see Vasquez v. Cooper, 862 F.2d 250, 254-55 (10th Cir. 1988)("Vasquez has no right to a particular sentence within the statutory limits. The due process analysis in this case, therefore, turns on whether the process of imposing the sentence was fundamentally fair."), so federal courts on habeas review hold that erroneous time-served credit awards do not present due process problems, see Augustiniak v. Shinn, No. CIV 18-3977, 2020 WL 3620254, at *4 (D. Ariz. January 24, 2020)(Boyle, M.J.)("Neither party has directed this Court to clearly established federal law holding that incorrect state-law decisions regarding presentence credit can amount to a due process violation."); Howard v. White, 76 F. App'x 52, 52-53 (6th Cir. 2003)("[An erroneous time-served credit award claim] is not cognizable in this federal habeas corpus proceeding because it challenges the state court's interpretation and application of its sentencing laws and guidelines. A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state concern only.").

So long as here there were adequate safeguards, that the safeguards did not produce the optimal result does not mean a Constitutional violation occurred. New Mexico's time-served

statute is sufficiently open to interpretation that disputes over its application can arise.  Cf. State v. Barefield, 1979-NMCA-060, ¶ 29, 92 N.M. 768, 772, 595 P.2d 406, 410 ("If the confinement was not in connection with the offense charge, § 31-20-12 . . . does not authorize a credit."); State v. Barrios, 1993-NMCA-138, ¶ 7, 116 N.M. 580, 582, 865 P.2d 1224, 1226 ("During the entire time Defendant was in custody in Texas, he was being held as a fugitive from New Mexico and he had a 'no bond' hold placed on him in reference to the New Mexico charges. Therefore, Defendant's confinement in official custody from January 5, 1992, until his sentencing, was related to the New Mexico charge which is the subject of this appeal." (no source given for quotation)).[43]  Indeed, Cerna Gallegos maintains such a dispute over the statute's application; Cerna Gallegos argues that no error at all occurred, because New Mexico's statute does not require application of presentence credit when a person receives, as Walton did in 2016, a sentence suspended in favor of probation. Cf. State v. Nieto, 2013-NMCA-065, ¶¶ 6-9, 303 P.3d 855, 857-58 ("[W]e conclude that it was within the discretion of the district court to choose to suspend Defendant's sentence and to decide the parameters of probation most suitable . . . .  The pre-sentence confinement credit need not be credited against the probation time ordered by the district court.").[44]  Here, such an ambiguity

---

[43]The Court, exercising its Erie function to predict how the Supreme Court of New Mexico would state New Mexico law, predicts that the Supreme Court of New Mexico effectively would adopt the results that the Court of Appeals of New Mexico reaches in State v. Barefield and State v. Barrios.  The Supreme Court of New Mexico elsewhere has expounded the presentence credit statute along essentially the same lines, articulating "a three-part test for determining if presentence credit is appropriate: 1) Was defendant confined in either case? 2) Did the second charge trigger the incarceration (such as the bond revocation in *Ramzy*)? and 3) Was bond set for the escape?" State v. Facteau, 1990-NMSC-040, ¶ 7, 109 N.M. 748, 750, 790 P.2d 1029, 1031.

[44]The Court predicts that the Supreme Court of New Mexico would adopt the New Mexico Court of Appeals' statement of law in State v. Nieto, because the Supreme Court of New Mexico has quoted with approval other conclusions reached in State v. Nieto.  See State v. Aslin, 2020-NMSC-004, ¶ 11, 457 P.3d 249, 252.

arose, and Walton ultimately convinced Judge Sánchez that the award he imposed initially was erroneous: jail time on the magistrate case initially should have counted towards a sentence on the district court case after bounding-over.  That the process produced initially an incorrect outcome does not mean, however, the processes available to Walton were Constitutionally insufficient.  Cf. Hurd v. District of Columbia, 2023 WL 8697829, at *5 ("[E]ven accepting that Hurd was entitled to time-served credit . . . , this theory cannot support damages because the consequent over-incarceration did not 'result[ ] from the lack of process surrounding [the District's] initial decision to reincarcerate him.'" (quoting party's brief)).  No procedural due process violation, therefore, lies on the theory that Walton was deprived without process her liberty interest in these credits.

### 3. Although Walton Experienced a Procedural Due Process Injury, Because Her Sentence Was Based on Inaccurate Information, Walton Does Not Establish that Any Individual Defendant Is Responsible Constitutionally.

The best avenue available to Walton for establishing due process liability is that her sentence was based on inaccurate information.  On this question, the Court concludes that Walton experienced a due process injury, but also that Walton does not establish any individual Defendant's responsibility for causing that injury.  This preliminary conclusion that Walton experienced a due process injury -- although it does not affect the Court's individual officer liability conclusions -- changes the framework applicable to the Court's Monell analysis.  See Section VII infra, at 101-104.  See also n.46 infra, at 90-94.  The parties did not address this doctrine, but there is a due process doctrinal home for what the Court identifies as the heart of Walton's claim: that she was sentenced based on incorrect information, namely, the omission in the sentencing recommendation of the 101 days in jail she had spent already while her case was in magistrate court.  See United States v. Ruby, 706 F.3d 1221, 1229 (10th Cir. 2013)("'[T]he due

process clause protects a defendant's right not to be sentenced on the basis of materially incorrect information.'" (quoting United States v. Cook, 550 F.3d 192, 1296 (10th Cir. 2008)); United States v. Adams, 873 F.3d 512, 517 (6th Cir. 2017)("'[A] violation of due process exists when a sentencing judge relies upon erroneous information.' . . . '[T]he defendant must establish that the challenged evidence is materially false or unreliable, and that such false or unreliable information actually served as the basis for the sentence' in order to prove a due-process violation." (quoting United States v. Wilson, 614 F.3d 219, 225 (6th Cir. 2010), then United States v. Robinson, 898 F.2d 1111, 1116 (6th Cir. 1990)(first brackets the Court's, second brackets United States v. Adams')).

a. **Walton Experienced a Procedural Due Process Injury, Because She Was Sentenced Based on Inaccurate Information.**

On the theory that Walton was sentenced based on inaccurate information -- insofar as Judge Sánchez did not know about the 101 days she had spent in jail -- then a due process injury lies on Walton's sentence. Although this issue most frequently arises when sentencing courts consider such potentially unreliable information as hearsay about a defendant, see United States v. Ruby, 706 F.3d at 1229 ("Corroborating evidence is often key to determining whether a statement is sufficiently reliable."); United States v. Todd, 515 F.3d 1128, 1136 n.6 (10th Cir. 2008)("To the extent Mr. Spindler's statement and that of the informant constitutes hearsay, 'sentencing courts may consider hearsay evidence provided that the evidence has sufficient indicia of reliability.'" (quoting United States v. Dazey, 403 F.3d 1147, 1177 (10th Cir. 2005))), the issue also can arise as to relatively less contestable factual issues, such as the number of felony convictions a defendant has or whether a defendant had been deported previously, see United States v. Miller, 900 F.3d 509, 511, 513-14 (7th Cir. 2018)("The government in its sentencing memorandum wrote,

erroneously, that 'it appears that Mr. Miller has six prior felony convictions.' He had only five. . . . The district judge repeated the government's error at sentencing.   [W]e conclude that the misstatement about the number of his prior felony convictions resulted in procedural error." (quoting party's brief)); United States v. Corona-Gonzalez, 628 F.3d 336, 342 (7th Cir. 2010)("[T]he district court's reliance on the nonexistent fact that Mr. Corona-Gonzalez previously had been removed and then reentered the United States . . . [likely] affected the district court's sentencing assessment. . . . [A]llowing the present sentence to stand . . . would affect the 'fairness, integrity or public reputation of [the] proceedings.'" (quoting United States v. Olano, 507 U.S. 725, 732 (1993)).  Thus, in the same way, an inaccurately informed sentencing due process injury lies on the proposition that Walton was sentenced based on inaccurate information about the number of days she had spent in jail on the case.  Although Walton must raise any objections to the presentence report, nevertheless she still has a right not to be sentenced based on inaccurate information.  See State v. Lack, 1982-NMCA-111, ¶¶ 25-26, 98 N.M. 500, 508, 650 P.2d 22, 30 ("[T]he defendant has an obligation to make his objection to the amount of damage known to the sentencing judge at the time the condition is imposed or request a hearing to fix the amount. . . . However, a defendant has a right to be sentenced on the basis of accurate information.").[45]  This preliminary conclusion that Walton experienced a due process injury does not affect the Court's conclusions below that no individual officer Defendant is liable for causing that violation, but the conclusion does affect the framework applicable to the Court's Monell discussion.  See Section

---

[45]Exercising its Erie duty, the Court predicts that the Supreme Court of New Mexico would adopt the quoted rule from State v. Lack; the Supreme Court of New Mexico has indicated its agreement with that case.  See State v. Rivera, 2004-NMSC-001, ¶ 8, 134 N.M. 768, 770, 82 P.3d 939, 941.

VIII infra, at 101-104.  Although, as the Court explains later, Walton's Monell claims also are

unsuccessful ultimately -- she does not establish a policy or practice that produces the kinds of

harms she experienced -- nevertheless, those conclusions do not foreclose the proposition that

Walton suffered a Constitutional injury; that is, the Court concludes that Walton suffered a due

process injury, even though she does not establish who caused it or any Defendant's responsibility

or liability for it.[46]

---

[46]The Court concludes that a due process violation lies when a person is sentenced based on materially inaccurate information, even without any individual natural person bearing responsibility for that violation.  The Court, in reaching this conclusion, is motivated by two strands of doctrine: (i) criminal law cases that discuss misinformed sentencing due process problems do not require there be any individual natural person who can be held liable -- these cases theorize the violation without respect to a would-be violator's liability; and (ii) the Tenth Circuit's Monell framework mandates the theoretical possibility that a plaintiff experiences a Constitutional violation without there being any individual Defendant who is liable for causing violation.  As the Court notes later, for example, Monell liability could obtain if criminal defendants regularly are sentenced based on inaccurate information, because of a probation department's institutional failures which regularly cause sentencing recommendation reports to be filled with inaccuracies; even if no individual officer is liable, that people regularly are sentenced based on inaccurate information could make for institutional Monell liability.

The Court reads the misinformed-sentencing criminal cases as holding that a person suffers a Constitutional injury without the need to assign culpability to any individual officer for causing the injury; put another way, a person sentenced based on materially inaccurate information experiences a Constitutional violation regardless of who, or if any one person, is responsible for that violation.  See United States v. Ruby, 706 F.3d 1221, 1229 (10th Cir. 2013)("'[T]he due process clause protects a defendant's right not to be sentenced on the basis of materially incorrect information.'" (quoting United States v. Cook, 550 F.3d 192, 1296 (10th Cir. 2008)); United States v. Miller, 900 F.3d 509, 511, 513-14 (7th Cir. 2018)("The government in its sentencing memorandum wrote, erroneously, that 'it appears that Mr. Miller has six prior felony convictions.' He had only five. . . . The district judge repeated the government's error at sentencing.  [W]e conclude that the misstatement about the number of his prior felony convictions resulted in procedural error." (quoting party's brief)); United States v. Adams, 873 F.3d 512, 517 (6th Cir. 2017)("'[A] violation of due process exists when a sentencing judge relies upon erroneous information.' . . . '[T]he defendant must establish that the challenged evidence is materially false or unreliable, and that such false or unreliable information actually served as the basis for the sentence' in order to prove a due-process violation." (quoting United States v. Wilson, 614 F.3d 219, 225 (6th Cir. 2010), then United States v. Robinson, 898 F.2d 1111, 1116 (6th Cir. 1990)(first brackets the Court's, second brackets United States v. Adams')); United States v. Corona-Gonzalez, 628 F.3d 336, 342 (7th Cir. 2010)("'[T]he district court's reliance on the nonexistent fact

that Mr. Corona-Gonzalez previously had been removed and then reentered the United States . . . [likely] affected the district court's sentencing assessment. . . . [A]llowing the present sentence to stand . . . would affect the 'fairness, integrity or public reputation of [the] proceedings.'" (quoting United States v. Olano, 507 U.S. 725, 732 (1993)).  As the Court here concludes, Walton experienced a violation, because she was sentenced based on inaccurate information, but no individual Defendant is responsible for that injury.

Not every sentence based on incorrect information involves a due process violation, of course.  Not just any factual error produces a Constitutional violation: the inaccuracy must be material.  See United States v. Ruby, 706 F.3d at 1229 ("'[T]he due process clause protects a defendant's right not to be sentenced on the basis of materially incorrect information.'" (quoting United States v. Cook, 550 F.3d at 1296)).  Moreover, not every sentencing error is a due process violation.  For example, just because a judge makes a mistake does not mean he or she has violated the Constitution; there are sometimes just mistakes and errors that may violate a rule, a statute, a guideline, a doctrine, but the error does not violate the Constitution.  Such errors, however, may just be erroneous legal conclusions -- misapplying the Guidelines, or misapplying a rule of the Federal Rules of Criminal Procedure, or a statute -- which do not independently violate the Constitution.  Where a sentence is based, instead, on incorrect facts which are material, because they impact the overall sentence, then due process is violated.  Of course, not every factual inaccuracy is material: if a presentence report misspells the defendant's name (Smith, not Smithe), or misstates the defendant's hometown (Albuquerque, not Santa Fe), or misstates the number of siblings the defendant has (three brothers, not two), then these errors likely are not material and do not make for a due process violation.  But a factual mistake that affects the length or severity of the sentence is a due process problem.  See United States v. Ruby, 706 F.3d at 1229; United States v. Miller, 900 F.3d at 511, 513-14; United States v. Adams, 873 F.3d at 517; United States v. Corona-Gonzalez, 628 F.3d at 342.

Courts, in assessing due process wrongs from misinformed sentences, have not looked to what actor is causally responsible.  Part of the seeming tension in this conclusion -- a wrong, without a liable wrongdoer -- can be explained by the fact that the cases theorizing wrongs from misinformed sentencing are criminal cases and not civil cases.  It is on direct or collateral appeal of a criminal sentence that courts have addressed whether a criminal defendant's sentence, based on inaccurate information, is a problem.  Because the context is criminal, there is no need to assign blame or liability on individual officers for causing the violation: the reviewing court's conclusion holds regardless of responsibility.  Moreover, even if it arises in the civil context, multiple levels of doctrine typically will shield from liability any individual actor who conceivably could bear responsibility for such harms -- the probation officer supplying false information, or the sentencing judge relying on that information to sentence the defendant.  Thus, due process § 1983 liability requires a non-negligent mens rea, see Section V.C. infra, at 93-95; Daniels v. Williams, 474 U.S. 327, 336 (1986)("Petitioner alleges that he was injured by the negligence of respondent, a custodial official at the city jail. Whatever other provisions of state law or general jurisprudence he may rightly invoke, the Fourteenth Amendment to the United States Constitution does not afford him a remedy."), and absolute immunity bars suit for errors in a presentence report, see Section VII infra, at 98-100; Tripati v. U.S.I.N.S., 784 F.2d 345, 348 (10th Cir. 1986)("[T]he selection of an appropriate sentence [is an] . . . important part[] of the judicial process. . . . [W]hen, as here, the challenged activities of a federal probation officer are intimately associated with the judicial phase

of the criminal process, he or she is absolutely immune from [] civil suit for damages.").   Indeed, in some sense, it is the sentencing judge who inflicts the injury, but, of course, that judge is immune from suit.  See United States v. Adams, 873 F.3d 512, 517 (6th Cir. 2017)("'[A] violation of due process exists when a sentencing judge relies upon erroneous information.'" (quoting United States v. Wilson, 614 F.3d at 225)); Moss v. Kopp, 559 F.3d 1155, 1163 (10th Cir. 2009)("'[J]udges acting in their judicial capacity are absolutely immune from liability under section 1983 . . . .'" (quoting Turney v. O'Toole, 898 F.2d 1470, 1472 (10th Cir. 1990)).   These misinformed sentencing cases, therefore, assume the proposition that a Constitutional wrong is occurring, even if the individual actor -- the judge or the probation officer supplying the faulty information -- would be wholly immune from liability.   The wrong that these cases theorize, therefore, is a due process violation without any liable due process violator.

It is thus possible to separate out the injury from any would-be injurer, a result that the Tenth Circuit's Monell caselaw requires.   That is, it is possible to conclude that Walton suffered a harm, because she was sentenced based on inaccurate information, without needing to conclude that any individual officer is liable for that harm.   If, for example, Walton was a criminal defendant appealing her sentence on the basis that she was sentenced based on inaccurate information, i.e., because she was insufficiently credited time-served, the Court would have little difficulty concluding that she suffered an injury; the inaccuracy is material, moreover, because the 101 days she was not credited is almost twenty percent of the eighteen month sentence imposed on Walton. See United States v. Ruby, 706 F.3d at 1229 ("'[T]he due process clause protects a defendant's right not to be sentenced on the basis of materially incorrect information.'" (quoting United States v. Cook, 550 F.3d at 1296)).   The Court, to reach the conclusion that Walton suffered an injury, would not need also to assign blame for supplying the incorrect information:  indeed, even a wholly mechanical, non-human error, e.g., a malfunctioning office printer, might have omitted in the sentencing recommendation report the 101 days; such an error, if not caught and fixed by any stakeholder, would be a reversible error sounding in due process.   The misinformed number-of-felonies case and the misinformed number-of-deportations case noted above, see United States v. Miller, 900 F.3d at 511, 513-14; United States v. Corona-Gonzalez, 628 F.3d at 342, do not make the Constitutional violation turn on how the mistake wound its way into the person's sentence; all that matters is that the factual error materially affected the sentencing outcome.   Thus, the omission of the 101 days -- although, the Court concludes, likely not even a negligent omission, see Section V.C infra, at 95-97 -- caused Walton to be sentenced based on inaccurate information.   This essentially is what Judge Sanchez did when he ordered Walton's immediate release from custody: he realized the mistake and corrected it.

The Court thus concludes that Walton experienced a harm, and, although this conclusion does not change the outcome of the Court's conclusions about individual officer liability, it changes the applicable Monell liability framework.   The Court still concludes that no individual officer is responsible for that violation: Walton does not establish who literally supplied the erroneous information in the presentence report, see Section V.B.3.b supra, at 90-93; even if she established who supplied the misinformation, she does not establish that person possessed the requisite mens rea, see Section V.C supra at 93-95; even if she did establish causal responsibility and the requisite mental culpability, absolute judicial immunity would immunize those actions, see Section VII supra, at 98-100.

- 90 -

The practical import of the Court's preliminary conclusion that the inaccuracy in her sentencing harmed Walton, however, is that it changes the applicable <u>Monell</u> framework. As the Court later discusses, <u>Monell</u> liability normally exists when an officer violates a plaintiff's rights, and the officer is acting in accordance with a policy that is unconstitutional; thus the normal rule is that, without an individual officer being liabile, there can be no <u>Monell</u> liability:

> [T]o establish municipal liability, a plaintiff must show: 1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged. . . . In addition, a municipality may not be held liable where there was no underlying Constitutional violation by any of its officers.

<u>Graves v. Thomas</u>, 450 F.3d 1215, 1218 (10th Cir. 2006)("<u>Graves</u>"). Nonetheless, the Tenth Circuit has theorized a carveout from that rule, when no individual officer is liable, but a plaintiff experiences a Constitutional injury as the result of the actions of multiple, individually non-liable actors acting in accordance with an overall Constitutionally deficient practice or policy. <u>See</u> <u>Quintana v. Santa Fe Cnty. Bd. of Commissioners</u>, 973 F.3d 1022, 1033 (10th Cir. 2020)("[M]unicipal liability under <u>Monell</u> may exist without individual liability."); <u>Crowson v. Washington Cnty. Utah</u>, 983 F.3d 1166 (10th Cir. 2020)("In most cases, . . . whether a municipality is liable depend[s] on whether a specific municipal officer violated an individual's constitutional rights. But [<u>Garcia v. Salt Lake Cnty.</u>, 768 F.2d 303 (1985)("<u>Garcia</u>")] remains as a limited exception where the alleged violation occurred as a result of multiple officials' actions or inactions."). This <u>Garcia</u> doctrine thus presupposes the existence of situations where a person experiences a Constitutional violation without any individual defendant being culpable; this scenario presupposes the analytical separation of Constitutional wrong from Constitutional wrongdoer. The Tenth Circuit's framework addresses widespread, institutional failures that, as a rule produce unconstitutional outcomes. The Tenth Circuit's doctrine makes for a <u>Monell</u> framework roughly to fit the Eichmann problem: wrongs worked on an institutional scale, but not on an individual scale. <u>See</u> Hannah Arendt, <u>Eichmann in Jerusalem: A Report on the Banality of Evil</u> 276 (1963)("The trouble with Eichmann was precisely that so many were like him, and that the many were neither perverted nor sadistic, that they were, and still are, terribly and terrifyingly normal."). For example, in another universe, if Lea Detention's document retention and information storage policies are so flawed that people in their custody regularly are sentenced based on presentence reports riddled with errors, even though no Lea Detention employee personally is responsible for causing such errors, then that would make for the kind of wrongful-policy-without-wrongful-officer <u>Monell</u> liability that <u>Garcia</u> hypothetically permits.

The Court is skeptical about whether, in practice, such facts could arise. In Walton's actual case, no one caught what was simply a one-off mistake: no one at the 2016 sentencing caught the 101 days' omission -- not Walton herself, nor her defense counsel, the prosecutor, the probation officer, or Judge Sanchez. But the Court is doubtful whether such errors could on a widescale, systematic level arise. For example, in the hypothetical scenario just sketched, it seems implausible that no stakeholder would catch on to such institutional failures and do something to remedy them: defense counsel, like Walton's, would not fail to notice recurring errors in presentence reports; prosecutors would scrutinize this work to prevent and correct errors; Lea Detention's own counsel would alert it to such problems; and courts, facing recurringly inaccurate

**b.** **Walton Does Not Establish that Any Individual Defendant Caused Her Misinformation Constitutional Injury, Because She Does Not Demonstrate Which Defendant Supplied the Sentencing Court the Faulty Information.**

Although Walton thus can establish the existence of an injury, she does not establish any individual Defendant caused that injury, so the individual Defendants are entitled to qualified immunity.  Only those defendants who supplied the incomplete information upon which Judge Sánchez based Walton's sentence could have acted unconstitutionally.   For this reason, Quintana -- about whom there is no allegation that he supplied information on which the sentence was based -- could not be liable.  Only Cerna Gallegos (Walton's probation officer), and Parish (Lea Detention's records custodian) -- as well as Lea Detention (which holds the Walton's incarceration records) -- could be liable.  If any of these parties provided to Judge Sánchez the information that omitted erroneously the 101 days information, then that individual would have inflicted on Walton a Constitutional wrong.

This proposition, however, is ultimately only hypothetical, because Walton has not adduced adequate evidence as to any of these Defendants' actions.  No evidence -- besides Walton's own speculative deposition testimony and affidavit -- establishes who played what role in providing the

---

presentence reports, presumably, would raise red flags.  Moreover, in the broken-office-printer hypothetical offered earlier, it seems unlikely that a probation department's printers would, unnoticed by anyone, produce error-ridden reports on so wide a scale as to make for Monell liability.  Accordingly, it appears doubtful whether in reality, a plaintiff could establish the existence of such deficient policies or practices, where no individual officer is at fault.

The Court, respectfully, is thus skeptical of the Tenth Circuit's Garcia doctrine -- it is unclear what kind of real-world scenarios to which it applies -- but nonetheless, that doctrine hypothesizes such scenarios as the one the Court sketches.  Here, that Garcia framework applies.  As discussed later, however, Walton does not establish that the violation she experienced was any more than a one-off mistake; she does not establish any widespread policy or practice exists whereby Lea Detention's employees regularly produce erroneous presentence reports.  Accordingly, even though she experienced a due process injury, no Monell liability lies on it.

incomplete information on which her sentence was based.  See Walton Depo. At 44:2-25:16, at 7-8 ("Q. [A]t the time that Ms. Cerna made her sentencing recommendation to the Court, you agree that she was simply relying on the information that had been given to her by Ms. Parish?  A. Yes."); Walton Aff. ¶¶ 2, 4, at 1 ("I am unaware of who actually calculated the incorrect presentence confinement. . . . I have no personal knowledge of how the presentence confinement time was calculated.").  Walton does not appear to have made the effort to ascertain these facts central to her case, nor does she maintain that, with additional discovery, she can overcome this fundamental evidentiary lacuna.  Cf. Fed R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to . . . take discovery; or (3) issue any other appropriate order.").  Indeed, although the Court later stayed discovery pending its resolution of the qualified immunity motions for summary judgment, see Stipulated Order Granting the Unopposed Motion to Stay Discovery Based Upon Qualified Immunity and Vacate Existing Discovery Deadlines, filed October 17, 2022 (Doc. 79), the Court put that stay in place after Walton responded to the various motions for summary judgment and, as just explained, Walton never maintained that the Court should delay ruling until she had time for additional discovery. Even if with additional discovery Walton demonstrated that, e.g., Parish supplied Cerna Gallegos the faulty information who, in turn, supplied that information to Judge Sánchez, nevertheless, other doctrines -- lack of mens rea, see Section V.C infra, at 86-87, and absolute judicial immunity, see Section VII infra, at 90-93 -- would shield both individual Defendants' liability.  Accordingly, Walton cannot overcome qualified immunity even on this misinformed sentencing theory of due

process liability, because she does not establish that any individual Defendant violated her due

process rights.[47]

---

[47]The Court notes that Walton has not developed whether Judge Sánchez was ignorant of the 101 days, i.e., whether the sentence was based on incorrect information about the amount of presentence jail time. Walton does not put in the record the sentencing recommendation report that went to Judge Sanchez, nor does she put in the record a transcript of the 2016 sentencing hearing. Either document would demonstrate whether Judge Sanchez was ignorant of the 101 days' jail time, or, alternatively, whether he was aware of them, but considered the issue and decided that the 101 days' jail time did not count towards the district court case. Walton's arguments suggest the ignorance route, but she has not wholly made clear what occurred.

If Judge Sanchez was not misinformed and instead considered the issue but decided it against Walton, then these facts would be analyzed as merely an erroneous legal conclusion. See Vasquez v. Cooper, 862 F.2d 250, 255 (10th Cir. 1988)("Vasquez is not entitled to apply the time he spent in presentence custody as credit against his sentence of imprisonment when the trial judge took such presentence incarceration time into consideration in ordering the sentence and Vasquez' total incarceration time is within the statutory limitation set for his offense."). As noted above, a Constitutionally sufficient procedure need not be error free: if Judge Sanchez considered the issue, but reached the wrong legal conclusion, then Walton has no due process claim. In such a context, she got the process to which the Constitution entitled her, even if that process failed her on this particular occasion. See Section V.B.2 supra, at 68-69.

The Court recognizes some tension between its conclusion that, if Judge Sanchez' time-served credit decision was fully informed, then no Constitutional violation occurs, and the Court's conclusion that if Judge Sanchez was misinformed, then a Constitutional violation could occur. While a fully informed time-served credit determination raises no Constitutional stakes, a misinformed determination on the same question raises a due process problem; it may seem incongruous to conclude that it matters Constitutionally if Judge Sanchez was ill-informed about a decision that, in isolation, has no Constitutional ramifications.

Nonetheless, the Court determines that Walton possessed a Constitutional right that Judge Sanchez possess a complete and accurate picture of Walton's situation when sentencing her. Even if an adverse time-served credit decision alone raises no Constitutional issues, that Judge Sanchez was misinformed about this determination could. Courts have found Constitutional violations based on misinformed decisions about decisions that, in and of themselves, do not raise Constitutional problems, e.g., a decision to increase a sentence based on a defendant's number of felonies or a prior deportation. See United States v. Miller, 900 F.3d 509, 511, 513-14 (7th Cir. 2018)("The government in its sentencing memorandum wrote, erroneously, that 'it appears that Mr. Miller has six prior felony convictions.' He had only five. . . . The district judge repeated the government's error at sentencing. [W]e conclude that the misstatement about the number of his prior felony convictions resulted in procedural error." (quoting party's brief)); United States v. Corona-Gonzalez, 628 F.3d at 342)("[T]he district court's reliance on the nonexistent fact that Mr. Corona-Gonzalez previously had been removed and then reentered the United States to deal drugs [likely] affected the district court's sentencing assessment. . . . [A]llowing the present sentence to

C.     **WALTON DOES NOT ESTABLISH THE REQUESITE SCIENTER FOR DUE PROCESS VIOLATION LIABILITY.**

An alternative basis for concluding that no individual Defendant violated Walton's due process rights -- under either a procedural or substantive theory -- is that Walton does not establish the requisite scienter on the Defendants' part for due process § 1983 recovery.  Under any theory of due process liability, Walton does not establish with adequate evidence that the Defendants possessed a mens rea beyond negligence.  A mens rea beyond negligence is necessary to sustain a claim for a violation of due process.  See Daniels v. Williams, 474 U.S. 327, 336 (1986)("Petitioner alleges that he was injured by the negligence of respondent, a custodial official at the city jail.  Whatever other provisions of state law or general jurisprudence he may rightly invoke, the Fourteenth Amendment to the United States Constitution does not afford him a remedy."); Sloan v. Pugh, 2005 WL 2464678, at *1-2 ("[A] prisoner has a constitutional right, founded on either the Fifth or Eighth Amendment,[] or both, not to be imprisoned past the date his sentence expires. . . . [T]o establish a violation of due process, plaintiff must show that defendants were guilty of more than mere negligence.").  Although Walton repeatedly asserts that the Defendants acted intentionally in causing her harm, Walton points to no record evidence to suggest such knowledge. She offers only her own speculations, without basis in the record, and at other times, admits that

---

stand . . . would affect the 'fairness, integrity or public reputation of [the] proceedings.'" (quoting United States v. Olano, 507 U.S. at 732))).

In the Court's view, it is not only when making determinations of independent Constitutional import that a court's reliance on material factual inaccuracies will raise a due process issue.  If the rule were otherwise, it would not matter that a sentencing court was misinformed about, e.g., the number of felonies a person had or whether they had been deported previously, because those determinations are not of independent Constitutional significance.  Rather, it is the misinformed quality itself that raises the due process problem; so too here, the omission of the 101 magistrate case days inflicts Constitutional injury.

she lacks evidence of the Defendants' conduct.  See Walton Aff. ¶¶ 2, 4, at 1 ("I am unaware of who actually calculated the incorrect presentence confinement. . . . I have no personal knowledge of how the presentence confinement time was calculated.").  As the Court notes above, Walton does not appear to have made the effort to develop these critical facts, nor has she argued that the Court should delay ruling so that she can engage in more extensive discovery, if even she would be entitled to such relief.  Cf. Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to . . . take discovery; or (3) issue any other appropriate order.").  Even, however, if with more extensive discovery, Walton developed that, e.g., Parish and Cerna Gallegos both knowingly provided Judge Sánchez inaccurate information, absolute judicial immunity would insulate their actions.  See Section VII infra, at 90-93.  Although the Court determines that Walton experienced a due process injury, because her sentence was based on erroneous information, Walton yet does not establish any Defendant acted with the requisite mens rea in producing that error, even if she had established which individual Defendant is responsible causally.  The Defendants thus did not violate Walton's procedural due process rights.[48]

---

[48]The Court acknowledges apparent tension in the rule that Walton experienced a due process injury because of her misinformed sentencing, but that, because Walton establishes no scienter beyond negligence, no violation lies.  The misinformed sentencing cases do not turn on the mens rea involved in the provision of inaccurate information; those cases do not suggest that a Constitutional violation lies only because the sentence knowingly was based on inaccurate information.  Those cases theorize the violation without regards to the pertinent actors' scienter.  The other line of doctrine, upon which the Court here relies, holds that scienter is required for a due process violation.

The difference can be explained thus: as noted above, see n.46, supra, the misinformed sentencing cases typically arise from direct appeal and collateral proceedings and not, like the scienter cases, from § 1983 claims.  Thus, requiring scienter in the § 1983 cases makes sense given the need to predicate monetary liability on some mentally culpable conduct; this requirement

Even if there was a violation, it is not clearly established.  Walton cites no on-point Supreme Court or Tenth Circuit caselaw demonstrating that a due process violation occurs on facts like these, so no reasonable officer would have been on notice.  Accordingly, the individual Defendants are entitled to qualified immunity.  The record that Walton has developed is insufficient to withstand summary judgment.

## VI.   WALTON'S EIGHTH AMENDMENT CLAIMS DO NOT SURVIVE QUALIFIED IMMUNITY.

Any claims that Walton might assert under the Eighth Amendment against the Defendants cannot overcome qualified immunity.  Such a claim would fail for two reasons: (i) an Eighth Amendment over-detention framework, like a due process over-detention theory, is inapposite and represents the only plausible Eighth Amendment theory; and (ii) Walton cannot establish the requisite Constitutional scienter.   The Defendants are correct to point out that Walton's FAC does not contain explicitly a claim for Eighth Amendment liability, see Doe 3 Reply at 6 ("Plaintiff has never, prior to the filing of her Response, alleged or even so much as intimated she was making an Eighth Amendment challenge to her original sentence."); nevertheless, Walton's briefing relies

_____

contrasts with direct appeal and collateral attack cases where the sentence can be adjusted with respect to any individual actor's liability.  Notably, in the direct and collateral attack contexts, the remedy is resentencing, so that the mens rea responsibility does not affect the remedy's availability.  Cf. United States v. Pulley, 601 F.3d 660, 665 (7th Cir. 2010)("[I]f the defendant establishes that the sentencing court relied on critical, inaccurate information when announcing the sentence, a defendant may be granted the remedy of resentencing.").  Accordingly, there should be little tension between the conclusion that she experienced a due process injury insofar as she was sentenced based on misinformation, and the conclusions that no individual Defendant caused that injury, both because Walton develops an insufficient factual record about who-did-what and because Walton specifically does not establish that any individual Defendant had a mens rea beyond negligence.  In terms of liability, Walton hypothetically can experience a Constitutional injury as a result of multiple individuals' actions, without any one individual being liable -- i.e., on a municipal policy-or-practice claim under Monell.  Here, however, as discussed later, Walton does not succeed on this basis for liability either.  See Section VIII infra, at 93-96.

extensively on Eighth Amendment caselaw, but any Eighth Amendment claim that Walton could assert would not overcome summary judgment.  The Eighth Amendment prohibits cruel-and-unusual punishments; claims under this Constitutional provision target, e.g., conditions in prison facilities, and do not target only undue infliction of physical pain.  See Estelle v. Gamble, 429 U.S. 97, 102 (1976)("[T]he [Eighth] Amendment proscribes more than physically barbarous punishments. . . . The Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . ,' against which we must evaluate penal measures." (quoting Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir. 1968))).  Walton has no prison-conditions claim, and the only plausible Eighth Amendment theory that Walton articulates -- an over-detention theory -- is inapposite for the same reasons that due process over-detention claim is inapposite, namely that Walton was incarcerated pursuant to a valid court-imposed sentence.  An independent reason an Eighth Amendment claim would fail is that Walton cannot establish the requisite scienter on any Defendant's part.

## A.    AN EIGHTH AMENDMENT OVER-DETENTION CLAIM FAILS.

Walton's only plausible Eighth Amendment theory is over-detention, but this claim fails for the same reasons that the same claim fails under due process.  Like the due process over-detention cases, the Eighth Amendment theory of over-detention that some federal courts have articulated operate on the assumption that any detention past a judicially imposed sentence is cruel and unusual.  See Routt v. Howry, 835 F. App'x 379, 383 (10th Cir. 2020)("Imprisonment beyond one's term can constitute cruel and unusual punishment for purposes of the Eighth Amendment.'" (quoting Mitchell v. N.M. Dep't of Corr., No. 93-2038, 1993 WL 191810, at *3 (10th Cir. June 1, 1993))).  Walton was not over-detained, however, as explained above.  See Section V.A.1 supra, at 63-69; Section V.B.1 supra, at 72-73.  No Eighth Amendment liability exists on this theory either.

### B.    WALTON HAS NOT ESTABLISHED THE SCIENTER REQUESITE FOR EIGHTH AMENDMENT LIABILITY.

An independent reason that Walton's would-be Eighth Amendment claim fails is that she cannot establish that the Defendants possessed the deliberate indifference scienter that the Eighth Amendment requires.  A § 1983 claim under the Eight Amendment requires the plaintiff to show the Defendants acted with deliberate indifference to her suffering.  See Sloan v. Pugh, 2005 WL 2464678, at *1-2 ("[T]o make out such a claim under the Eighth Amendment, it must be shown that defendants acted with deliberate indifference to whether plaintiff suffered an unjustified deprivation of his liberty.").  For essentially the same reasons that she cannot establish any mens rea beyond negligence -- a conclusion fatal to her due process claims, see Section V.C supra, at 85-87 -- she cannot establish the deliberate indifference mens rea, a higher threshold, that she must for her Eighth Amendment claims.  Walton accuses the Defendants callously of disregarding her assertions that she was being unlawfully held.  See Walton Aff. ¶ 6-7, at 1 ("Everybody I contacted, if they responded, said they were not responsible and that I would have to contact a lawyer. . . . Everyone I caontacted [sic] was aware of my problem but all of them sat back and did noting [sic] knowing I was doing time that I never should have done.").  That claim is not what is meant by deliberate indifference: the Defendants were not indifferent to Walton's physical suffering, and were under no obligation to listen an inmate's assertion that, in essence, her sentence was illegal. They were unable to release Walton without a court order.  See N.M.S.A. § 33-3-12(B) ("Any jailer who deliberately and knowingly releases a prisoner without an order of release as provided in this section, except upon expiration of the prisoner's term of commitment, is guilty of a misdemeanor and shall be removed from office.").  Prison officials told Walton to seek out legal counsel regarding her time-served credit claim, because only a lawyer -- not prison officials --

could seek out a court order on Walton's behalf.  See Inmate Request Form at 1 ("Request: [I] was wondering why my time dec 2015 till may 25th 2016 wasn't counted towards my sentence that im in here on . . . .  Response: You need to contact your attorney.  There is nothing we can do about it.").  The prison officials' recommendation that Walton seek out counsel does not demonstrate deliberate indifference, because, as the prison officials correctly note, they had no authority to upset Judge Sánchez' sentence, which was valid for all that the Defendants knew or could know.  See N.M.S.A. § 33-3-12(B).  The defendants were not obligated to do anything more.  Thus, an Eighth Amendment claim fails on Walton's inability to demonstrate deliberate indifference.

There being no Constitutional violation, there is also no clearly established law to the same effect.  Walton points to no on-point Supreme Court or Tenth Circuit precedent that an Eighth Amendment claim exists on facts like hers; the Court's independent research identifies no such precedent either.  Accordingly, even if there was a Constitutional violation, it is not clearly established, so qualified immunity bars Walton's Eighth Amendment claim.

**VII.   ABSOLUTE JUDICIAL IMMUNITY BARS WALTON'S CLAIMS AGAINST THE WRONGFUL PREPARATION OF THE SENTENCING RECOMMENDATION.**

As the Court has discussed, Walton's claims are best characterized as attacking as unconstitutional the sentence imposed on her and its preparation; insofar as her claims at heart target any actions that the Defendants took in the sentence's preparation, absolute judicial immunity wholly bars Walton's claims.  Although the parties did not raise this issue, the Court's independent research establishes absolute immunity as a bar to potential liability for the preparation of the sentencing recommendation.  As the Court discusses above, Walton's attack on the sentencing recommendation is best theorized under procedural due process, specifically the rule that a due process violation lies on a sentence based on inaccurate information; Walton indeed

did experience a due process injury, the Court concludes.  See Section V.B.3.a supra, at 81-82.  The Court also concludes, however, that Walton does not establish which individual Defendant caused that injury, see Section V.B.3.b supra, at 82-85, and does not establish that any Defendant possessed the requisite mens rea, see Section V.C supra, at 85-87.  Even if, however, Walton could establish which Defendant supplied Judge Sánchez the incorrect information and could establish a sufficient scienter, judicial absolute immunity would prevent her recovery.  That is, even if Walton could establish that Parish or Cerna Gallegos knowingly, intentionally, or maliciously omitted the 101 day time-served figure, Walton could not sue them, because absolute immunity immunizes such actions auxiliary to quintessentially judicial functions, namely sentencing.  And even if a different theory outside due process for Constitutional liability existed as to the sentence's preparation, absolute judicial immunity also prevents such a theory.

As the Court previously has held, assisting a judge in the completion of judicial functions entitles a person to absolute immunity from liability arising from those acts.  See Martinez v. Lucero, No. CIV 11-1003, 2012 WL 2175772, at *26 (D.N.M. May 31, 2012)("Butler did 'no more than assist[ ]' Judge Ortega.  Because Butler acted at Judge Ortega's direction of and assisted him in the performance of a judicial act, the Court finds that she is entitled to absolute immunity." (quoting Spalsbury v. Sisson, 250 F. App'x 238, 248 (10th Cir. 2007))).  The Tenth Circuit and other federal Courts of Appeals have the same rule.  See Tripati v. U.S.I.N.S., 784 F.2d 345, 348 (10th Cir. 1986)("[T]he selection of an appropriate sentence [is an] . . . important part[] of the judicial process. . . . [W]hen, as here, the challenged activities of a federal probation officer are intimately associated with the judicial phase of the criminal process, he or she is absolutely immune from [] civil suit for damages.").  As the Eleventh Circuit, quoting earlier binding Fifth Circuit precedent, has explained:

The district court's dismissal of Spaulding's damage claims against the federal probation officers was proper. Judges who act within the scope of their authority enjoy absolute immunity from damage suits. *Stump v. Sparkman,* 435 U.S. 349 . . . (1978); *Pierson v. Ray,* 386 U.S. 547 . . . (1967). This immunity has been extended to prosecutors for their decision to prosecute and their conduct of the government's case on the theory that these activities are 'intimately associated with the judicial phase of the criminal process . . .' *Imbler v. Pachtman,* 424 U.S. 409 . . . (1976). We hold that a probation officer is entitled to the same protection when preparing and submitting a presentence report in a criminal case. The report is an integral part of the sentencing process, and in preparing the report the probation officer acts at the direction of the court. *See* Fed.R.Crim.P. 32. We think it apparent that this narrow function is 'intimately associated with the judicial phase of the criminal process' and thus, where, as here, the challenged activities of a federal probation officer are within this function, he or she is absolutely immune from a civil suit for damages. *Burkes v. Callion,* 433 F.2d 318 (9th Cir. 1970); *Friedman v. Younger,* 282 F.Supp. 710 (C.D. Cal. 1968). *See also Cruz v. Skelton,* 502 F.2d 1101 (5th Cir. 1974). Defendants' activities were within this protected function, and the complaint seeking damages was properly dismissed.

Hughes v. Chesser, 731 F.2d 1489, 1490 (11th Cir. 1984)(quoting Spaulding v. Nielsen, 599 F.2d 728, 729 (5th Cir. 1979)).   See Peay v. Ajello, 470 F.3d 65, 70 (2d Cir. 2006)("[P]resentence reports . . . aid . . . a judicial function and . . . safeguards [are] in place to protect a defendant's right to be sentenced based on accurate information, we hold that absolute immunity from claims for damages applies to Connecticut probation officers in the preparation and submission of presentence reports.").   Accordingly, absolute immunity provides a basis for granting summary judgment against Walton.

## VIII.   WALTON'S MONELL CLAIMS DO NOT SURVIVE SUMMARY JUDGMENT.

Lea Detention, a municipal defendant, is owed summary judgment on Walton's Constitutional claims under Monell, against it, because she does not establish that Lea Detention has a policy that produces Constitutional harms like the one that Walton alleges that she suffered -- including the procedural due process harm that the Court concludes Walton did suffer, see Section V.B3.a supra.   Municipal defendants can face Constitutional liability if they possess a

policy or practice that produces Constitutional harms.  See Bird v. W. Valley City, 832 F.3d 1188,

1207-08 (10th Cir. 2016)("[A] local government is liable only when 'the unconstitutional actions

of an employee were representative of an official policy or custom of the municipal institution, or

were carried out by an official with final policy making authority with respect to the challenged

action." (quoting Seamons v. Snow, 206 F.3d 1021, 1029 (10th Cir. 2000)(emphasis in Bird v. W.

Valley City, but not in Seamons v. Snow))).   The particular Constitutional analysis depends

whether there is an underlying Constitutional violation and, specifically, whether any individual

municipal employee committed a Constitutional violation.  The general rule is that: (i) a municipal

officer committed an underlying Constitutional violation; (ii) a municipal policy or custom exists; and

(iii) there is a direct causal link between the policy or custom and the injury alleged.  See Graves v.

Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006)("Graves")("[T]o establish municipal liability, a plaintiff

must show: 1) the existence of a municipal policy or custom and 2) a direct causal link between the

policy or custom and the injury alleged. . . . In addition, a municipality may not be held liable where

there was no underlying constitutional violation by any of its officers.").  Notwithstanding the general

rule, in some circumstances, Monell liability exists even when no individual municipal employee-actor

is liable.  See Quintana v. Santa Fe Cnty. Bd. of Commissioners, 973 F.3d 1022, 1033 (10th Cir.

2020)("[M]unicipal liability under Monell may exist without individual liability.").  This situation

occurs when a plaintiff's rights are violated, because of the actions of multiple municipal

employees, none of whom individually are liable; alternatively, if no individual employee is liable,

and a plaintiff does not experience a violation, then no Monell liability obtains:

> The general rule in [Trigalet v. City of Tulsa, Oklahoma, 239 F.3d 1150
> (10th Cir. 2001)("Trigalet")] is that there must be a constitutional violation, not just
> an unconstitutional policy, for a municipality to be held liable. In most cases, this
> makes the question of whether a municipality is liable dependent on whether a
> specific municipal officer violated an individual's constitutional rights. But [Garcia
> v. Salt Lake Cnty., 768 F.2d 303 (10th Cir. 1985)("Garcia")] remains as a limited

exception where the alleged violation occurred as a result of multiple officials' actions or inactions.

Crowson v. Washington Cnty. Utah, 983 F.3d 1166 (10th Cir. 2020).  As the Court discusses above, this Garcia framework addresses the Eichmann problem: harms worked on an institutional scale, not an individual one.  See Hannah Arendt, Eichmann in Jerusalem: A Report on the Banality of Evil 276 (1963)("The trouble with Eichmann was precisely that so many were like him, and that the many were neither perverted nor sadistic, that they were, and still are, terribly and terrifyingly normal."); n.46 supra, at 88-92.

Here, the rule of Garcia governs, but Walton cannot succeed under that rule, because she does not establish that Lea Detention has a policy or practice that produced the Constitutional harm she experienced.  Walton experienced a procedural due process Constitutional injury, insofar as her sentence was based on erroneous information, see Section V.B.3.a supra, at 81-82, but, for several reasons, no individual Defendant is liable for that injury: Walton does not establish who caused that harm, see Section V.B.3.b supra, at 82-85; even if she established who literally is responsible, she does not establish a mens rea beyond negligence, see Section V.C supra, at 85-87; and absolute judicial immunity would shield from liability any Defendant for liability arising out of the erroneous sentencing due process violation, see Section VII supra, at 91-93.  Accordingly, Garcia is the applicable framework, but Walton does not succeed under that rule, because she does not establish that the harm she experienced flowed from an unconstitutional policy or practice that Lea Detention possesses.  Walton has developed no factual record whatsoever about Lea Detention's practices; again, she offers only her own speculative testimony about what policies that Lea Detention possesses which might have produced the material omission of the 101 days' jail time.  See Walton Aff. ¶¶ 2, 4, at 1 ("I am unaware of who actually calculated the incorrect

- 104 -

presentence confinement. . . . I have no personal knowledge of how the presentence confinement time was calculated."). Moreover, she does not, under rule 56(d) of the Federal Rules of Civil Procedure, maintain that with additional discovery she can establish that Lea Detention has an unconstitutional policy or practice. Accordingly, Lea Detention is entitled to summary judgment on Walton's Monell claims against it.[49]

In conclusion, the Court possesses personal jurisdiction over Cerna Gallegos, Walton's various Constitutional claims fail, and the Defendants are entitled to summary judgment. She does not establish a Fourth Amendment, Ex Post Facto, Due Process, or Eighth Amendment liability against the individual Defendants, and she does not establish Monell lability against Lea Detention. Accordingly, the individual Defendants are entitled to qualified immunity and Lea Detention is entitled to summary judgment. The Court therefore dismisses with prejudice all the Defendants from this case and will enter separately an order of Final Judgment.

**IT IS ORDERED** that: (i) Defendant Ruben Quintana's Motion for Summary Judgment Based Upon Qualified Immunity and Failure to State a Claim, filed March 22, 2022 (Doc. 39), is

---

[49]The Court's MSJ Order concludes that the Monell claims against Lea Detention failed on the basis solely that Walton does not establish the existence of an unconstitutional policy or practice, because the Court in its Order had determined that the individual Defendants committed a Constitutional violation, under a due process, over-detention violation, although it was not clearly established. See MSJ Order at 12 ("Even though Walton's overdetention violated her Fourteenth Amendment due process rights, her Fourteenth Amendment right against overdetention is not 'clearly established.' . . . There is no Tenth Circuit or Supreme Court precedent establishing a Fourteenth Amendment right against overdetention." (quoting Riggins v. Goodman, 572 F.3d at 1107)). The MSJ Order, therefore, analyzes Walton's claims under Graves, because the MSJ Order concludes that the individual officer Defendants committed a violation, albeit one not clearly established. See MSJ Order at 18 ("Graves controls here. . . . Although Walton can demonstrate that she suffered a constitutional violation, she cannot show that the violation was a result of a Lea County Detention policy or practice."). The Court now, however, analyzes Walton's claims under Garcia, because it determines that, although an injury occurred, no individual Defendant is liable for causing it.

granted; (ii) Defendant "John Doe 3"'s Motion for Summary Judgment and Memorandum In Support, filed June 27, 2022 (Doc. 55), is granted; (iii) Defendant Kristie Parish's Motion For Summary Judgment Based Upon Qualified Immunity and Failure to State a Claim, filed July 1, 2022 (Doc. 57), is granted; (iv) Lea County Detention Center's Motion for Summary Judgment, filed July 1, 2022 (Doc. 58), is granted; (v) Defendant Denice Cerna Gallegos's Motion for Summary Judgment and Memorandum in Support, filed December 28, 2022 (Doc. 84), is granted; and (vi) the Court dismisses with prejudice from this case Defendants Ruben Quintana, John Doe 3, Kristie S. Parish, Lea County Detention Center, and Denice Cerna Gallegos.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Ross Bettis
Law Office of Ross Bettis
Hobbs, New Mexico

    *Attorneys for the Plaintiff*

Bryan D. Evans
Atwood, Malone, Turner & Sabin, PA
Roswell, New Mexico

-- and --

K. Renee Gantert
Vail, Arizona

    *Attorneys for Defendant Denice Cerna Gallegos*

Douglas E Gardner
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

-- and --

Samuel C. DeFillippo
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

*Attorneys for Defendants Kristie S. Parish, Lea County Detention Center, and Ruben Quintana*